## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **SALT AND LIGHT ENERGY** | § | |
| **EQUIPMENT, LLC,** | § | |
| | § | |
| **Plaintiff/Counter-Defendant,** | § | **Civil Action No.: 3:22-cv-00654-N** |
| | § | |
| **v.** | § | |
| | § | |
| **ORIGIN BANCORP, INC., DBA** | § | |
| **ORIGIN BANK,** | § | |
| | § | |
| **Defendant/Counter-Plaintiff,** | § | |
| | § | |
| **v.** | § | |
| | §1036 | |
| **DENISE MUDIGERE and** | § | |
| **SHAWN MUDIGERE,** | § | |
| | § | |
| **Third-Party Defendants.** | § | |

## ORIGIN BANK'S BRIEF IN SUPPORT OF ITS
## <u>MOTION TO EXCLUDE EXPERT TESTIMONY OF JASON KOONTZ</u>

Sᴮᴀɪᴛɪ & Cᴏᴍᴘᴀɴʏ PLLC

**Mazin A. Sbaiti**
**Brad J. Robinson**
**Griffin S. Rubin**
Dallas Arts Tower
2200 Ross Ave., Suite 4900W
Dallas, Texas 75201
T: (214) 432-2899
F: (214) 853-4367
mas@sbaitilaw.com
bjr@sbaitilaw.com
gsr@sbaitilaw.com

*Attorneys for Defendant Origin Bank*

## TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................................. i

TABLE OF AUTHORITIES......................................................................................................... ii

I.     INTRODUCTION ...........................................................................................................1

II.    LEGAL STANDARD .....................................................................................................1

III.   FACTUAL BACKGROUND ..........................................................................................2

IV..   ARGUMENTS AND AUTHORITIES ...........................................................................3

       A.     Koontz's Opinions Are Facially Irrelevant to This Case ....................................3

       B.     Koontz's Opinions Are Unreliable Under Rule 702 ............................................5

              1.     Koontz's Testimony Is Not the Product of Reliable
                     Principles and Methods..............................................................................5

              2.     Koontz's Testimony Is Not Based on the Relevant Facts or
                     Data ...........................................................................................................7

              3.     Koontz's Reliance on the Parties" Course of Performance
                     Dooms His Opinions................................................................................10

              4.     Koontz's "Poll" Infected His Opinions with Legal Error .......................11

IV.    CONCLUSION..............................................................................................................16

# TABLE OF AUTHORITIES

*Albert v. Warner-Lambert Co.*,
   234 F. Supp. 2d 101 (D. Mass. 2002) ....................................................................15

*Bakri v. Nautilus Ins. Co.*,
   No. 3:21-CV-2001, 2023 U.S. Dist. LEXIS 20141 (N.D. Tex. Feb. 7, 2023) ........................2

*Boyd v. State Farm Ins.*,
   158 F.3d 326 (5th Cir. 1998) ............................................................................ 6-7

*C. A. May Marine Supply Co. v. Brunswick Corp.*,
   649 F.2d 1049(5th Cir. 1981) ...........................................................................13

*Carlson v. Bioremedi Therapeutic Sys.*,
   822 F.3d 194 (5th Cir. 2016) ..............................................................................2

*Chemical Bank v. PIC Motors Corp.*,
   452 N.Y.S.2d 41(N.Y. App. Div. 1982)...........................................................11, 12

*Crawford Supply Grp., Inc. v. Bank of Am., N.A.*,
   No. 09-cv-2513, 2011 U.S. Dist. LEXIS 117670 (N.D. Ill. Oct. 12, 2011)...........................7

*Daubert v. Merrell Dow Pharm., Inc.*,
   509 U.S. 579 (1993)...................................................................................4, 13

*E. Montgomery County Mun. Util. Dist. No. 1 v. Roman Forest Consol. Mun Util. Dist.*,
   620 S.W.2d 110 (Tex. 1981) .............................................................................10

*Exxon Corp. v. Tex. Motor Exch.*,
   628 F.2d 500 (5th Cir. 1980) .............................................................................13

*Fed. Deposit Ins. Corp. v. Ft. Worth Aviation*,
   806 F.2d 575 (5th Cir. 1986) ..............................................................................4

*Gen. Elec. v. Joiner*,
   522 U.S. 136 (1997).........................................................................................7

*Guillory v. Domtar Indus., Inc.*,
   95 F.3d 1320 (5th Cir. 1996) ..............................................................................9

*Haven v. Dickerson*,
   No. 4:09-cv-00647, 2011 U.S. Dist. LEXIS 173642 (S.D. Tex. July 13, 2011).....................6

*Hildreth v. Merle Norman Cosmetics, Inc.*,
  No. 08-02-00402-CV, 2004 Tex. App. LEXIS 3082 (Tex. App.—El Paso 2004) ................12

*Johnson & Johnson v. Smithkline Beecham Corp.*,
  960 F.2d 294 (2d Cir. 1992) ........................................................................................ 13-14

*Knight v. Kirby Inland Marine, Inc.*,
  482 F.3d 347 (5th Cir. 2007) ............................................................................................7-8

*Kumho Tire Co. v. Carmichael*,
  526 U.S. 137 (1999)............................................................................................................2

*Matosky v. Manning*,
  428 Fed. App'x. 293 (5th Cir. 2011) ..................................................................................6

*Minasian v. Standard Chtd. Bank, P.L.C.*,
  109 F.3d 1212 (7th Cir. 1997) ...........................................................................................7

*Nat'l Union Fire Ins. Co. v. Wells Fargo Bank, N.A.*,
  No. 03-cv-2452, 2005 U.S. Dist. LEXIS 47175 (C.D. Cal. Mar. 16, 2005)........................15

*Pipitone v. Biomatrix, Inc.*,
  288 F.3d 239 (5th Cir. 2002) .............................................................................................5

*Puga v. RCX Sols., Inc.*,
  922 F.3d 285 (5th Cir. 2019) .............................................................................................4

*Reinsdorf v. Skechers U.S.A.*,
  922 F. Supp. 2d 866 (C.D. Cal. 2013)...............................................................................15

*Roman v. Western Mfg.*,
  691 F.3d 686 (5th Cir. 2012) .............................................................................................4

*Scott Fetzer Co. v. House of Vacuums, Inc.*,
  381 F.3d 477 (5th Cir. 2004) .....................................................................................14, 15

*Shields Limited P'ship v. Bradberry*,
  526 S.W.3d 471 (Tex. 2017) .............................................................................................11

*Stahl Petroleum Co. v. Phillips Petroleum Co.*,
  550 S.W.2d 360 (Tex. App.—Amarillo 1977) .............................................................. 10-11

*Storer Cable Commc'ns v. City of Montgomery*,
  806 F. Supp. 1518 (M.D. Ala. 1992)..................................................................................4

*Swann v. Charlotte-Mecklenburg Bd. of Educ.*,
    318 F. Supp. 786 (W.D.N.C. 1970) ...................................................................4

*TitleMax of Tex., Inc. v. City of Dallas*,
    No. 3:21-cv-1040, 2023 U.S. Dist. LEXIS 126700 (N.D. Tex. July 24, 2023) .................7, 9

*United States v. Arthur*,
    51 F.4th 560 (5th Cir. 2022) ...................................................................2

*United States v. Frazier*,
    387 F.3d 1244 (11th Cir. 2004) ...................................................................9. 10

*United States v. Tucker*,
    345 F.3d 320 (5th Cir. 2003) ...................................................................5

*Venetian Blind & Floor Covering, Ltd. v. Well Fargo Bank, N.A.*,
    No. 08-cv-2451, 2010 U.S. Dist. LEXIS 8434 (S.D. Tex. Feb. 2, 2010) ...............................5

*Viterbo v. Dow Chem. Co.*,
    826 F.2d 420 (5th Cir. 1987) ...................................................................7

*Watkins v. Telsmith, Inc.*,
    121 F.3d 984 (5th Cir. 1997) ................................................................. 2, 5-6, 15

*Wells Fargo Bank, N.A. v. Bivona & Cohen, P.C.*,
    No. 12-cv-5212, 2015 U.S. Dist. LEXIS 133468 (S.D.N.Y. Sept. 30, 2015) ........................4
*Williams v. Illinois*,
    567 U.S. 50 (2012) ...................................................................1

## Rules

FED. R. EVID. 602 ...................................................................9

FED. R. EVID. 702 ................................................................... *passim*

FED. R. EVID. 702(a) ................................................................... 1, 2, 3-4

FED. R. EVID. 702(b) ................................................................... 7-8, 0

FED. R. EVID. 702(c) ...................................................................5,

## Statutes

TEX. BUS. & COM. CODE § 2.208(a) ...................................................................

**ORIGIN BANK'S BRIEF IN SUPPORT OF ITS MOTION TO EXCLUDE**
**EXPERT TESTIMONY OF JASON KOONTZ**                                 **Page iv**

TEX. BUS. & COM. CODE § 9-607(c) ..........................................................................5

**Other Authorities**

Shari Seidman Diamond, Fed. Jud. Ctr., *Reference Guide on Survey Research, in* Reference Manual on Scientific Evidence 369 (3d ed. 2011).....................................................................13

# I.

## INTRODUCTION

This Court should strike Plaintiff Salt & Light Energy Equipment, LLC ("SNLEE")'s proposed banking expert, Jason Koontz ("Koontz"). The central thesis of SNLEE's lawsuit is that Defendant Origin Bancorp, Inc. d/b/a Origin Bank ("Origin") caused ProPetro Services Inc. ("ProPetro") to terminate its relationship with SNLEE by sending a notice letter of Origin's right to receive payment from ProPetro in place of SNLEE (the "Letter"). Koontz admits that his thesis is only that Origin's *timing* in sending the Letter to ProPetro was commercially unreasonable. But he also admits that he has no evidence that Origin's allegedly unreasonable *timing* is what caused ProPetro to terminate SNLEE. In other words, his opinion on commercial reasonableness is completely irrelevant. And after conceding that he has not opined on what "commercial reasonableness" even means, he proceeds to offer various conclusions about what is or is not commercially reasonable. This is conclusory advocacy plain and simple. Piling on top of that are his naked assertions that his "training, experience, and education" confirm the accuracy of his opinions and his informal survey he conducted, which fails every known standard for proper survey research. There is nothing here.

# II.

## LEGAL STANDARD

The Federal Rules of Evidence permit expert testimony when the offering expert displays "genuine 'scientific, technical, or other specialized knowledge that will help the trier of fact to understand the evidence or to determine a fact in issue.'" *Williams v. Illinois*, 567 U.S. 50, 80 (2012) (brackets omitted) (quoting FED. R. EVID. 702(a)).

"A qualified expert may testify if the expert's specialized knowledge will aid the trier of

fact and '(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.'" *Bakri v. Nautilus Ins.*, No. 3:21-cv-2001, 2023 U.S. Dist. LEXIS 20141, at *3–4 (N.D. Tex. Feb. 7, 2023) (Godbey, C.J.) (quoting FED. R. EVID. 702(a)). It is incumbent upon district courts to assess "whether the reasoning or methodology underlying [expert] testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.'" *Carlson v. Bioremedi Therapeutic Sys.*, 822 F.3d 194, 199 (5th Cir. 2016) (citation omitted).

The proponent of the expert testimony bears the burden to satisfy Rule 702 by a preponderance of the evidence. *United States v. Arthur*, 51 F.4th 560, 571 (5th Cir. 2022). In deciding a motion to exclude an expert, courts must ensure that the expert "employs . . . the same level of intellectual rigor that characterizes the practice of an expert in the relevant field," *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). Stated otherwise, courts are charged to act as gatekeepers of expert testimony "to evaluat[e] whether [an] expert is a hired gun or a person whose opinion in the courtroom will withstand the same scrutiny that it would among his professional peers." *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 991 (5th Cir. 1997).

### III.

### <u>FACTUAL BACKGROUND</u>

For the sake of brevity and preservation of litigant and judicial resources, Origin respectfully incorporates the factual background from its pending brief in support of its motion for summary judgment filed concurrently herewith.

## IV.

## ARGUMENTS AND AUTHORITIES

### A. KOONTZ'S OPINIONS ARE FACIALLY IRRELEVANT TO THIS CASE

Koontz's opinion is that Origin's *timing* was commercially unreasonable because Origin "waited" until August 2021, supposedly right when SNLEE was about to close with Amerisource, to send its letter.[1] Koontz believes, however, that had Origin sent exactly the same letter and had exactly the same discussions with ProPetro five months *earlier*—say, in March or April 2021 (right after SNLEE defaulted)—then that would have been commercially reasonable.[2]

Koontz has no opinion on whether the Letter or even its *timing* is what caused ProPetro to terminate SNLEE.[3] SNLEE likewise has no evidence that had Origin sent exactly the same letter and had exactly the same discussions with ProPetro in March or April 2021, ProPetro would not still have terminated.[4] And it is established fact that Origin's actions had no impact on the collateral (because ProPetro paid 100% of its AR) and did not cost SNLEE its deal with Amerisource— which not only closed, but closed *only because Origin later made some concessions as to its lien.*

Therefore, because neither Koontz nor any evidence establishes a causal relationship between the allegedly commercially unreasonable timing and ProPetro's termination of SNLEE, Koontz's opinion is simply irrelevant.

To survive scrutiny under Rule 702, Koontz's opinions "must help the trier of fact to

---

[1] Origin believes that SNLEE's and Koontz's entire thesis lacks any substantiated evidentiary predicate, but accepts it *arguendo* to make this point.

[2] Exhibit 2 to Robinson Declaration, Deposition Excerpts of Jason Koontz ("Koontz Tr.") at 87:12-18 (APP_049); 88:25-89:22 (APP_049-050).

[3] Koontz Tr. at 92:20-25 (APP_052) ("Your report does not provide any opinions on whether Origin sending the notice letters when it did caused ProPetro to terminate its relationship with Salt & Light, does it? A At this time, I have not been asked to provide an opinion regarding that.").

[4] *See* Exhibit 3 to Robinson Decl., Deposition Excerpts of Lisa McCauley ("McCauley Tr.") at 64:1-65:6 (APP_063-064).

understand the evidence or to determine a fact in issue." FED. R. EVID. 702(a). Helping the trier of

fact in this context requires Koontz's "evidence [to] possess validity when applied to the pertinent

factual inquiry," which is "[p]rincipally . . . a matter of relevance." *Roman v. Western Mfg.*, 691

F.3d 686, 694 (5th Cir. 2012) (citation and internal quotation marks omitted); *see Puga v. RCX

Sols., Inc.*, 922 F.3d 285, 293–94 (5th Cir. 2019) ("Assisting the trier of fact means 'the trial judge

ought to insist that a proffered expert bring to the jury more than the lawyers can offer in

argument.'" (citation omitted)). "Expert testimony which does not relate to any issue in the case is

not relevant and, ergo, non-helpful." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 591

(1993) (citation and internal quotation marks omitted).

But by its very nature, "reasonableness" involves judging an act or omission with respect

to its intended or likely impact. *See, e.g.*, *Storer Cable Commc'ns v. City of Montgomery*, 806 F.

Supp. 1518, 1549 (M.D. Ala. 1992) ("[T]he company contends that its means exceed what is

'reasonable' to achieve the law's stated purpose."). As an example, when determining whether a

means of desegregating schools was reasonable, the analysis concerned whether the available

methods were designed to or had a likelihood of "accomplish[ing] the end in view"—*i.e.*,

"desegregation of the schools." *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 318 F. Supp. 786,

799 (W.D.N.C. 1970).

Thus, nothing of Koontz's reasonableness analysis pertains to § 9.607(c)'s aim, which is to

protect the value of collateral encumbered by a security agreement. *See Fed. Deposit Ins. Corp. v.

Ft. Worth Aviation*, 806 F.2d 575, 577 (5th Cir. 1986) (declaring the purpose of § 9-607(c)'s

predecessor section); *see also Wells Fargo Bank, N.A. v. Bivona & Cohen, P.C.*, No. 12-cv-5212,

2015 U.S. Dist. LEXIS 133468, at *41 (S.D.N.Y. Sept. 30, 2015).

Koontz's musings about "a variety of *possible* negative consequences"[5] for SNLEE "that could [have] happen[ed] in the universe of possibilities"[6] are impertinent given that he had no evidence that any of those outcomes materialized.[7] The "collateral" Origin pursued was the accounts receivable ProPetro owed SNLEE—100% of which was paid off by ProPetro.[8]

Therefore, the type of injury Texas Business and Commerce Code § 9.607(c) aims to prevent is nonexistent here. And "in the face of direct evidence" showing the absence of this sort of injury, Koontz's opinions are "not helpful to the trier of fact" and should be excluded. *See United States v. Tucker*, 345 F.3d 320, 332 (5th Cir. 2003).

## B. KOONTZ'S OPINIONS ARE UNRELIABLE UNDER RULE 702

### 1. Koontz's Testimony Is Not the Product of Reliable Principles and Methods

Rule 702(c) requires Koontz's testimony to be "the product of reliable principles and methods." Because no such principles and methods, let alone reliable ones, are anywhere to be found in his testimony, Koontz should be precluded from serving as an expert.

Because the subject matter of Koontz's testimony is not scientific in nature, the *Daubert* factors are not that helpful, *see Venetian Blind & Floor Covering, Ltd. v. Well Fargo Bank, N.A.*, No. 08-cv-2451, 2010 U.S. Dist. LEXIS 8434, at *1 (S.D. Tex. Feb. 2, 2010)—nevertheless, Koontz's opinions must be sufficiently reliable as to "withstand the same scrutiny that it would

---

[5] See Exhibit 1 to Robinson Decl. (Koontz Expert Report ("Report") at 12 (APP_014) (emphasis added).
[6] Koontz Tr. at 75:11-13 (APP_044 ). Though spending nearly a full page of his report discussing these possible negative consequences, Koontz simultaneously protests that SNLEE did not request for him "to provide any opinions regarding the negative consequences that may have occurred to SNLEE and their financial impact." Report at 12 n.22 (APP_014). Because this aspect of Koontz's evidence is thus "perfectly equivocal," it "does not make any fact more or less probable" and should be excluded as irrelevant. *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 245 (5th Cir. 2002).
[7] Koontz Tr. at 75:10-13 (APP_044).
[8] McCauley Tr. at 40:15-20 (APP_061) ("Q. Do you know what the AR was in August of 2021 that was due to Salt and Light by ProPetro? A. I do not. Q. Do you know whether all of that AR was paid in full by ProPetro? A. Yes, it was.") and *id*. at 59:6-9 (APP_062 ).

among his professional peers" in a court of law. *Watkins*, 121 F.3d at 991. But they do not.

To start, Koontz admitted that the conclusion he provides on commercial reasonableness hinges on an unarticulated, undefined conception of commercial reasonableness. Despite Koontz offering opinions in his report regarding commercial reasonableness, Koontz admitted to not defining and delineating a standard for "commercial reasonableness," "commercial reasonableness as it relates to sending notice letters to account debtors," or "commercial reasonableness as it relates to the collection of secured collateral."[9] That is a fatal admission. Koontz's lack of any underlying standard allows him to claim commercial unreasonableness whenever he wants to, untethered from any definition that is itself substantiated. That is the very definition of a "conclusory" opinion. *See Matosky v. Manning*, 428 F. App'x. 293, 298 (5th Cir. 2011) (per curiam) (unpublished); *Haven v. Dickerson*, No. 4:09-cv-00647, 2011 U.S. Dist. LEXIS 173642, at *3 (S.D. Tex. July 13, 2011) (striking expert opinion where conclusions were "based . . . upon an undefined standard").

As well, Koontz's conclusory assertions altogether lack support. At many junctures, Koontz offers opinions given his understanding of industry standards and practices.[10] While facially appropriate, the underlying details are absent from Koontz's opinions. He does not elaborate on them in his report, and when pressed at his deposition, Koontz admitted that he could not cite any "authority" or "regulation" supplying these purported industry standards and practices.[11] Without identifying the substance behind the ephemeral industry practices he supposedly relied on in rendering his opinions, Koontz is offering nothing but unsupported

---

[9] Koontz Tr. 80:20-81:7 (APP_045-046).
[10] *See* Report at 4 (APP_006), 6–7 (APP_008-009), 12 (APP_014), 18 (APP-020), 20–21 (APP_022-023), 23 (APP_025).
[11] *See* Koontz Tr. 54:4-7 (APP-042); *see also id.* 71:15-25 (APP_043), 108:17-23 (APP_057).

conclusions, which makes his opinions even more unreliable. *See Boyd v. State Farm Ins.*, 158 F.3d 326, 331 (5th Cir. 1998).

This is why Koontz leans so hard on his "training, experience, and education." When asked for the basis of opinions, he consistently responded: his "training, experience, and education"—he retorted as much at least *fourteen times* during his deposition.[12] And Koontz did not try to elaborate on this answer or even explain how his training, experience, and education "shaped the[] opinions" he offered. *See Crawford Supply Grp., Inc. v. Bank of Am., N.A.*, No. 09-cv-2513, 2011 U.S. Dist. LEXIS 117670, at *11–12 (N.D. Ill. Oct. 12, 2011). As such, Koontz's testimony is nothing "more than subjective belief [and] unsupported speculation," which is inadmissible under Rule 702. *See Daubert*, 509 U.S. at 590; *see also Minasian v. Standard Chtd. Bank, P.L.C.*, 109 F.3d 1212, 1216 (7th Cir. 1997). And "[w]ithout more than credentials and a subjective opinion, [Koontz]'s testimony that 'it is so' is not admissible." *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 424 (5th Cir. 1987); *see Gen. Elec. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.").

### 2. Koontz's Testimony Is Not Based on the Relevant Facts or Data

It is also required for Koontz's testimony to have a basis in "sufficient facts or data" in the case. FED. R. EVID. 702(b). But his opinions are deficient under this requirement as well. "'Experts are permitted to rely on assumptions when reaching their opinions,' but 'those assumptions must have some factual basis in the record and an underlying rationale.'" *TitleMax of Tex., Inc. v. City of Dallas*, No. 3:21-cv-1040, 2023 U.S. Dist. LEXIS 126700, at *6 (N.D. Tex. July 24, 2023)

---

[12] *See* Koontz Tr. 33:16 (APP_036); 39:23-24 (APP_37); 40:5-6, 15-16 (APP_038); 42:8-9 (APP_039); 46:2-3 (APP_040); 53:9-10, 17-18, 23-24 (APP_041); 71:20-21 (APP_043); 81:25-82:1 (APP_046-047); 84:20-21 (APP_048); 108:14-15, 21-22 (APP_057).

(citation omitted). Koontz, however, made several assumptions with so little factual basis and underlying rationale as to cause his opinions to fail Rule 702(b). *See Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 355 (5th Cir. 2007) ("[An] expert's testimony must be reliable at each and every step or else it is inadmissible.").

Two assumptions in particular stand out: first, Koontz assumed that "[Origin] knew that SNLEE's new loan with Amerisource was nearing the finish line and [Origin] would soon be paid off" when Origin sent the letter to SNLEE.[13] And based on this assumption, Koontz concluded that Origin's actions were commercially unreasonable. Yet this assumption finds support in a single, vaguely worded document—a document that only conveys the hopes of one individual at Amerisource that SNLEE would execute the Loan Documents that day.[14] It is frankly a mystery how Koontz arrived at his assumption; on what basis could he assume from the expression of aspiration from an Amerisource individual that (i) the SNLEE-Amerisource deal was "nearing the finish line," and (ii) Origin possessed *actual* knowledge that the SNLEE-Amerisource deal was "nearing the finish line."[15] Taking one solitary expression of hope from someone not at Origin and constructing an intricate assumption from which Koontz draws his ultimate conclusion is improper under Rule 702(b).

Second, Koontz arrives at his opinions on commercial reasonableness based on the assumption that Origin "kn[ew] that Gulf Coast . . . was a primary cause of the delay in closing and funding SNLEE's new line of credit."[16] This assumption is doubly doomed. For one thing, it is irrelevant why SNLEE could not find a new line of credit. Koontz seems to think that Origin must stay its hand for as long as SNLEE "tries its best" to find replacement funding, or that Origin

---

[13] *See* Report at 11 (APP_013).
[14] *See* Report at 11 & n.20 (APP_013).
[15] *See* Report at 11 (APP_013).
[16] *See* Report at 14 (APP_016).

Origin Bank's Brief In Support Of Its Motion To Exclude
Expert Testimony Of Jason Koontz                                                              **Page 8**

must have known that Gulf Coast would release its lien—there is no evidence of any of that. What's more, Koontz's folly finds roots in the idea that "Gulf Coast . . . not provid[ing] a UCC release" to SNLEE "would have prevented Amerisource from being able to fund the line of credit."[17] But Koontz never explains why he believes Gulf Coast needed to provide a UCC release to SNLEE before SNLEE *signed* the Amerisource loan papers. While the lien release may have been a condition precedent to Amerisource closing, SNLEE could have signed the papers. Koontz's convenient acceptance of a non-sequitur undermines the reliability of his opinions. *See Guillory v. Domtar Indus.*, 95 F.3d 1320, 1331 (5th Cir. 1996) (excluding an expert opinion that was "not based upon the facts in the record but on altered facts and speculation designed to bolster [the offering party]'s position").

Finally, Koontz's driving assumption—that Origin had *actual* knowledge that Gulf Coast was a primary cause of the delay in the Amerisource deal and still sent the letter—is solely based on discussions Koontz had with SNLEE's control person, Counter-Defendant Shawn Mudigere ("Mudigere"). There is no evidence to corroborate, let alone rationalize, this assumption.

So not only did Koontz draw this critical assumption from communications with an interested party who already has an adversarial relationship with the truth, Koontz did so based on Mudigere's unsworn word attesting to *Origin*'s actual knowledge when there is not a shred of evidence from Origin supporting it. *See* FED. R. EVID. 602. No Origin witness has substantiated this belief. The assumptions Koontz makes have absolutely no "factual basis in the record" and entirely lack "an underlying rationale." *TitleMax*, 2023 U.S. Dist. LEXIS 126700, at *6; *see* FED. R. EVID. 702(b).

---

[17] *See* Report at 13 (APP_015).

For Koontz to take Mudigere's word as gospel, draw a pivotal assumption on that basis, and then offer expert opinions from there is advocacy, not expertise. *See United States v. Frazier*, 387 F.3d 1244, 1262–63 (11th Cir. 2004) ("Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments."). These core assumptions are just the most prominent examples of Koontz failing to base his opinions in "sufficient facts or data." Given the pervasive nature of this flaw, Koontz's opinions are excludable on this basis.

### 3. Koontz's Reliance on the Parties' Course of Performance Dooms His Opinions

Koontz's entire report turns on Origin's agreement to give SNLEE more time to find replacement funding, which he speculates created a "course of performance" that inured to the detriment of SNLEE when Origin started its collection efforts.

Yet the loan documents preclude this argument as a matter of law—SNLEE expressly waived reliance on any course of performance as a means of amending or varying the rights or duties under those documents. The loan documents plainly state that (1) the loan must be paid back per the terms of the Note, (2) any forbearance by Origin is not to be construed as a waiver or an amendment of Origin's rights under the loan and security agreement, and (3) a forbearance or amendment to either must be in writing and signed by Origin. [18]

Therefore, the parties' alleged course of performance is irrelevant. *See E. Montgomery County Mun. Util. Dist. No. 1 v. Roman Forest Consol. Mun Util. Dist.*, 620 S.W.2d 110, 112 (Tex. 1981) ("The conduct of the parties is ordinarily immaterial in the determining of the meaning of

---

[18] Ex. 4, Revolving Credit and Security Agreement, Art. XI (APP_090) ("…Bank shall not be deemed to have waived any of its rights upon or under [the Note or Security] or Collateral unless such waiver be in writing and signed by the Bank. No course of dealing and no delay or omission on the part of the Bank in exercising any right shall operate as a waiver of such right or any other right."); Ex. 5, Revolving Promissory Note (APP_106, 109-110) (Note Art. I, VI).

an unambiguous instrument."); *see also Stahl Petrol. Co. v. Phillips Petrol. Co.*, 550 S.W.2d 360, 367–68 (Tex. App.—Amarillo 1977) (applying plain meaning of contractual term, despite evidence that parties' course of performance indicated that parties intended different meaning, when term was unambiguous), *aff'd*, 569 S.W.2d 480 (Tex. 1978).

For instance, in *Shields Ltd. Partnership v. Bradberry*, the Supreme Court of Texas held that a landlord's acceptance of late rental payments from a long-term tenant could not amend or waive the parties' agreement that contractual rights, remedies, and obligations would not be waived on the basis of any accommodation or forbearance because all waivers and amendments had to be in writing and signed by the waiving party. *See* 526 S.W.3d 471, 479 (Tex. 2017).

> We agree with Shields that, as a matter of law, accepting late rental payments does not waive the nonwaiver provision in the underlying lease or, correspondingly, the contractual requirement that rent is due on the first of the month, without prior demand, and no later than the tenth day of the month. Moreover, Shields did not act inconsistently with its right to accept untimely rent without waiving the nonwaiver provision.

*Id.* at 480. Similarly, in *Chemical Bank v. PIC Motors Corp.*, that court rejected the very argument SNLEE and the Guarantors, Mudigere and Counter-Defendant Denise Mudigere, make here. There, the contract read:

> No delay on the part of the Bank in exercising any rights hereunder or failure to exercise the same shall operate as a waiver of such rights; no notice to or demand on the undersigned shall be deemed to be a waiver of the obligation of the undersigned or of the right of the Bank to take further action without notice or demand as provided herein; nor in any event shall any modification or waiver of the provisions of this guaranty be effective unless in writing nor shall any such waiver be applicable except in the specific instance for which given.

452 N.Y.S.2d 41, 43 (N.Y. App. Div. 1982). The court held that the language precluded a finding that course of performance could alter the bank's contractual rights, concluding that "neither the alleged prior course of conduct nor the alleged promise that it would be continued could modify

the obligation of Siegel as guarantor of payment." *Id*. Therefore, in the face of the plain language in the loan documents, Origin's supported acquiescence to SNLEE's nonpayment of the loan—even if true—was not the type of course of performance that would lead to SNLEE never having to pay the loan.

Moreover, no court has used the parties' course of performance to fill in contractual gaps outside of Article 2 or 2A of the UCC. And even then, it only applied when the contract was silent or unambiguous on an issue. *See, e.g.*, *Hildreth v. Merle Norman Cosmetics, Inc*., No. 08-02-00402-CV, 2004 Tex. App. LEXIS 3082, at *9–10 (Tex. App.—El Paso 2004) (mem. op.) ("[I]f the contract is unambiguous then the conduct of the parties is immaterial to determine its meaning.").

SNLEE also stresses that Origin releasing its lien on collateral as signifying Origin's intent not to collect on the Note in full. But releasing the lien arises under the security agreement, which is a separate document and obligation from the Note. *Chem. Bank*, 452 N.Y.S.2d at 44 ("It is plain that the bank had the right to release the collateral without discharging the guarantor [and therefore], the negligence . . . of the bank's employees in so doing is irrelevant").

Therefore, Koontz's extensive treatment of the history of the parties' course of dealing is unrelated to Origin's rights and duties.

### 4. Koontz's "Poll" Infected His Opinions with Legal Error

Also particularly troubling in Koontz's opinions is his self-admitted reliance on "a poll of active lenders, retired lenders, and bank board directors" he used to confirm his "opinion that is [sic] was not reasonable for [Origin] to take collection action when a new loan was at the finish line."[19] Koontz's so-called poll comes nowhere close to the reliability threshold required by Rules

---

[19] Report at 12 n.21 (APP_014).

702 and 703, and because this deficient survey informs the core opinions offered by Koontz, he should be excluded as an expert witness.

Before turning to the methodology (or lack thereof) Koontz's poll utilizes, Origin points out an even more basic reason why the poll fatally taints Koontz's opinions. When an expert polls others in the "relevant scientific community" regarding an expert opinion, the expert conducting the survey does so properly in an effort "to aid in determining whether [she] is proposing *to use methods* that would be rejected by a representative group of experts to arrive at the opinion the expert will offer." Shari Seidman Diamond, Fed. Jud. Ctr., *Reference Guide on Survey Research, in* REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 369 (3d ed. 2011) (emphasis added). This makes sense given Supreme Court precedent instructing that the analytical "focus . . . must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595.

Koontz's poll facially violates this command. In his own words, Koontz conducted a survey to ask whether other alleged experts in the banking industry "agreed with [his] *opinion*"—that is, the conclusion that Koontz draws—regarding Origin's actions.[20] Contrary to *Daubert*, Koontz did not seek to confirm the propriety of his "principles and methodology," but rather the ultimate conclusion he generated. *See* 509 U.S. at 595. Koontz's poll is therefore fundamentally flawed in its core premise, and his opinions must be excluded.

The execution of Koontz's survey, *i.e.*, the methodology, also renders the poll completely unreliable and thereby inadmissible. "Surveys . . . are admissible[] if they are pertinent to the inquiry[] upon a showing that the poll is reliable and was compiled in accordance with accepted survey methods." *C. A. May Marine Supply Co. v. Brunswick Corp.*, 649 F.2d 1049, 1054 (5th Cir. 1981). Before "the findings of a survey" are examined, "it is important to determine exactly what

---

[20] Report at 12 n.21 (APP_014) (emphasis added).

weight is to be given to the evidence." *Exxon Corp. v. Tex. Motor Exch.*, 628 F.2d 500, 506 (5th Cir. 1980); *see Johnson & Johnson v. Smithkline Beecham Corp.*, 960 F.2d 294, 300 (2d Cir. 1992) ("The evidentiary value of a survey's results rests upon the underlying objectivity of the survey itself."). To do so, courts in this circuit look to two factors: (1) "the manner of conducting the survey," and (2) "the way in which participants are questioned." *Scott Fetzer Co. v. House of Vacuums, Inc.*, 381 F.3d 477, 487 (5th Cir. 2004). With a survey, the ultimate question "becomes, Was the poll or survey conducted in accordance with generally accepted survey principles, and were the results used in a statistically correct way?'" Diamond, *supra*, at 364 (citation omitted). And while a survey need not be perfectly administered to be admissible, "serious flaws in a survey will make any reliance on that survey unreasonable. Otherwise, any survey, no matter how tendentious, would force the parties to trial." *House of Vacuums*, 381 F.3d at 488 (citation omitted). Koontz's poll is nothing but serious flaw on top of serious flaw and makes Koontz's opinions inadmissible.

Normally, analyzing a survey's reliability requires critical examination of the survey's component parts, including, but not limited to, the "design, execution, and analysis." Diamond, *supra*, at 362; *see also id.* (outlining the appropriate considerations in greater specifics). But the way Koontz conducted his poll precludes this baseline examination altogether (which makes some sense considering he is not an expert in survey practices). As he admitted, Koontz, among other things: (i) believes he "probably" polled five people for his survey;[21] (ii) refused to identify each of the people polled;[22] (iii) could not recall the actual question he asked each individual;[23] (iv) did not provide any written prompts or background facts to those surveyed;[24] and (v) conveyed the

---

[21] Koontz Tr. at 96:6-9 (APP_053).
[22] See Koontz Tr. at 96:14-19, 21-23 (APP_053)
[23] Koontz Tr. 97:19-98:4 (APP_054-055).
[24] Koontz Tr. 98:10-13 (APP_055).

opinions of those surveyed based on his memory of the oral conversations he had with those polled.[25] These realities of Koontz's poll outright prevent Origin from analyzing the way this survey was conducted and the way participants were questioned, which are the factors necessary to analyze the reliability of an expert's survey. *See House of Vacuums*, 381 F.3d at 487.

Accordingly, because it is (literally) impossible to examine whether Koontz's survey is admissible, the survey and the opinions with which the survey is inextricably intertwined must be excluded. *See, e.g.*, *Reinsdorf v. Skechers U.S.A.*, 922 F. Supp. 2d 866, 878–79 (C.D. Cal. 2013) (excluding a survey because (i) the offering party did not "identify any scientific principles underlying" the survey, and (ii) the survey "appear[ed] to violate numerous accepted practices in the field of survey research"); *Albert v. Warner-Lambert Co.*, 234 F. Supp. 2d 101, 105–07 (D. Mass. 2002) (excluding a survey because it "conformed to virtually none of" the elements of a "reliable" survey).

Koontz's poll amounts to an attempted bolstering mechanism for expert opinions already lacking both relevance and reliability. And his proffered survey confirms what is readily apparent: the opinions Koontz offers here cannot "withstand the same scrutiny that [they] would among [Koontz's] professional peers." *Watkins*, 121 F.3d at 991; *cf., e.g.*, *Nat'l Union Fire Ins. Co. v. Wells Fargo Bank, N.A.*, No. 03-cv-2452, 2005 U.S. Dist. LEXIS 47175, at *13 (C.D. Cal. Mar. 16, 2005) ("The court doubts that any banker would rely on such an informal survey to determine the practices of banks in processing ATM deposits.").

Unable to survive even slight pressure testing under Rules 702 and 703, Koontz's survey and his opinions compromised by the survey must be excluded.

---

[25] Koontz Tr. 98:14-17 (APP_055), 99:7-15 (APP_056).

## IV.

## <u>CONCLUSION</u>

For these reasons, the expert opinions of Koontz must be stricken.

Dated: September 8, 2023

Respectfully submitted,

**SBAITI & COMPANY PLLC**

*/s/ Brad J. Robinson*
**Mazin A. Sbaiti**
Texas Bar No. 24058096
mas@sbaitilaw.com
**Brad J. Robinson**
Texas Bar No. 24058076
bjr@sbaitilaw.com
**Griffin S. Rubin**
Texas Bar No. 24121809
gsr@sbaitilaw.com
**SBAITI & COMPANY PLLC**
Dallas Arts Tower
2200 Ross Ave., Suite 4900W
Dallas, Texas 75201
T: (214) 432-2899
F: (214) 853-4367

**ATTORNEYS FOR DEFENDANT**