**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **SALT AND LIGHT ENERGY** | § | |
| **EQUIPMENT, LLC,** | § | |
| | § | |
| **Plaintiff/Counter-Defendant,** | § | **Civil Action No.: 3:22-cv-00654-N** |
| | § | |
| **v.** | § | |
| | § | |
| **ORIGIN BANCORP, INC., DBA** | § | |
| **ORIGIN BANK,** | § | |
| | § | |
| **Defendant/Counter-Plaintiff,** | § | |
| | § | |
| **v.** | § | |
| | § | |
| **DENISE MUDIGERE and** | § | |
| **SHAWN MUDIGERE,** | § | |
| | § | |
| **Third-Party Defendants.** | § | |

**DEFENDANT'S APPENDIX IN SUPPORT OF ITS MOTION TO EXCLUDE**
**EXPERT TESTIMONY OF JASON KOONTZ**

Pursuant to Local Rules 7.1(i) and 7.2(e), Defendant/Counter-Plaintiff Origin Bancorp,

Inc. d/b/a Origin Bank ("Origin") files this Appendix in Support of their Motion to Exclude and

Brief in Support.  Each page of this Appendix is numbered sequentially in the lower, right-hand

corner.

Defendant relies on the following in support of its Motion in addition to the filings and

pleadings in this case.

| Exhibit | Document | Pages |
|---|---|---|
| A | Declaration of Brad J. Robinson | APP |
| 1 | Expert Report of Jason Koontz dated July 19, 2023 | APP |
| 2 | Deposition excerpts of Jason Koontz taken on August 1, 2023 | APP |

**DEFENDANT'S APPENDIX IN SUPPORT OF ITS MOTION TO EXCLUDE**
**TESTIMONY OF JASON KOONTZ**                                    **Page 1**

| 3 | Deposition excerpts of Lisa McCauley taken on August 1, 2023 | APP |
|---|---|---|
| 4 | Revolving Credit and Security Agreement dated December 11, 2018 | APP |
| 5 | Revolving Promissory Note dated December 11, 2018 | APP |

Dated: September 8, 2023

Respectfully submitted,

*/s/ Brad J. Robinson*

**Mazin A. Sbaiti**
Texas Bar No. 24058096
mas@sbaitilaw.com
**Brad J. Robinson**
Texas Bar No. 24058076
bjr@sbaitilaw.com
**Griffin S. Rubin**
Texas Bar No. 24121809
gsr@sbaitilaw.com
**SBAITI & COMPANY PLLC**
Dallas Arts Tower
2200 Ross Ave., Suite 4900W
Dallas, Texas 75201
T: (214) 432-2899
F: (214) 853-4367

**ATTORNEYS FOR DEFENDANT**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **SALT AND LIGHT ENERGY EQUIPMENT, LLC,** | § § § | |
| **Plaintiff/Counter-Defendant,** | § § | **Civil Action No.: 3:22-cv-00654-N** |
| **v.** | § § | |
| **ORIGIN BANCORP, INC., DBA ORIGIN BANK,** | § § § | |
| **Defendant/Counter-Plaintiff,** | § § | |
| **v.** | § § | |
| **DENISE MUDIGERE and SHAWN MUDIGERE,** | § § § | |
| **Third-Party Defendants.** | § | |

**DECLARATION OF BRAD J. ROBINSON IN SUPPORT OF**
**MOTION TO EXCLUDE EXPERT TESTIMONY OF JASON KOONTZ**

I, the undersigned, make this Declaration to the best of my personal knowledge, and do so under the penalty of perjury.

1.      My name is Brad J. Robinson.  I am over 21 years of age, of sound mind, and fully competent to make this Declaration.

2.      I am a partner at the law firm of Sbaiti & Company PLLC, which has been retained to represent Origin Bankcorp, Inc., dba Origin Bank in the above referenced matter.  The statements herein are based on my personal knowledge and my representation of Origin Bankcorp, Inc. dba Origin Bank.

---

Declaration of Brad J. Robinson                                                                                    Page 1

3.      Attached as Exhibit 1 to this Declaration is a true and correct copy of the expert report of Jason Koontz dated July 19, 2023.

4.      Attached as Exhibit 2 to this Declaration is a true and correct copy of deposition excerpts of Jason Koontz taken on August 1, 2023.

5.      Attached as Exhibit 3 to this Declaration is a true and correct copy of deposition excerpts of Lisa McCauley taken on August 1, 2023.

6.      Attached as Exhibit 4 to this Declaration is a true and correct copy of Revolving Credit and Security Agreement By and Between Origin Bank and Salt and Light Energy Equipment LLC dated December 11, 2018.

7.      Attached as Exhibit 5 to this Declaration is a true and correct copy of Revolving Promissory Note by Salt and Light Energy Equipment LLC to Origin Bank dated December 11, 2018.

I declare under penalty of perjury under the laws of the State of Texas and the laws of the United States of America that the foregoing is true and correct.

Dated: September 8, 2023                    */s/ Brad J. Robinson*_____
                                            Brad J. Robinson

---

Declaration of Brad J. Robinson                                    Page 2

# Expert Report with Supplemental Opinions
# by Jason D Koontz
# July 19, 2023

## Salt and Light Energy Equipment, LLC, Plaintiff,

## v.

## Origin Bancorp, Inc., DBA Origin Bank, Defendant.

## v.

## Salt and Light Energy Equipment, LLC, et al.
## Counterclaim Defendants.

## United States District Court
## Northern District of Texas
## Dallas Division
## Civil Action No.: 3:22-cv-00654-N

**EXHIBIT**

**1**

## Contents

Section 1: Assignment ...................................................................................................................... 3

Section 2: Qualifications ................................................................................................................. 3

Section 3: Scope of this Assignment ............................................................................................. 3

Section 4: Key Terms ...................................................................................................................... 4

Section 5: Opinion .......................................................................................................................... 6

Section 6: Supplemental Opinion 1 (July 19, 2023) ................................................................. 14

Section 7: Conclusion ................................................................................................................... 23

Appendix 1 ...................................................................................................................................... 24

Appendix 2 ...................................................................................................................................... 27

Appendix 3 ...................................................................................................................................... 30

APP_004

# Section 1: Assignment

Salt and Light Energy Equipment, LLC, the Client (hereinafter referred to as "SNLEE"), in the above action, retained me to provide expert testimony in this matter based on my knowledge of and experience in commercial lending and commercial debt collection. My opinions are the subject of this expert report, the scope of which is described further below in Section 3.

# Section 2: Qualifications

I have over twenty years of lending experience, including, but not limited to, loan origination, underwriting, closing, servicing, debt collection, and foreclosure when necessary. I fulfilled the role of Senior Vice President with Summit Community Bank and had a secured loan approval limit. While at Summit Community Bank, I also served on the Bank's loan committee.

Over my lending career, I have originated, underwritten, and closed thousands of commercial and consumer loans. I managed servicing issues within my loan portfolio regarding loan closing proceeds, loan payments, hazard insurance, real estate taxes, flood insurance, requests for information, loan modifications, and force-placed insurance. If a borrower defaulted, I was also responsible for working with them to cure the default.

I currently provide consulting services to community banks that need assistance or support in their lending and collection areas.

I have earned the Credit Risk Certification (CRC) designation. This CRC designation is the only recognized professional designation for credit and lending professionals.[1] The CRC designation demonstrates that the holder possesses the knowledge and skills necessary to master many credit risk situations. I must complete at least fifteen hours of continuing education annually to maintain the CRC designation. Refer to my CV attached to this report for additional information.

# Section 3: Scope of this Assignment

The purpose of my report is to review the actions of Origin Bank (hereinafter referred to as "the Bank") as they relate to its handling of the SNLEE loan from origination through payoff in August of 2021. Because of my experience in commercial lending and commercial debt collection, I was asked to provide opinions regarding the Bank's handling of SNLEE's loan and if they were

---

[1] https://www.rmahq.org/credentialing/crc/?gmssopc=1

consistent with commercial debt collection industry guidelines. More specifically, to address the following:

- Considering the circumstances, if the Bank's decision to initiate the distribution of Accounts Receivable collection letters to SNLEE's customers around August 5, 2021, was a practice that adhered to reasonable industry practices.

My fee schedule is $425 per hour, plus expenses. The fee for testimony at either deposition or trial is $425 per hour. My fee is not contingent on the outcome of this matter or the nature of my opinions. In performing my assignment, I have relied upon or considered both the information and documents listed in Appendix 2, as well as information referenced in the footnotes of this report.

# Section 4: Key Terms

The following are some important terms and information to aid the reader in this report:

**Accounts Receivable (A/R)**
Accounts receivable refers to the outstanding payments owed to a business by its customers or clients for goods or services provided on credit. It represents the amount of money that a company expects to receive from its customers in the future.

Accounts receivable play a vital role in a company's cash flow management, as a prompt and efficient collection of payments ensures the availability of funds for day-to-day operations, investment in new opportunities, and meeting financial obligations such as payroll and loan payments.

**Accounts Receivable Collection Letter**
An accounts receivable collection letter is a written communication sent by a creditor, such as a bank, to a borrower's customers when the lender has a UCC (Uniform Commercial Code) lien on the borrower's accounts receivable (A/R). The letter is often called a "Notice of Assignment" or a "Notice of Lien."

When a lender has a lien on a borrower's A/R, it means that the lender has a secured interest in those assets as collateral for the borrower's debt. The lender may choose to send a Notice of Assignment or Notice of Lien to the borrower's customers to inform them of the lender's claim on the accounts receivable.

This letter notifies the borrower's customers that the lender has a priority interest in the borrower's accounts receivable and that future payments should be made directly to the lender rather than to the borrower. The letter typically provides instructions on how the customers should make payments and includes contact information to direct the payments to the lender.

Redirecting a borrower's A/R by sending a Notice of Lien to their customers can have significant consequences for the borrower's cash flow and business operations. By rerouting payments to the lender, the borrower may experience an immediate impact on their available funds (cash flow), which can be highly disruptive and potentially damaging to their business.

**Collateral**

Assets that are offered to secure a loan or other credit. For example, if you get a real estate mortgage, the bank's collateral is typically your house. Collateral becomes subject to seizure on default.[2]

**Default**

A default occurs when the borrower cannot fulfill their obligations, as outlined in the loan documents. Examples can include non-payment, violating loan covenants, breaching collateral requirements, or making material misrepresentations. When a default happens, the lender may take actions such as demanding immediate repayment, increasing the interest rate on the loan, starting legal proceedings, or seizing collateral to recover the debt.

**Demand Letter**

A demand letter for a commercial debtor is a formal written notice sent by a bank or creditor to a business or individual who has defaulted on a commercial loan. It outlines the amount owed, the terms of the loan agreement, and any applicable interest or penalties. The letter demands immediate payment or compliance with the agreed-upon terms and warns of potential legal action if the debt is not resolved within a specified timeframe.

**Salt and Light Energy Equipment LLC (SNLEE)**

SNLEE provides equipment and services to the oil and gas industry. Denise Mudigere and Prashanth Mudigere (also referred to as Shawn) are the Managers and Members of SNLEE.[3]

**Guarantors**

When someone (either an individual(s) or a business) acts as a guarantor on a loan, they assume the responsibility to repay the loan if the primary borrower defaults, serving as a backup source of payment to the lender. In this matter, SNLEE's loan with the Bank was guaranteed by Denise Mudigere and Shawn Mudigere.[4]

**UCC lien**

A UCC lien also known as a Uniform Commercial Code lien, is a legal claim placed on a borrower's assets to secure the repayment of a debt or the performance of an obligation. The UCC is a standardized set of laws that govern commercial transactions in the United States.

---

[2] https://www.helpwithmybank.gov/glossary/index-glossary.html#i
[3] Unanimous Written Consent of the Managers and Members of Salt and Light Energy Equipment LLC in Lieu of Special Meeting. ORIGIN 000063 – ORIGIN 000065.
[4] Guaranty Agreement. ORIGIN 000066 – ORIGIN 000074.

When a creditor extends credit to a debtor, they may require collateral to protect their interests in case the debtor cannot repay the debt. This collateral can be in the form of property, such as inventory, equipment, or accounts receivable. To establish a legal claim on this property, the creditor files a UCC lien with the appropriate state authority, typically the Secretary of State or similar agency.

The UCC lien provides public notice to other potential creditors that a prior claim exists on the specified property. It establishes the creditor's priority in the event of default or bankruptcy. It creates a security interest in the property, allowing the creditor to repossess and sell it to satisfy the debt if necessary.

# Section 5: Opinion

**The Bank's decision to send Accounts Receivable collection letters dated August 5, 2021 was not a reasonable industry practice for commercial loan collection at that time.**

AR collection letters are a commonly used tool in commercial debt collection, reflecting a standard industry practice. However, like any tool, their effective implementation relies on understanding the appropriate timing and context for their application.

Background: SNLEE's banking relationship with Origin.

On December 11, 2108, Origin extended a $3,000,000 line of credit to SNLEE.[5] However, during the borrowing relationship, the Bank decided that they no longer wanted to provide lending services to the oil and gas industry. To help move SNLEE out of the Bank, it referred SNLEE to Gulf Coast Business Credit (Gulf Coast);[6] the Bank worked directly with Gulf Coast to implement a new financing arrangement.[7] While Gulf Coast was considering financing for SNLEE, they filed a UCC lien on SNLEE's assets. However, according to Shawn Mudigere, the final terms offered by Gulf Coast did not meet the needs of SNLEE. Gulf Coast was only willing to consider a portion (3 or 4 clients) of SNLEE's total accounts receivable when providing funding. As a result, this would reduce the amount potentially available to SNLEE under a line of credit arrangement.[8] SNLEE declined Gulf Coast's offer.

SNLEE continued to seek another lender who could meet their needs.[9] During this time, the Bank, consistent with industry practices, continued to work with SNLEE by providing them with nine

---

[5] Revolving Credit and Security Agreement. ORIGIN 000012 – ORIGIN 000044.
[6] Shawn Mudigere shared this information with me during a call on June 14, 2023.
[7] Email Exchange between Austin Lewis (Origin) and Ryan Dendinger (Gulf Coast) and marketing material. ORIGIN 001147 to ORIGIN 001160 is an example of the interaction between the Bank and Gulf Coast.
[8] Shawn Mudigere shared this information with me during a call on June 14, 2023.
[9] Internex Capital was another lender that SNLEE had reached out to but could not agree upon terms that would provide SNLEE with the competitive financing that it needed. One hurdle in the Internex offer was an initial interest

loan modifications even though SNLEE had defaulted on the loan.[10] [11] The Bank also sent three demand letters to SNLEE during this period, which would not be unusual.

- On September 16, 2020, the Bank's legal counsel, Sbaiti & Company, sent a Demand Letter to Salt and Light Energy Equipment (SNLEE), Denise Mudigere, and Prashanth Mudigere.[12]

- On March 15, 2021, the Bank sent a Demand Letter to Salt and Light Energy Equipment (SNLEE), Denise Mudigere, and Prashanth Mudigere.[13]

- On April 23, 2021, the Bank's legal counsel, Sbaiti & Company, sent a Demand Letter to Salt and Light Energy Equipment (SNLEE), Denise Mudigere, and Prashanth Mudigere.[14]

However, after each demand expired, the Bank continued working with SNLEE and took no steps toward collection actions. On May 3, 2021, the Monday after the most recent demand expired, it appeared to be business as usual between SNLEE and the Bank.

---

rate of 11.25%, which was more than three times the rate of the original deal offered by the Bank before the bank had increased the interest rate. ORIGIN 000142.

[10] Answer and Counterclaims of Defendant Origin Bank. Pages 10 – 12.

[11] It was not as though the Bank was providing modifications out of pure goodwill as they had doubled the interest rate that SNLEE was paying. Further, the bank was advancing interest payments off the SNLEE line of credit to pay SNLEE's loan payments which is not consistent with standing lending practices. This action caused SNLEE to pay interest on the advanced funds (interest on interest payments). This can be seen in an email dated June 9, 2020 between Chris Kehlenbeck and Loan Administration at the Bank. Austin Lewis was also included in the email exchange. Chris Kehlenbeck stated in the email, "*Hello! Can we get this extension booked? It won't let me make an interest payment off the line since it's matured, but Jeff's approval is below. I'll make the payment after the extension is complete. Thank you!*"

[12] Demand Letter. September 16, 2020. ORIGIN 000131 to ORIGIN 000132.

[13] Demand Letter. March 15, 2021. ORIGIN 000140 to ORIGIN 000141.

[14] Demand Letter. April 23, 2021. ORIGIN 000144 to ORIGIN 000145.

We are working with them and providing all the documents.
I will update you as soon as I find out something from them on an estimated closing date.


Sent from my iPhone


On May 3, 2021, at 8:25 AM, Austin Lewis <alewis@origin.bank> wrote:


Shawn, do you have an estimate of when any of these term sheets would be approved by the lender or fund? This week, this month? What has to happen in order to fund?

Austin G. Lewis
<image001.jpg>
Origin Bank

And nearly one month after the April demand was sent,

| From: | Mike Wawczak |
|-------|--------------|
| Sent: | Thursday, May 20, 2021 10:15 AM |
| To: | 'smudigere@snlee.com' |
| Subject: | Interest Due. |

Shawn

Please note that next week I will need to collect past due interest.

It is noted that the company has not made a payment since the note matured March 4, 2021.

**Please note that interest owed to June 4, 2021 is $97,381.65 and accrues at $960.37 (per diem).**

As stated in the demand letter from our attorney on April 23rd, the balance owed (not including interest) is $2,019,812.55
This includes late fees and attorney fees of $99,071.24.

Payoff of fees, past due interest and principal to June 4, 2021 is:  $2,117,194.20

Thank you.

In its written responses in the Answer and Counterclaim, The Bank admits it didn't take action and continued to work with SNLEE by providing additional time to get alternate funding.[15]

<u>What is the purpose of sending a demand letter to a borrower?</u>

---

[15] Answer and Counterclaims of Defendant Origin Bank. Page 16 of 34. Paragraph 44.

The purpose of sending a demand letter to a commercial loan borrower is to request immediate payment of the outstanding debt formally. It serves as a legal notice that notifies the borrower of their default on the loan and allows them to rectify the situation by making the required payment(s). The demand letter is often a precursor to further legal action, such as initiating a lawsuit, applying a default interest rate, or pursuing other collections efforts, if the borrower cannot comply with the demand for repayment.

<u>The Bank established a practice of not acting on the demand letters.</u>
Although sending out multiple demand letters, the Bank never took action before August 5, 2021, to collect the debt.

<u>Why does this matter?</u>
If a lender consistently sends multiple demand letters to a borrower without taking any collection actions, it can establish a pattern and practice that may make it challenging for the lender to take effective collection actions against the borrower in the future. This behavior might weaken the perception of the lender's resolve with the borrower and undermine its credibility for enforcing debt repayment.

When a borrower observes a repeated pattern of demand letters without accompanying actions, they may develop a perception that the lender is unwilling or unable to take aggressive collection measures. If the lender eventually escalates the collection process by pursuing legal action or other aggressive measures, the borrower may be surprised or feel unfairly targeted. The borrower could argue that the lender had previously established a different expectation through its consistent pattern of inaction. It is advisable for the lender to be consistent in its approach when enforcing collection actions. Consistency in dealing with delinquent accounts helps establish a clear precedent and reinforces the lender's position in pursuing debt repayment.

<u>August 2021–The Amerisource closing.</u>
On August 2, 201, SNLEE was near the finish line. After a search that took well over a year, it had in its possession the Amerisource loan documents. The Bank was apprised of developments regularly and had firsthand knowledge that the Amerisource loan was reaching finalization. It had known as early as one month beforehand that SNLEE was working with Amerisource. On July 1, 2021, Shawn Mudigere sent the following text to Mike Wawczak at the Bank.[16]

---

[16] Text message to the Mike Wawczak at the Bank. July 1, 2021 at 2:18 PM.



1
2
3    On July 14, Shawn shared the following information with the Bank regarding Amerisource's offer
4    to SNLEE.
5



6
7
8    At the Bank's request on July 30, 2021, Shawn Mudigere gave the Bank contact information so
9    that it could correspond directly with Amerisource, which would provide it with unfiltered
10   information regarding the new line of credit and the status of the request.
11



On August 2, 2021, Austin Lewis, SVP of Commercial Lending with the Bank, emailed Allison Billings at Amerisource asking if she had received the executed loan documents.[17] It had taken a long time to get a new line of credit in place for SNLEE; undoubtedly, the Bank was eager to get the line of credit off its books. On the following day, August 3, 2021, Allison replied,[18]

*"We have not yet received the executed loan documents. Hopefully, we'll get them in today."*

<u>Bank's Improper Actions: Targeting SNLEE's customers despite nearing the final stages of a new line of credit.</u>

Even though the Bank knew that SNLEE's new loan with Amerisource was nearing the finish line and they would soon be paid off, they abruptly took aggressive action against SNLEE. The Bank contacted customers and provided impactful information and instructions. Through correspondence dated August 5, 2021, the Bank reached out to each of SNLEE's clients and directed all payments to be sent to the Bank. This decision was made 104 days after the third demand letter, which demanded seven days of repayment (by April 30, 2021).[19] I have reviewed the documents provided to me and cannot find any information that would shed light on the Bank's decision to take such action at that time.[20] I believe starting a debt collection action at this pivotal

---

[17] Email exchange between Austin Lewis and Allison Billing. August 2, 2021. ORIGIN 000423.
[18] Email exchange between Austin Lewis and Allison Billing. August 3. 2021. ORIGIN 000360.
[19] Demand Letter. April 23, 2021. ORIGIN 000144 to ORIGIN 000145.
[20] Mike Wawczak email to Jim Crotwell. July 26, 2021. The Bank had discussed taking control of SNLEE's accounts receivable. ORIGIN 000302.

time when the loan was at the finish line contradicted standard commercial debt collection practices.[21]

_Why does this matter?_

Because of the Bank's decision to send out accounts receivable collection letters to SNLEE's clients while SNLEE was completing a new line of credit, SNLEE likely dealt with (knowingly and unknowingly) a variety of possible negative consequences.[22]

- Damage to business relationships: The collection likely created confusion and concern among the customer's clients, potentially damaging the SNLEE's reputation and business relationships. Clients may question the financial stability or reliability of the customer, leading to strained or severed business ties.

- Loss of revenue and business opportunities: If clients become hesitant to continue doing business with SNLEE because of the collection letter, it could cause a loss of revenue and future business opportunities. Clients may choose to work with competitors who do not face such collection issues. In this matter, the Plaintiff (SNLEE) has alleged that "…several customers, including Plaintiff's biggest customer, ProPetro, ceased doing business with it due expressly to Defendant's (The Bank) premature and wrongful notice."[23]

- Increased stress and distraction: Dealing with the accounts receivable collection issue and its repercussions could divert the customer's attention and resources from focusing on their core business activities. This additional stress and distraction may hinder their ability to effectively manage other important aspects of their operations. SNLEE stated in the Complaint, _"The premature and improper notice letters sent to all of Plaintiff's customers-and its business as a whole-into disarray."[24]_

- Deal killer. The Bank's sudden action could have killed the Amerisource loan. Amerisource could have become concerned at the sudden actions of the Bank and withdrew from the line of credit request. It would have been reasonable for Amerisource to expect that SNLEE would face negative consequences if customers felt SNLEE had financial problems. This expectation could have backfired on the Bank and caused damage to itself as Amerisource would not be paying off SNLEE's existing line of credit.

---

[21] In addition to my opinion, I took a poll of active lenders, retired lenders, and bank board directors who agreed with my opinion that is was not reasonable for the Bank to take collection action when a new loan was at the finish line.

[22] I have not been asked to provide any opinions regarding the negative consequences that may have occurred to SNLEE and their financial impact. This section of the report was included to highlight all of the negative consequents that could occur to a borrower and what a lender should consider when taking action with an accounts receivable collection letter to address a past due loan.

[23] Plaintiff's First Amended Complaint. Civil Action No.: 3:22-CV-00654. Page 4. Paragraph 18. Paragraphs 19-24 also provide additional information.

[24] Plaintiff's First Amended Complaint. Civil Action No.: 3:22-CV-00654. Page 3. Paragraph 13.

1  <u>When the Bank took action with SNLEE's customers, it also did not consider the delays in the</u>
2  <u>Amerisource loan funding were due in part to circumstances beyond SNLEE's control.</u>

3

4  Amerisource clearly stated that it wanted a first lien on SNLEE's A/R and inventory.
5  Amerisources's term sheet included:

6

Collateral:    Lender will have a blanket security interest on all assets of the Client, with
first priority security interest in all A/R and inventory of the Client.
Satisfactory Intercreditor Agreement(s) and/or Subordination Agreement(s) to
be negotiated with any existing secured lender(s) prior to funding.
Subordination of all other related party, shareholder and/or subordinated debt.

7

8

9  The Amerisource commitment to SNLEE required that Gulf Coast Bank release its UCC lien on
10  SNLEE's business assets.[25]

11

Based on our discussions to date and the information provided, Amerisource Business Capital ("Amerisource") is pleased to issue this Approval & Commitment Letter which confirms our approval of the proposed credit facilities with Amerisource.  Below are details regarding several changes to the loan facility. The closing and funding of the credit facilities is subject to all of the terms and conditions set forth in the Term Sheet, satisfactory execution of all required documents, and any other requirements which Amerisource may deem necessary in its sole discretion, including:

(1)  Customer signed supporting documentation for all service invoices going forward
(2)  Accounts receivable credit insurance with Amerisource as loss payee
(3)  Filing of a first lien deed of trust on the Brownfield, TX real estate
(4)  Exclusion of evergreen inventory availability within the borrowing base
(5)  In lieu of evergreen inventory, an additional term facility is available to assist in meeting the Origin Bank pay-off. The term facility will allow borrowing up to $315,000 not to exceed 18% of accounts receivable availability. The facility will be amortized over a twelve-month period
(6)  Subordination of the SBA loan
(7)  Pay-off and release of the Origin Bank lien
(8)  Release of the Gulf Coast Bank UCC
(9)  Executed original legal documents
(10) IRS inquiry—to be completed upon receipt of executed legal documents.

12

13

14  Contrary to the Bank's opinion that SNLEE was delaying the closing,[26] suppose that SNLEE had
15  turned the documents in to Amerisource within one hour after receiving the loan documentation
16  of closing. In this matter, Gulf Coast had still not provided a UCC release which would have
17  prevented Amerisource from being able to fund the line of credit. [27] [28]

18

---

[25] Amerisource Approval & Commitment Letter. June 15, 2021. SNLEE002901.
[26] Answer and Counterclaims of Defendant Origin Bank. Page 19 of 34. Paragraph 57.
[27] An additional requirement for SNLEE was to obtain a Subordination Agreement form the Small Business Administration. This was provided on June 22, 2021 and accepted by Amerisource on June 23, 2021. SNLEE002894 – SNLEE002897.
[28] An additional delay can be attributed to Amerisource. In an email dated July 8, 2021, Allison Billings updates Shawn on delays. SNLEE001227.

<u>Why did Gulf Coast have a UCC lien?</u>

When SNLEE applied with Gulf Coast in early 2021, Gulf Coast took a UCC lien on SNLEE's assets. However, when the deal did not happen, Gulf Coast failed to release the lien. According to Shawn Mudigere, on multiple occasions, SNLEE contacted Gulf Coast to get a UCC release on their collateral.[29] Since the Bank has directed SNLEE to Gulf Coast, it even contacted the Bank for help. In a text message to Austin Lewis at the Bank;



In summary, the Bank, knowing that Gulf Coast Bank was a primary cause of the delay in closing and funding SNLEE's new line of credit that would pay off the Bank's line of credit, took a seemingly impulsive reaction against SNLEE, setting the stage for SNLEE's claims in its First Amended Complaint.[30]

# Section 6: Supplemental Opinion 1 (July 19, 2023)

**The Bank's Payoff Statement (2023 Payoff Statement) to SNLEE dated July 7, 2023, was prepared in a manner that was misleading, and provided inaccurate**

---

[29] Shawn Mudigere shared this information with me during a call on June 14, 2023.
[30] Shawn Mudigere in a conversation on June 14, 2023, Shawn informed me that the Bank was aware of the Gulf Coasts delays in releasing the UCC lien.

**information. Based on the information provided to me, the SNLEE loan was paid in full as of August 2021.**

The 2023 Payoff Statement was misleading for the following reasons:

- The stated principal balance of $608,839.11 on page 1 was incorrect. This caused all calculations afterwards that relied upon this amount to be incorrect. (Refer to section 1 below)
- The late charge of $96,037.07 was materially different than the previous monthly late charges found on the March – August 2021 loan statements. The use of this late charge inflated the amount owed to the Bank. (Refer to section 2 below)
- The method in which the payments were applied on the 2023 Payoff Statement is different than found in the 2021 SNLEE loan statements and not consistent with the payment language found in the Promissory Note. (Refer to section 3 below)
- The Interest per day figure of $79.42 was incorrect. (Refer to section 4 below)
- Because the interest per day figure was overstated, this caused the total due as of July 7, 2023, to be incorrect. (Refer to section 4 below)

The loan was paid off (to $0.00) as of August 2021. Prior to the start of litigation in this matter I have not seen,

- Monthly loan statements after August 2021, loan history statements, or internal loan servicing system generated documents to show activity related to the SNLEE loan (Refer to section 5 below).

**Section 1. Conflicting amounts due.** On or about July 7, 2023, Origin Bank provided the 2023 Payoff Statement that indicated SNLEE had an outstanding principal balance of $608,839.11 as of 08/25/2021.[31]

| | | |
|---|---|---|
| Amerisource Payment Received (8/25/21) | | $(1,600,000.00) |
| New Principal Balance (at 8/25/21) | | $ 607,320.81 |
| | | |
| Interest Rate | 18% | |
| Interest per day | $ 303.66 | |
| Days (8/26/21 to 8/30/21) | 5 | |
| Interest Due (8/26/21 to 8/30/21) | | $ 1,518.30 |
| | | |
| TOTAL PRINCIPAL BALANCE (at 8/25/21) | | $ 608,839.11 |

2023 Payoff Statement – Page 1 – Section 2

However, this is materially different and greater when compared to the SNLEE Loan Year-To-Date Activity statement as of 12/31/21 (2021 Statement). The 2021 statement indicated that the

---

[31] Payoff Statement. July 7, 2023. Origin 002245.

principal loan balance was $450,000 as of 08/25/2021.[32] Further, the 2021 Statement (on the
following page) indicated that the principal balance was $0.00 after a $450,000 payment was
applied to the loan on August 31, 2021 (with an effective date of August 30, 2021).

| Posting Date | Effective Date | Transaction Description | Total | Principal |
|---|---|---|---|---|
| END OF PREVIOUS YEAR BALANCES | | | | $2,120,741.31 |
| 01/04/21 | 01/04/21 | PAYMENT | $35,332.46 | $24,214.32 |
| 01/11/21 | 01/11/21 | PAYMENT | $12,600.00 | $12,600.00 |
| 01/15/21 | 01/15/21 | PAYMENT | $5,000.00 | $5,000.00 |
| 01/21/21 | 01/21/21 | PAYMENT | $58,185.68 | $58,185.68 |
| 01/21/21 | 01/21/21 | PAYMENT | $3,159.28 | $0.00 |
| 02/09/21 | 02/09/21 | PAYMENT | $50,000.00 | $39,316.55 |
| 02/26/21 | 02/26/21 | PAYMENT | $15,000.00 | $15,000.00 |
| 03/29/21 | 03/29/21 | PAYMENT | $45,683.45 | $45,683.45 |
| 08/19/21 | 08/18/21 | PAYMENT | $132.50 | $132.50 |
| 08/31/21 | 08/25/21 | PAYMENT | $129,391.19 | $0.00 |
| 08/31/21 | 08/25/21 | PAYMENT | $1,470,608.81 | $1,470,608.81 |
| 08/31/21 | 08/30/21 | PAYMENT | $450,000.00 | $450,000.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| ENDING BALANCES | | | | $0.00 |

Origin Loan Year-To-Date Activity Statement – 12/31/2021 – History Section

**Section 2. The $96,037.07 late charge reflected on the 2023 Payoff Statement is materially
different than late charges included in the April through August 2021 loan statements.** This
contradiction can be seen in the August 13, 2021 SNLEE loan statement indicating that late charges
due were only $8,887.46.[33]

| | |
|---|---|
| Past Due Principal | 1,920,741.31 |
| Interest To 09/04/21 | 29,771.49 |
| Past Due Interest | 155,964.26 |
| Late Charges Due | 8,887.46 |
| **Total Due On 09/04/21** | **$2,115,364.52** |

Summary Section – 08/13/2021 Loan Statement

---

[32] Origin Loan Year-To-Date Activity. 12/31/2021. ORIGIN 002235
[33] SNLEE Loan Statement. August 13, 2021. ORIGIN 002233.

However, on the 2023 Payoff Statement, the late charge was increased to $96,037.07 as of August 25, 2021. The Bank calculated a late charge on the total unpaid principal balance (5% of $1,920,741,31).[34]

| DESCRIPTION | | TOTAL |
|---|---|---|
| Principal Balance (at 8/5/21) | | $ 1,920,741.31 |
| | | |
| Total Interest Due (at 8/5/21) | | $ 156,924.63 |
| | | |
| Interest per day | $ 960.37 | |
| Days (8/5/21 to 8/25/21) | 20 | |
| Interest Due (8/5/21 to 8/25/21) | | $ 19,207.40 |
| | | |
| Late charges | | $ 96,037.07 |
| | | |
| Legal Bill - Exall | | $ 2,695.00 |
| Legal Bill - Sbaiti & Company | | $ 11,665.50 |
| | | |
| Courier Fee | | $ 49.90 |
| | | |
| TOTAL (at 8/25/21) | | $ 2,207,320.81 |

2023 Payoff Statement – Page 1 – Section 1

This contradicts the Bank's actions when calculating the late charge in previous months. A sample of the late charges assessed and included on loan statements in 2021 (when the full principal amount was due):[35]

| Statement Due Date | Late Charge Assessed |
|---|---|
| March 4, 2021 | $0.00 |
| April 4, 2021 | $3,034.17 |
| May 4, 2021 | $3,034.17 |
| June 4, 2021 | $5,958.33 |
| July 4, 2021 | $5,958.33 |
| August 4, 2021 | $8,887.46 |
| September 7, 2021 | $8,887.46 |

Last, a review of the Promissory Note does not make it clear that the Bank could charge a late fee on the entire amount. The Promissory Note offers the following regarding late fees.[36]

---

[34] Payoff Statement. July 7, 2023. Origin 002245.
[35] Information taken from various Origin loan statements prepared for the benefit of SNLEE. The above examples can be found at ORIGIN 002067, ORIGIN 002069, 002065, ORIGIN 002063, ORIGIN 002061, ORIGIN 002059, and ORIGIN 002057.
[36] Promissory Note. December 11, 2018. SNLEE0002754

> payable in full (the "**Maturity Date**").  All payments received hereon shall be applied first to the payment of accrued interest on the unpaid principal, with the remainder, if any, applied to reduction of principal. Any payment received later than ten (10) days from the due date thereof must be accompanied by a late fee payment in the amount of five percent (5%) of the amount of such monthly payment.

Monthly payment is not defined in the loan documents. In summary, the Bank did not follow standard industry guidelines when it calculated the late charge using inconsistent methods.

Also, I cannot determine how the Bank arrived at any of the late charges assessed above. I may be able to determine if I am able to conduct an inspection of the Bank's loan servicing system. As of this date, I have not been provided access to the Bank's loan servicing system.

**Section 3. The 2023 Payoff Statement does not properly apply the loan payments, which leads to a misleading principal balance.** According to the Promissory Note,[37]

> Interest on the unpaid principal balance of this Note shall be due and payable on January 11, 2019, and continuing regularly and monthly thereafter on the same day of each month, until December 11, 2019, when all accrued and unpaid interest and all unpaid principal shall be due and payable in full (the "**Maturity Date**").  All payments received hereon shall be applied first to the payment of accrued interest on the unpaid principal, with the remainder, if any, applied to reduction of principal. Any payment received later than ten (10) days from the due date thereof must be accompanied by a late fee payment in the amount of five percent (5%) of the amount of such monthly payment.

Promissory Note – 1. Interest Rates and Payments

A review of the Loan Year-to-Date Activity statement shows that payments were applied consistent with the terms found in the Promissory Note. The August 31, 2021, payment applied with an effective date of August 25th shows the interest was paid first and then the principal.

---

[37] Promissory Note. December 11, 2018. SNLEE0002754

| Posting Date | Effective Date | Transaction Description | Total | Principal | Interest |
|---|---|---|---|---|---|
| END OF PREVIOUS YEAR BALANCES | | | | $2,120,741.31 | |
| 01/04/21 | 01/04/21 | PAYMENT | $35,332.46 | $24,214.32 | $11,118.14 |
| 01/11/21 | 01/11/21 | PAYMENT | $12,600.00 | $12,600.00 | $0.00 |
| 01/15/21 | 01/15/21 | PAYMENT | $5,000.00 | $5,000.00 | $0.00 |
| 01/21/21 | 01/21/21 | PAYMENT | $58,185.68 | $58,185.68 | $0.00 |
| 01/21/21 | 01/21/21 | PAYMENT | $3,159.28 | $0.00 | $0.00 |
| 02/09/21 | 02/09/21 | PAYMENT | $50,000.00 | $39,316.55 | $10,683.45 |
| 02/26/21 | 02/26/21 | PAYMENT | $15,000.00 | $15,000.00 | $0.00 |
| 03/29/21 | 03/29/21 | PAYMENT | $45,683.45 | $45,683.45 | $0.00 |
| 08/19/21 | 08/18/21 | PAYMENT | $132.50 | $132.50 | $0.00 |
| 08/31/21 | 08/25/21 | PAYMENT | $129,391.19 | $0.00 | $129,391.19 |
| 08/31/21 | 08/25/21 | PAYMENT | $1,470,608.81 | $1,470,608.81 | $0.00 |
| 08/31/21 | 08/30/21 | PAYMENT | $450,000.00 | $450,000.00 | $0.00 |
| 08/31/21 | 08/31/21 | ADJ DECREASE | $47,865.39 | $0.00 | $47,865.39 |
| 08/31/21 | 08/31/21 | FEE WAIVER | $10,246.03 | $0.0 | $0.00 |
| ENDING BALANCES | | | | $0.0 | |

*2. Then towards principal.*

*1. Payment applied to interest first.*

Origin Loan Year-To-Date Activity Statement – 12/31/2021 – History Section

However, the 2023 Payoff Statement as seen on the following page shows that the Bank applied the payments first toward interest (properly), and then (improperly) to the late charges, legal fees, courier fees and **last** to the principal balance.

| DESCRIPTION | | TOTAL |
|---|---|---|
| Principal Balance (at 8/5/21) | | $ 1,920,741.31 |
| Total Interest Due (at 8/5/21) | | $ 156,924.63 |
| Interest per day | $ 960.37 | |
| Days (8/5/21 to 8/25/21) | 20 | |
| Interest Due (8/5/21 to 8/25/21) | | $ 19,207.40 |
| Late charges | | $ 96,037.07 |
| Legal Bill - Exall | | $ 2,695.00 |
| Legal Bill - Sbaiti & Company | | $ 11,665.50 |
| Courier Fee | | $ 49.90 |
| TOTAL (at 8/25/21) | | $ 2,207,320.81 |
| Amerisource Payment Received (8/25/21) | | $(1,600,000.00) |
| New Principal Balance (at 8/25/21) | | $ 607,320.81 |

2023 Payoff Statement – Page 1 – Section 1 and top of Section 2

Using this method to apply the proceeds resulted in a misleading principal balance of $607,320.81.

**Section 4. The 2023 Payoff Statement includes a misleading Total Principal Balance as of August 25, 2021.** The statement includes the following amount due at the bottom of the 2023 Payoff Statement.

| | | |
|---|---|---|
| Amerisource Payment Received (8/25/21) | | $(1,600,000.00) |
| New Principal Balance (at 8/25/21) | | $ 607,320.81 |
| | | |
| Interest Rate | 18% | |
| Interest per day | $ 303.66 | |
| Days (8/26/21 to 8/30/21) | 5 | |
| Interest Due (8/26/21 to 8/30/21) | | $    1,518.30 |
| | | |
| TOTAL PRINCIPAL BALANCE (at 8/25/21) | | $ 608,839.11 |

2023 Payoff Statement - Page 1 – Section 2

However, the stated principal balance as of 08/25/2021 includes **future** interest amounts (08/26/2021–08/30/2021) that have been included in the principal amount. First, interest should never be lumped in with the principal loan amount due and called Total Principal Balance. They are two separate items and should be identified separately. It would be appropriate to call the combined figure the "total due" or the "payoff amount" if it represented the full amount due on the loan. Further, future interest amounts that have not accrued should not have been included earlier (as can be seen on the following page).

| | | |
|---|---|---|
| Amerisource Payment Received (8/25/21) | | $(1,600,000.00) |
| New Principal Balance (at 8/25/21) | | $ 607,320.81 |
| | | |
| Interest Rate | 18% | |
| Interest per day | $ 303.66 | |
| Days (8/26/21 to 8/30/21) | 5 | |
| Interest Due (8/26/21 to 8/30/21) | | $    1,518.30 |
| | | |
| TOTAL PRINCIPAL BALANCE (at 8/25/21) | | $ 608,839.11 |

2023 Payoff Statement – Page 1 – Section 2

To recap, the Total Principal Balance (at 8/25/21) of $608,839.11 was calculated by incorrectly adding the New Principal Balance and the Interest Due amounts together.

|  |  |
|---|---|
| New Principal Balance: | $607,320.81 |
| Interest Due: | $    1,518.30 |
| Total: | $608,839.11 |

It is not standard lending practice to combine interest and principal together and call it principal. It is also not standard lending practice to include future amounts (in this case, five days' future interest) in the principal balance due as of an earlier date (08/25/2021). As a result, the Total Principal Balance in the 2023 Payoff Statement was inaccurate. Assuming that earlier calculations

1  in the process were appropriate and leaving out the five days future interest, the correct amount
2  would have been $607,320.81 (see line two of Section 2 above).
3
4  Because of the incorrectly stated Total Principal Balance of $608,839.11, the Total Principal
5  Balance as of 08/30/2021 after the application of the $450,000 was applied was also incorrect.
6

| New Principal Balance (at 8/25/21) | | $ 608,839.11 |
|---|---|---|
| New Loan/Partial Payment (8/30/21) | | $ (450,000.00) |
| | | |
| TOTAL PRINCIPAL BALANCE (at 8/30/21) | | $ 158,839.11 |
| | | |
| New Principal Balance (at 8/30/21) | | $ 158,839.11 |
| | | |
| Interest Rate | 18% | |
| Interest per day | $ 79.42 | |
| Days (8/30/2021 to 07/07/2023) | 677 | |
| Interest Due (8/30/2021 to 07/07/2023) | | $ 53,767.34 |
| | | |
| TOTAL DUE as of 7/7/23 | | $ 212,606.45 |

7
8  2023 Payoff Statement – July 7, 2023 – Page 2 – Sections 3 and 4
9
10  This had the cascading effect of causing the Interest per day of $79.42 to be incorrect. Assuming
11  everything else in the 2023 Payoff Statement was correct up to this point (which it was not), the
12  interest should have been calculated using $157,320.81 ($607,320.81 - $450,000 = $157,320.81).
13  Based upon this amount, the Interest per day should have been $78.66 ($157,320.81 X 18% / 360
14  days). Note: The Promissory Note indicates that interest is calculated using 360 days (instead of
15  365 calendar days), consistent with commercial loan industry practices. The calculated interest due
16  was overstated because of the improper Interest per day calculation. This led to a misleading
17  amount due on the 2023 Payoff Statement.
18
19  In summary, the 2023 Payoff Statement contains many errors and is not credible. The 2021
20  Statement (which was prepared prior to the start of litigation) appears to be the most accurate
21  reflection of how payments were applied, and the loan was paid to $0.00. Based upon the
22  information available to me, the SNLEE loan was paid off in August 2021.
23
24  **Section 5. The Loan Year-to-Date Activity Statement (the 2021 Statement) indicated that the loan**
25  **was paid to zero as of August 31, 2021. Prior to the lawsuit initiated by SNLEE, the Bank did not**
26  **provide any information to indicate that the loan had not been paid to zero.**
27
28  To recap, as seen below, the history section of the 2021 Statement showed that the loan had been
29  paid to $0.00.
30

| Posting Date | Effective Date | Transaction Description | Total | Principal | Interest | Late Fees/ Other | Escrow | Insurance |
|---|---|---|---|---|---|---|---|---|
| END OF PREVIOUS YEAR BALANCES | | | | $2,120,741.31 | | | $0.00 | |
| 01/04/21 | 01/04/21 | PAYMENT | $35,332.46 | $24,214.32 | $11,118.14 | $0.00 | $0.00 | $0.00 |
| 01/11/21 | 01/11/21 | PAYMENT | $12,600.00 | $12,600.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 01/15/21 | 01/15/21 | PAYMENT | $5,000.00 | $5,000.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 01/21/21 | 01/21/21 | PAYMENT | $58,185.68 | $58,185.68 | $0.00 | $0.00 | $0.00 | $0.00 |
| 01/21/21 | 01/21/21 | PAYMENT | $3,159.28 | $0.00 | $0.00 | $3,159.28 | $0.00 | $0.00 |
| 02/09/21 | 02/09/21 | PAYMENT | $50,000.00 | $39,316.55 | $10,683.45 | $0.00 | $0.00 | $0.00 |
| 02/26/21 | 02/26/21 | PAYMENT | $15,000.00 | $15,000.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 03/29/21 | 03/29/21 | PAYMENT | $45,683.45 | $45,683.45 | $0.00 | $0.00 | $0.00 | $0.00 |
| 08/19/21 | 08/18/21 | PAYMENT | $132.50 | $132.50 | $0.00 | $0.00 | $0.00 | $0.00 |
| 08/31/21 | 08/25/21 | PAYMENT | $129,391.19 | $0.00 | $129,391.19 | $0.00 | $0.00 | $0.00 |
| 08/31/21 | 08/25/21 | PAYMENT | $1,470,608.81 | $1,470,608.81 | $0.00 | $0.00 | $0.00 | $0.00 |
| 08/31/21 | 08/30/21 | PAYMENT | $450,000.00 | $450,000.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 08/31/21 | 08/31/21 | ADJ DECREASE | $47,865.39 | $0.00 | $47,865.39 | $0.00 | $0.00 | $0.00 |
| 08/31/21 | 08/31/21 | FEE WAIVER | $10,376.03 | $0.00 | $0.00 | $10,376.03 | $0.00 | $0.00 |
| ENDING BALANCES | | | | $0.00 | | | $0.00 | |

Origin Loan Year-To-Date Activity Statement – 12/31/2021 – History Section

The history also shows that accrued interest had been reversed and late charges had been waived which would be consistent with a loan that has been closed.

If the SNLEE loan had remained active (not paid off) and current, I would expect to see the following.

- Monthly loan statements after August 2021. No statements after August 2021 were provided to me.
- A 2022 Loan Year-To-Date Activity statement like the 2021 Statement (ORIGIN 002235).
- Loan servicing screenshots showing loan activity after August 2021.

If the loan had remained active (but past due), I would have expected to see the following.

- Monthly loan statements after August 2021.
- Collection letters like the ones provided that were dated before August 2021.
- Loan charge-off memo if any of the SNLEE loan had been charged off by the Bank.
- Loan processing tickets (paper or electronic) charging down a portion of the loan balance that might have been deemed uncollectable.
- Loan servicing system screenshots showing that the loan has been reclassified as a non-accrual loan.

I have not been provided with any of the above information to indicate that the loan was active or had any unpaid balances owed to the Bank after August 2021.

# Section 7: Conclusion

Over the course of nine loan modifications and three demand letters, there were multiple opportunities for the Bank to have pulled the plug on the SNLEE line of credit and taken action to collect the obligation.

However, the Bank did not act. It continued with "business as usual" with SNLEE. It was not until August 5, 104 days after the most recent demand letter while a loan was in the final stages of being closed, that the Bank's "seemingly endless patience finally ran out."[38]

There were many opportunities for the Bank to have acted that would have been appropriate and consistent with industry guidelines. However, waiting until a new line of credit in the final closing stages was neither logical nor consistent with standard commercial collection practices.

The documents identified in this report are reasonably relied upon by experts in this field in forming this type of opinion. My opinions expressed above are based upon my consideration of reliable principles and methods and the application thereof to the facts and information reviewed. If asked at trial or provided supplemental materials or information, I reserve the right to amend or supplement my opinions and reasoning. I hold all of these opinions to a reasonable degree of professional certainty.

Respectfully submitted,

J.D. Koontz
3818 MacCorkle Ave, SE
Charleston, WV 25304

---

[38] Answer and Counterclaims of Defendant Origin Bank. Page 19 of 34. Paragraph 58.

# Appendix 1

1
2                                    **Depositions**
3
4    I have been deposed in the following matters during the previous four years.
5
6    • First Federal Bank, a federally chartered savings bank and successor in interest by merger to
7    CBC National Bank, Plaintiff, v. Barry M. Siegel and Renee Stella. Defendants. Circuit Court,
8    Fourth Judicial Circuit, in and for Duval County, Florida. Case No.: 2020-CA-000288. Division:
9    CV-B. The Client is Barry Siegel. March 2023.
10
11   Lyons Heritage Tampa, LLC., Plaintiff vs. Olurotimi Phillips and Jacqueline Phillips, Defendants-
12   Counter plaintiffs. In the Circuit Court for the Sixth Judicial Circuit in and for Pinellas County,
13   Florida. Case No: 20-001615-CI. January 2023.
14
15   Mary Beth Wallace, a/k/a Mary P. Wallace, Plaintiff, v. Davis Trust Company; Allegheny
16   Insurance Services, Inc.; James W. Wallace; Hugh Hitchcock; and Hoy Ferguson, Defendants.
17   Circuit Court of Randolph County West Virginia, Civil Action No.: 20C-119. October 2022.
18
19   The Barbara Bek Payne Family Trust Dated November 3, 2008. Superior Court for the State of
20   California, County of Los Angeles – Central District. Case No.: 16STPB01383. May 2022. May
21   2022. The Client is Leigh E. Payne, Successor-In-Interest to Robert Erie Payne. June 2022.
22
23   Sergio Larios, Plaintiff, v. Specialized Loan Servicing LLC and WF Victoria Grantor Trust
24   2016-3, and Does 1-25, Defendants. Superior Court of the State of California – County of Los
25   Angeles. Case No. 18SSTCP02482. January 2022.
26
27   Blackjewel, LLC., et al., Plaintiffs v. United Bank, Defendant, United States Bankruptcy Court
28   for the Southern District of West Virginia. Chapter 11. Case No 19-30289. Adv. Proceeding No.
29   3:20-ap-03007. October 2021.
30
31   Cash Link USA, LLC d/b/a Cash Link USA, Plaintiff, v. Christopher Flathers, Defendant. Circuit
32   Court of Jackson County, Missouri at Independence Associate Division.  Case No. 1916-
33   CV33003.  October 2021.
34
35   Patrick P. Galford and Tessa L. Galford, Plaintiffs, v. Alcova Mortgage, LLC, Nationstar
36   Mortgage LLC, d/b/a Mr. Cooper, and Shumate Appraisals, LLC, Defendants. Circuit Court of
37   Mercer County, West Virginia. Case No.: 19-C-37. August 2021. The Client is Alcova Mortgage,
38   LLC.
39
40   Peta-Gaye P. Connors, Plaintiff, v. Dutch Miller of Charleston, Inc. and Tommy Henson,
41   Defendants.  Circuit Court of Kanawha County, West Virginia.  Case No. 18-C-521. June 2021.

Stephanie Suttle, Plaintiff, v. Stephen Calk and the Federal Savings Bank, Defendants. United States District Court for the Northern District of Illinois – Eastern Division, Chicago, Illinois. Case No. 19-cv-4541. June 2021.

Alyssa Mayer, Christopher Cahill, Charles and Kathleen Carey, Patricia Carey, Charles F. Carey and Kathleen A. Carey Revocable Living Trust, Anne Cuddy, Marianne Dubois, Frank Joseph Heyen III, Gary Hines, Scott Intagliata, Roman Katchaluba, Patrick Keyes, Manoj Kintali, Kristine Kucera, Mike and Cynthia Mahoney, John and Deborah Mallory, Alex Mallory, Twinkaljim Properties, LLC, Kirk and Fran Meany, Mitchell Messner, John Pusateri, Renee Roosa, Van and Marci Spears, Chelsea Swaggerty, Sam and Kate Sweeten, Jonathan Torres, Theresa Torres, and Chris Whiteman, Plaintiffs, v. Citizens Bank & Trust Company, Defendant. Circuit Court of Jackson County, Missouri at Kansas City. Case No. 19160CV30034 Division 14. May 2021.

Coalfield Lumber Co., Inc., A Kentucky Corporation, and Bryan K. Jude, Plaintiffs, v. Madelina M. "Tint" Stacy, Sheri Bragg, B&T Speedway, LLC, a West Virginia Limited Liability Company, Tint's Steak & Grill, A West Virginia Limited Liability Company, and Bank of Mingo, a West Virginia Corporation, Defendants. United States District Court for the Southern District of West Virginia – Charleston Division. Case No.: 2:19-CV-00681. November 2020.

Radiosurgery Solutions, LLC, a California limited liability company; Channel Blue, Inc., a California corporation, Plaintiffs, v. Select Healthcare Solutions Fund II, LLC, a California limited liability company; Select Healthcare Solutions, LLC, a California limited liability company; Select Technology Partners, LLC, a California limited liability company; Matthew Cutler, an individual, Defendants.  Superior Court of the State of California for the County of Los Angeles. Case No. BC632727. January 2020.

Davantic, LLC, Plaintiff, v. Michael P. Thompson, RealCorp, LLC, Val Young, MPT Realty, LLC, and TOP Properties, LLC, Defendants. Circuit Court of Kanawha County. Civil Action No. 16C-304. September 2019.

Shawn E. Fauber and Rosa Yvonne Fauber, Plaintiffs, v. Nationstar Mortgage, LLC, Jeffrey S. Moore, and ISGN Fulfillment Services, Inc., Defendants.  Circuit Court of Kanawha County. Civil Action No. 15-C-1650. September 2019.

### **Trials**

I have testified in the following cases during the last four years.

• CIT Bank, NA, Plaintiff, v. Shirley M. Bowen by her next friend Caroline Coffman, Defendant. Circuit Court of Hampshire County, West Virginia. Case No. 14-2016-C-97. June 2021.

• Radiosurgery Solutions, LLC, a California limited liability company; Channel Blue, Inc., a California corporation, Plaintiffs, v. Select Healthcare Solutions Fund II, LLC, a California limited liability company; Select Healthcare Solutions, LLC, a California limited liability company; Select Technology Partners, LLC, a California limited liability company; Matthew Cutler, an individual, Defendants. Superior Court of the State of California for the County of Los Angeles. Case No. BC632727. March 2022.

• Sergio Larios, Plaintiff, v. Specialized Loan Servicing LLC and WF Victoria Grantor Trust 2016-3, and Does 1-25, Defendants. Superior Court of the State of California – County of Los Angeles. Case No. 18SSTCP02482. April 2022.

• North Hills Group, Inc., Plaintiff, v. Danny Webb and Danny Webb Construction Company, Inc., Defendants. Circuit Court of Fayette County, West Virginia. Civil Action No. 19-C-2. May 2022

**Published Articles**

• Kanawha Valley Home and Living, an article titled "Ten Tips to Secure a Mortgage. June 2014.

• SEAK Expert Witness Directory, an article titled, "Lender Liability Expert Witness: Improper Activity by the Lender – Examples, Targets, and Signs" April 2020.

• SEAK Expert Witness Directory, an article titled, "Predatory Lending Expert Witness: Unfair and Abusive Loan Terms – Examples, Targets, and Signs," March 2020.

# Appendix 2

To prepare this report for the Client in this matter, I reviewed, considered, and relied upon documents provided to me by counsel for the plaintiffs. The documents I reviewed, considered, and may have relied upon in preparing my expert opinions are:

- Various Text Messages SNLEE 000903-SNLEE 000913
- 000000_SNLEE001735
- 000000_SNLEE002884
- 000001_SNLEE001573
- 000001_SNLEE002887
- 000002_SNLEE002868
- 000002_SNLEE002894
- 000003_SNLEE00000016
- 000003_SNLEE003259
- 000004_SNLEE00000041
- 000004_SNLEE0002857
- 000005_SNLEE001198
- 000005_SNLEE0002851
- 000006_SNLEE001332
- 000006_SNLEE002961
- 000007_SNLEE001274
- 000007_SNLEE003249
- 000008_SNLEE0002839
- 000008_SNLEE002866
- 000009_SNLEE0002840
- 000009_SNLEE002904
- 000010_SNLEE0002845
- 000010_SNLEE002913
- 000011_SNLEE002107
- 000011_SNLEE002910
- 000012_SNLEE001607
- 000012_SNLEE002905
- 000013_SNLEE002908
- 000013_SNLEE003299
- 000014_SNLEE002911
- 000014_SNLEE003387
- 000015_SNLEE002907
- 000015_SNLEE002898
- 000016_SNLEE002909

1. • 000016_SNLEE003115
2. • 000017_SNLEE002906
3. • 000017_SNLEE003130
4. • 000018_SNLEE002912
5. • 000018_SNLEE003123
6. • 000019_SNLEE002903
7. • 000019_SNLEE003111
8. • 000020_SNLEE002901
9. • 000021_SNLEE0002751
10. • 000022_SNLEE0002863
11. • 000023_SNLEE0002760
12. • 000024_SNLEE0002754
13. • 000025_SNLEE0002775
14. • 000026_SNLEE0002768
15. • 000027_SNLEE0002777
16. • 000029_SNLEE0002815
17. • 000030_SNLEE0002821
18. • 000031_SNLEE0002830
19. • 000032_ORIGIN 000974
20. • 000033_ORIGIN 001012
21. • 000034_ORIGIN 000967
22. • 000035_ORIGIN 000978
23. • 000036_SNLEE00000153
24. • 000037_SNLEE00000011
25. • 000038_SNLEE00000074 May 2021 email
26. • 000039_SNLEE00000045
27. • 000040_ORIGIN 000001
28. • 000041_ORIGIN 000302
29. • Sept. 16, 2021 Letter to Disregard
30. • 000043_Original001033
31. • 000044_PP-Origin 000671
32. • 000045_PP-Origin 000668
33. • 000046_PP-Origin 000411
34. • 000047_PP-Origin 000670
35. • 000048_PP-Origin 001757
36. • 000049_PP-Origin 001954
37. • 000050_PP-Origin 001777
38. • 000051_PP-Origin 001732
39. • 000052_PP-Origin 000656
40. • 000053_PP-Origin 000672
41. • 000054_PP-Origin 001607

- 000055_SNLEE0002723
- 000056_SNLEE0002717
- 000057_SNLEE0002731
- 000058_SNLEE0002742
- 000059_SNLEE0002749
- 000060_SNLEE0002734
- 000061_Origin002038
- 000062_Origin001067
- 000063_Origin048823 (Slipsheet)
- 2022-04-18 Plaintiff Salt and Light's First Amended Complaint Doc 11 4864-9567-9260 v.1
- 2022-07-05 Protective Order Doc 22 4859-3467-4983 v.1
- 2022-07-05 Protective Order Doc 22 4859-3467-4983 v.1
- 2022-11-23 Origin's Answer and Counterclaims Doc 34 4893-6990-9058 v.1 (0)
- ORIGIN001036
- SNLEE001356 - Financing and Loan Agreement
- SNLEE001227 – Email from Billings to Midigere
- 000064_Origin002057
- 000065_Origin002059
- 000066_Origin002061
- 000067_Origin002063
- 000068_Origin002065
- 000069_Origin002067
- 000070_Origin002069
- 000071_Origin002231
- 000072_Origin002233
- 000073_Origin002235
- 000074_Origin002245

Besides the documents referenced above, I may have also relied upon additional materials. Any additional materials that I may have relied upon are referenced in the footnotes of my report.

# Appendix 3

## Jason D. Koontz, CRC

3818 MacCorkle Ave, SE
Charleston, WV 25304
*Telephone (646) 397-3835   Cell 304-541-5394*
*JD@jasondkoontz.com.com*
*Jasondkoontz.com*

### SUMMARY

Senior banking vice president with over 20 years of lending, cash management, and bank operations experience. Vast hands-on experience in bank lending practices, deposit accounts, and matters involving residential real estate. Certified Residential Appraiser. Certified in credit risk.

**Coast-to-coast experience as an expert witness. Expert witness engagements have involved commercial loans, residential mortgages, predatory lending, debt collection, underwriting, consumer protection, fraud, truth in lending, lender liability, loan servicing, deposit accounts, residential property valuation, bank policies, and USPAP compliance. Clients include individuals, small business owners, mortgage loan servicers, and some of the largest lenders in the US. Experienced in both state and federal cases (including class actions). Extensive testifying experience at deposition and trial.**

### PROFESSIONAL EXPERIENCE

**Jason D. Koontz**                                                    **Charleston, WV**
*Consultant*                                             *September 2013 to present*

- Providing expert and litigation support to attorneys representing financial institutions, mortgage loan servicers, businesses, and individuals. Services including loan review, analysis, loan modifications & servicing, residential appraisals, USPAP appraisal reviews, deposition, and trial testimony.
- Individual training for Bank Directors so that they may be more informed and engaged.
- Assistance to banking clients who are evaluating loan proposals or preparing a loan package for consideration.
- Residential appraisal services for financial institutions and individuals. Appraisal services include but are not limited to residential property appraisals involved in litigation.
- Retained in over 225 matters.

**The RPC Group, LLC**                                            **Scott Depot, WV**
*Consultant*                                    *July 2012 to September 2013*

- Provided consulting and litigation support to attorneys representing financial institutions, businesses, and individuals. Services included loan review, analysis, and expert witness services.
- Real estate appraisals and consulting.

**Summit Community Bank**                                         **Charleston, WV**
*Senior Vice President*                                  *August 1998 to July 2012*

- Generated and managed customer relationships for commercial loans up to $15,000,000. Loan types included: commercial real estate, commercial construction, multi-unit housing, equipment, lines of credit, letters of credit, parking garages, and airport financing. Involved in underwriting, loan closing process, loan servicing, and, if necessary, debt collection.
- Managed problem loans, including foreclosures and repossessions.
- Generated consumer loans, which includes residential mortgages, automobile loans, credit cards, construction loans, home equity lines of credit, and unsecured loans. Personally, analyzed each request.
- Provided deposit services, including personal and commercial deposit accounts, escrow accounts, and trust accounts.

Page | 1                              Jason D. Koontz, CRC                              Revised 05/2023

1

- Cash management product sales, including overnight investment, zero-balance arrangements, internet banking, remote deposit banking, and internet bill pay.

**Banc One Leasing Corporation**                                    **Charleston, WV, and Dayton, OH**
*Account Executive*                                                 *August 1997 to August 1998*

- Provided leasing solutions to middle-market customers (those with annual sales over $5,000,000) in the State of West Virginia and the greater Dayton, Ohio, markets.

**United National Bank**                                            **Charleston, WV**
*Vice President*                                                     *November 1991 to August 1997*

- Cultivated and managed commercial relationships for commercial loans.
- Served as a Cash Management Specialist and established a formal cash management program. Provided sales support to employees throughout the company.
- Analyzed commercial loan requests and provided recommendations as a Credit Analyst.
- Managed past due accounts in the consumer and commercial loan collections department. Assisted in foreclosures and repossessions.

## EDUCATION

- Bachelor of Business Administration in Marketing, Marshall University, August 1991.
- Completed the Risk Management Association's Commercial Lending School, May 1993.
- Numerous seminars and training programs regarding the banking industry and residential real estate.

## CERTIFICATIONS

- Risk Management Association – Credit Risk Certification, April 2012
- WV Real Estate Appraiser Licensing & Certification Board–Certified Residential Appraiser License number: WV CR1162
- State of South Carolina Real Estate Appraisers Board–Certified Residential Appraiser License number: 8618

## PRESENTATIONS

- U.S. Small Business Administration, titled "Am I Making Money?  Understanding the Numbers Behind Your Business," November 2017.
- U.S. Small Business Administration, titled "Am I Making Money?  Understanding the Numbers Behind Your Business," June 2017.
- U.S. Small Business Administration, titled "Am I Making Money?  Understanding the Numbers Behind Your Business," December 2016.
- U.S. Small Business Administration, titled "Navigating the Loan Application Process," August 2014.
- SCORE – Charleston, titled "Navigating the Loan Application Process and Options When the Bank Says No," July 2014.
- U.S. Small Business Administration, titled "Bankers and Balance Sheets," June 2014.
- Kanawha Valley Board of Realtors, titled "Navigating the Loan Application Process," August 2012.

## PUBLICATIONS

- SEAK Expert Witness Directory, an article titled, "Improper Activity by the Lender – Examples, Targets, and Signs'" April 2020
- SEAK Expert Witness Directory, an article titled, "Unfair and Abusive Loan Terms – Examples, Targets, and Signs," March 2020
- Kanawha Valley Home & Living, an article titled "Ten Tips to Secure a Mortgage," June 2014.

**OTHER**

- Currently, serve on the expert panel for Money.com. Money is a personal finance brand and website. It was formerly also a monthly magazine first published by Time Inc.

- Served as a consultant for a video produced by Motion Masters, Inc., and distributed by Meridian Education Corporation, titled "Personal Finance Essentials: Financial Literacy for Young Earners—Credit Borrowing, and Debt," June 2011.

- WV Chapter of Score. Served as a volunteer and was Chairperson of the Charleston Chapter.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

SALT AND LIGHT ENERGY                §
EQUIPMENT, LLC,                      §
                                     §
Plaintiff/Counter-Defendant,§
                                     §    CIVIL ACTION NO.
v.                                   §    3:22-cv-00654-N
                                     §
ORIGIN BANCORP, INC., DBA            §
ORIGIN BANK,                         §
                                     §
Defendant/Counter-Plaintiff,§
                                     §
v.                                   §
                                     §
DENISE MUDIGERE and SHAWN            §
MUDIGERE,                            §
                                     §
Third-Party Defendants.              §


REMOTE ORAL AND VIDEOTAPED DEPOSITION BY

VIDEOCONFERENCE OF JASON D. KOONTZ

VOLUME I OF I

August 1, 2023


**EXHIBIT**

**2**

```
 1      A     Well, I would start with their loan policy to
 2 determine what their loan policy is for handling it.
 3 And then, from there, I would go and I believe they are
 4 regulated by the Federal Reserve and the FDIC.  So I
 5 would look to both of those institutions for information
 6 as far as additional guidance.
 7      Q     And did you, in fact, do that in this
 8 particular matter?
 9      A     No.  I don't believe that that was part of the
10 scope of my work as far as this matter.
11      Q     Okay.  As part of your job responsibilities
12 with Summit Community Bank, did you advise the bank on
13 how to properly collect on secured collateral once a
14 borrower defaulted?
15      A     I did not advise the bank.  But as a lender
16 there, based upon my training, education, experience, I
17 may have contributed, along with others, to determine
18 the best course of action when collecting a problem
19 loan.
20      Q     And what -- what is your general advice -- you
21 know, if you're the lender on a particular loan and
22 you're collecting on secured collateral, what is your
23 general advice or your procedure for collecting on that
24 collateral?
25                MR. HAMPILOS:  Objection.  Vague.
```

 1  contract construction, are you?

 2      A    I am not.

 3      Q    Okay.  Are you holding yourself out as an

 4  expert in the Uniform Commercial Code?

 5      A    I am not.

 6      Q    Are you holding yourself out as an expert in

 7  the Texas Business and Commerce Code?

 8      A    No.

 9      Q    Do you know what the Texas Business and

10  Commerce Code is?

11      A    It's a code similar to codes in other states

12  as far as providing regulations for businesses within

13  the state of Texas.

14      Q    Okay.  Have you reviewed any of the provisions

15  of the Texas Business and Commerce Code as part of your

16  foundation or basis for any of your opinions today?

17      A    Not in this matter.  I have reviewed it before

18  for another matter, but I don't believe in this matter.

19      Q    You have not looked at any sources to study

20  how Texas interprets and applies the Business and

21  Commerce Code as it relates to commercial loans, have

22  you?

23      A    No.  My involvement in this is largely based

24  upon my training, education, and experience as a lender.

25      Q    Okay.  And you have not done anything to study

1 how Texas interprets and applies the Business and

2 Commerce Code as it relates to the collection of secured

3 collateral, have you?

4      A    Again, my participation in this matter is

5 based upon my lending experience, training, education,

6 and as someone who has written loan documents.

7      Q    And just so we have a clear record, that's a

8 "no," then?

9      A    Would you please repeat the question?

10     Q    Yes, sir.  You have not studied how Texas

11 interprets and applies the Business and Commerce Code as

12 it relates to the collection of secured collateral in a

13 commercial loan situation, have you?

14     A    I have not studied the Texas code in regards

15 to that.  Again, I'm relying upon my training,

16 education, and experience.

17     Q    As an expert witness, you understand that it's

18 important for you to tell the truth; right?

19     A    Yes.

20     Q    And it's important for you to use reliable

21 methodology to arrive at your opinions; fair?

22     A    Yes.

23     Q    Okay.  From case to case, you need to offer

24 opinions that are consistent under the same or similar

25 facts; right?

Jason D. Koontz, Vol. I
August 01, 2023

```
 1  of the report.

 2      Q    Okay.  Is it fair for me to conclude, then,

 3  that between Appendix 2, which goes on to page 28 and 29

 4  of your report, and whatever documents are cited in the

 5  footnotes of your report, that is the universe of

 6  documents on which you've relied to provide your

 7  opinions in this case?

 8      A    In addition to my training, education, and

 9  experience, yes.

10      Q    Yes, sir.  But as far as documents go, that is

11  the universe of documents on which you've relied.  Is

12  that fair?

13      A    Or cited in the report, yes.

14      Q    Yes.  Were you provided documents that you did

15  not rely on that are not listed on Appendix 2?

16      A    No.  I believe all of the documents you see

17  here were the ones that were provided to me.

18      Q    Okay.  So Appendix 2 is a complete list --

19  strike that.

20                Appendix 2 and any footnotes in your

21  report citing a document is the complete universe of

22  documents you were provided.

23      A    It was my best intention to include all of

24  that information.

25      Q    Sitting here today, are you aware of any
```

Jason D. Koontz Vol I
August 01, 2023

1  counsel?

2      A    In addition to that, I also relied upon my

3  training, experience, education, as well as consulting

4  with others in the industry.

5      Q    As you sit here today, you don't know whether

6  you were provided all of the e-mails between Origin and

7  Salt & Light that discuss the loan, do you?

8      A    I do not know.

9      Q    Did you ask for every single e-mail that's

10 been produced in this case that discussed the loan?

11     A    I don't believe I asked for that in this

12 matter.

13     Q    As you sit here today, you don't know if you

14 have been provided and reviewed all of the e-mails

15 between Salt & Light and ProPetro discussing the Origin

16 loan or the Origin notice letters, do you?

17     A    I'm sorry.  Could you ask that again?

18     Q    Yes, sir.  As you sit here today, you don't

19 know whether you have been provided and, therefore,

20 reviewed all of the e-mails between Salt & Light and

21 their customer, or prior customer, ProPetro, discussing

22 the Origin loan or the Origin notice letters, do you?

23     A    That would be correct.

24     Q    All right.  And did you ask for all of those

25 e-mail communications?

1    Q    Great.  Before the break, you told me that,

2  after sending a demand letter, it was your opinion that

3  a lender need to act on that demand letter promptly and

4  within a reasonable time.  Is that fair?

5    A    I believe that's an accurate representation of

6  what I said.

7    Q    Okay.  What authority or basis do you have for

8  that opinion?

9    A    That's largely based upon my training,

10  experience, and education as a lender.  If I continually

11  send default letters and never take any action, then the

12  borrower at that point realizes that I may never take

13  action.  And then it robs me of the opportunity to help

14  keep them in line.

15    Q    Is that opinion based on any Fed or FDIC or

16  OCC regulation?

17    A    Again, it's based on my training, education,

18  and experience.

19    Q    Is that a "no"?

20    A    It is a "yes" that it's based on my training,

21  education, and experience that --

22    Q    Is it -- sorry.  I didn't mean to cut you off.

23    A    It's okay.  My training, education, and

24  experience as a lender has been guided by the lenders'

25  regulators over the course of my career.  And as

1  training, I cannot point you to a specific citation at

2  this point that says a demand letter has to be acted

3  upon within X number of days.

4      Q    Is there authority or a regulation that you

5  can cite to me for determining what a reasonable time is

6  under that circumstance?

7      A    No.  I don't believe so.

8      Q    Okay.  Your report references a call with

9  Shawn Mudigere on June 14th, 2023.  Are you familiar

10  with the call to which I'm referring?

11      A    I recall speaking with Shawn, but I'm not sure

12  of the date without referring to the report.

13      Q    Okay.  Very quickly, if you would look at

14  footnote 29 to your report.  And I believe that's the

15  only place it's cited, unless I missed one.

16      A    It's also footnote 30.

17      Q    Ah.  Thank you.  Okay.  Does that refresh your

18  recollection about --

19      A    Yes.  Thank you.

20              [Reporter clarification.]

21      Q    (BY MR. ROBINSON)  Mr. Koontz, your report

22  references and relies upon a conversation that you had

23  with Shawn Mudigere on June 14th, 2023, as noted in

24  footnotes 29 and 30.  Do you see that?

25      A    Yes.

1  been reasonable to wait out a few more days to see what

2  happens and to allow, in Origin's opinion, someone to

3  take a loan -- a problem loan off their books.

4       Q     And you understand that Origin had been

5  waiting for five months since the loan had defaulted at

6  this point; right?

7       A     Yes, I do.

8       Q     Okay.  You agree with me that Origin had the

9  contractual right to send the letters when it did;

10  right?

11      A     They had the contractual right, yes.

12      Q     You agree that Origin sent the letters before

13  Mr. Mudigere signed the new lending documents?

14      A     I'm not sure when he signed the documents.

15      Q     Okay.  Where in your report do you cite any

16  authority or regulation for the opinion that Origin

17  sending the letters when a new line of credit was

18  allegedly close to the final closing stages renders

19  Origin's decision unreasonable?

20      A     I relied upon my training, education, and

21  experience, as well as my peers in the industry, to

22  provide that opinion.

23      Q     Did you rely on the text of any FDIC, OCC, or

24  Fed regulations for that opinion?

25      A     I did not.

```
 1                    Will you please turn to page 12 of your
 2  report.
 3        A     I'm there.
 4        Q     Starting on line 4, you have a section
 5  underlined:  "Why does this matter?"  And you list out
 6  four bullet points of what you refer to as a variety of
 7  possible negative consequences.  Is that a fair
 8  characterization?
 9        A     Yes.
10        Q     Okay.  I just want to make clear:  You're not
11  saying that these four things happened in this case; you
12  are just listing them as potential things that could
13  happen in the universe of possibilities.
14        A     That's correct.
15        Q     Okay.  And when you say, "SNLEE likely dealt
16  with, knowingly and unknowingly, a variety of possible
17  negative consequences," you're not saying that any of
18  these things actually happened, are you?
19        A     Well, it's my understanding that the whole
20  nature of this suit is that there was damage to business
21  relationships, but I have not been asked to give an
22  opinion on it.
23        Q     Okay.  And I just want to make sure that I
24  don't need to go through these four bullet points with
25  you because you're not sitting here today telling this
```

Jason D. Koontz Vol I
August 01, 2023

1  Amerisource loan documents that are Exhibit 5 to your

2  deposition on August 16th, 2021; right?

3      A    Well, I can't agree that Mr. Mudigere signed

4  documents with that date.  I'm not sure if he actually

5  signed them on that date.  Only he could say that.

6      Q    Okay.  Do you have any reason to believe he

7  signed them after the August 16th date that appears on

8  the documents?

9      A    I have no knowledge to know if he signed them

10 at any other time other than this date.

11     Q    Okay.  And we agree that the Gulf Coast UCC

12 termination was filed on August the 18th; right?

13     A    Yes.

14     Q    Okay.  Are you aware, sitting here today, of

15 any reason that the UCC -- the Gulf Coast UCC had to be

16 terminated before Mr. Mudigere could sign the

17 Amerisource documents?

18     A    No, I'm not.

19     Q    Okay.

20              Mr. Koontz, where in your report do you

21 define the standard for commercial reasonableness?

22     A    I don't believe I have a definition in the

23 report for that.

24     Q    Okay.  Where in your report do you define the

25 standard for commercial reasonableness as it relates to

1  sending notice letters to account debtors?

2      A    I don't believe I have that in the report.

3      Q    Where in your report do you define the

4  standard for commercial reasonableness as it relates to

5  the collection of secured collateral?

6      A    I don't believe I have a definition in the

7  report that states that.

8      Q    Would you please turn to page 4 of your report

9  for me, sir?

10          Oh, strike that.  The sentence starts on

11  page 3.  I apologize.  Turn to page 3 of your report,

12  please, sir.

13     A    I am there.

14     Q    All right.  Very last sentence, starting on

15  line 34:  "Because of my experience in commercial

16  lending and commercial debt collection, I was asked to

17  provide opinions regarding the bank's handling of

18  SNLEE's loan and if they were consistent with

19  commercial" -- excuse me -- "commercial debt collection

20  industry guidelines."  Did I read that correctly?

21     A    Yes.

22     Q    Okay.  Is there anywhere in your report where

23  you define or cite a written source for debt collection

24  industry guidelines?

25     A    I believe I relied upon my training,

Jason D. Koontz, Vol I
August 01, 2023

82

1    education, experience, as well as my peers, and did not

2    include a definition as you've asked.

3        Q    Okay.  You've opined in your report that, by

4    working with Salt & Light to allow them time to obtain a

5    new lender, Origin created a course of performance.  Is

6    that a fair characterization of your opinion?

7        A    It's fair.

8        Q    Okay.  And that by not foreclosing as soon as

9    it could, Origin created a course of performance.

10       A    They created a practice where the demand

11   letters were not a threat for Salt & Light to take any

12   immediate action.

13       Q    And your report states that that course of

14   performance created an expectation on the part of Salt &

15   Light.

16       A    Could you refer me to that citation?

17       Q    Yes.  There are two.  The first is on page 9,

18   line 22 and 23.  And the second -- well, let's just

19   stick with that one for right now.

20       A    Okay.  Page 9.

21       Q    Yes.  On line 23, you state, "The borrower

22   could argue that the lender had previously established a

23   different expectation through its consistent pattern of

24   inaction."  Did I read that correctly?

25       A    Yes.

Jason D. Koontz Vol. I
August 01, 2023
84

```
 1      A    Without providing a legal conclusion, I
 2 believe that Origin had the right to collect on accounts
 3 receivable, as the lien appears to be perfected.  My
 4 concern and my opinion surrounds the reasonableness of
 5 the time that they chose to do that, when they had
 6 another lender ready to take them out and make this go
 7 away.
 8      Q    (BY MR. ROBINSON)  Are you opining today that
 9 Mr. Mudigere or Salt & Light's subjective expectation,
10 whatever that was, has an effect on the commercial
11 reasonableness of Origin's actions?
12               MR. HAMPILOS:  Objection.  Legal
13 conclusion.
14               You can answer.
15      A    I'm offering an opinion that as of the date
16 the letters were sent was not commercially reasonable.
17      Q    (BY MR. ROBINSON)  Is that opinion based at
18 all upon whatever subjective expectation Salt & Light
19 had?
20      A    My opinion is based upon my training,
21 education, and experience, as well as feedback from my
22 peers in the industry.
23      Q    Okay.  Does Salt & Light's subjective
24 expectation, whatever it was, have any bearing on your
25 opinion today?
```

Jason D. Koontz Vol I
August 01, 2023

1 that.

2    Q    You're not opining that once a borrower has an

3 expectation that a lender is not going to act on its

4 demand letters, that the lender is then precluded from

5 ever doing so, are you?

6    A    I have not offered that opinion.

7    Q    Where in your report do you opine when Origin

8 could have sent the notice letters and it would have

9 been commercially reasonable to you?

10    A    Well, I have opinions on that.  I have not

11 placed them in the report.

12    Q    Okay.  If Origin Bank had sent the notice

13 letters on March 5th, the day after the loan matured,

14 would that have been commercially reasonable, in your

15 opinion?

16    A    If the loan was in default and they gave

17 proper notice, it would be appropriate for Origin to

18 collect at that time.

19    Q    Mr. Koontz, we -- it's 12:07 here in Texas, I

20 believe 1:07 in West Virginia, where you are.  I've

21 probably got -- I don't know -- maybe an hour or ninety

22 minutes left.  Do you want to take a short five- or

23 ten-minute break, or would you like to take forty-five

24 minutes for lunch?

25    A    I'm fine with a ten-minute break and pushing

1  on --

2      Q    Okay.

3      A    -- provided that your thirty -- or sixty to

4  ninety is really sixty to ninety.

5                MR. HAMPILOS:  We're going to hold you to

6  it, Brad.

7                MR. ROBINSON:  Yeah.  I was about to say

8  why -- don't put that in the transcript.  Why did I say

9  that?  We all know lawyers never hold to that.

10     Q    (BY MR. ROBINSON)  Let's assume I have two

11 hours left.  If I have two hours left, would you like

12 lunch or a short break?

13     A    A ten-minute break would be fine.

14                MR. ROBINSON:  All right.  Let's go off

15 for about ten minutes.

16                THE VIDEOGRAPHER:  All right.  We're off

17 at 12:05.

18                [Off record: 12:05 p.m. to 12:22 p.m.]

19                THE VIDEOGRAPHER:  We're back on at

20 12:22.

21     Q    (BY MR. ROBINSON)  All right.  Mr. Koontz,

22 we're back on the record.  Are you ready to go for a

23 little bit longer?

24     A    Yes.

25     Q    All right.  Okay.  So I just want to confirm,

1  it is your opinion that Origin sending the notice

2  letters when it did was not unreasonable because of any

3  established course of performance but solely because of

4  the timing vis-à-vis the completion of the new loan with

5  Amerisource.  Is that accurate?

6      A    Maybe the best way I can reply is to refer to

7  my opinion:  The bank's decision to send accounts

8  receivable collection letters dated August 5th was not a

9  reasonable industry practice for a commercial loan

10  collection at that time.

11      Q    Okay.  And the reason that your report cites

12  "at that time" is because it's referring to your belief

13  that Salt & Light was on the verge of closing a new loan

14  with Amerisource; fair?

15      A    It is my understanding, as of that time, loan

16  documents were in hand and they were expecting to close

17  a loan that would help to pay off Origin Bank.

18      Q    Okay.  You don't have an opinion that sending

19  the notice letters was commercially unreasonable because

20  of the course of performance of not acting on prior

21  demand letters; true?

22      A    I have not provided an opinion on that.

23      Q    Okay.  Let's take a look at -- I will upload a

24  document that is Exhibit 6 and represent to you that it

25  is a true and correct copy of the revolving credit and

1  not sure about that, but it could.

2       Q    (BY MR. ROBINSON)  Okay.  Can we agree that

3  there's nothing in the sentence that we just wrote that

4  requires an event of default as a prerequisite to Origin

5  sending notice letters to account debtors?

6       A    Regarding the sentence we just read, I do not

7  see any language tying this provision to a default.

8       Q    Okay.  Do me a favor and read all of

9  Section 5.1, if you would, please, and then let me know

10  when you've done so.

11       A    I've read 5.1.

12       Q    Do you see anything in 5.1 that requires an

13  event of default as a prerequisite to Origin sending

14  notice letters to account debtors?

15       A    I do not see default language in Section 5.1.

16       Q    Give me a minute.  I'm crossing some questions

17  off.  I know that won't bother you.

18       A    Time is running.

19       Q    You're not here -- well, strike that.

20            Your report does not provide any opinions

21  on whether Origin sending the notice letters when it did

22  caused ProPetro to terminate its relationship with

23  Salt & Light, does it?

24       A    At this time, I have not been asked to provide

25  an opinion regarding that.

1    to twelve individuals that are still -- most of them

2    still active in the industry that I speak with.  And so

3    on one day I might ask one of them two questions, and it

4    might be a week later that I ask another one a question

5    on another case.

6        Q    How many individuals did you poll in this

7    case?

8        A    I would estimate that I probably spoke to

9    five.

10       Q    Can you tell me all of their names, please?

11       A    First one would be Tommy Clay, who is a

12   board -- on the board of directors for Bank of Mingo.

13   Larry Starks, who was a former West Virginia banking

14   commissioner.  I did talk to one banker, an executive at

15   First Bank and Trust in Virginia, but he said he would

16   only agree to -- we're friends and he doesn't want to

17   get involved in my litigation.  It scares him.  So he

18   said, "I'll give you my opinion, but I'm -- you're not

19   allowed to release my name."  So that would be the third

20   one.  I talked to --

21       Q    Real quick -- I'm sorry, Mr. Koontz.  So then

22   are you refusing to provide his name today?

23       A    I'm not providing his name.  I'll continue on

24   with the other names that I recall.  David Williams is

25   someone that I regularly talk to about these matters.

1  He's a retired banker.  He worked at state and national

2  banks in West Virginia over the years, and it's likely I

3  talked to him about it.  And at the moment, another name

4  is escaping me.  If I think of it, I'll come back to

5  you.

6      Q     Okay.  And if I'm understanding you correctly,

7  you spoke with them about this as part of other

8  conversations you were having with them and did not

9  reach out to them solely to solicit their opinions about

10 this case.  Is that correct?

11     A     Yeah.  Typical -- I'm having a conversation

12 with someone, or maybe they've called to ask me a

13 question.  And it usually gets around to, "What are you

14 working on?  What are you doing?"  And not -- in every

15 report, I do not provide a poll.  But when I do, I make

16 a point.  And I might have called one of these.  I just

17 can't recall at the moment.  But my point is, without

18 giving specifics as to the parties or where it's

19 located, I just say, "Hey, have you had this situation?"

20          In this matter, I think my question was

21 along the lines of, "Hey, if you had somebody that you

22 were trying to get out of the bank, you were at the

23 1 yard line, someone else is willing to take you out,

24 would you give them a few extra days to see if the other

25 bank came through, or would you decide at that point to

Jason D. Koontz Vol. I
August 01, 2023

1  take actions that you were allowed to do?"

2              And the responses that I got were

3  generally around, "I think I would give it a few more

4  days to see how it plays out."

5      Q    Okay.

6      A    And that was consistent with the opinion I had

7  going in, but I like to do that as a way to just check

8  myself to make sure that I'm not providing an opinion

9  that's not consistent with the industry.

10     Q    Did you provide them any documents or anything

11 in writing summarizing the facts as you wanted them to

12 consider them?

13     A    I did not.

14     Q    Do you have any of their responses in writing,

15 either sent to you or as notes from your conversations

16 with them?

17     A    No.  These would all be oral conversations.

18     Q    Okay.  The summary of the facts that you just

19 gave in your answer a second ago -- is that true and

20 correct and complete to the best of your recollection as

21 to what you've told them to solicit their opinion?

22     A    It might have varied a little, but it would

23 have been based upon the facts of this matter.  And I

24 might -- I'm trying to think if I even got a question as

25 far as along the lines of how far were they past due or

1  was there a demand letter.  And so anything like that I

2  would have provided, so --

3              The goal was to get an honest answer

4  based upon the facts because I knew someday I'm probably

5  going to be sitting across from you and I want to check

6  myself to make sure what I'm saying is consistent.

7      Q    Is it fair that if I wanted to know exactly

8  what you told them, that it's not written down anywhere,

9  there's no way for you to verify exactly what facts you

10 said and how you said it?

11     A    It is not written down.  That's correct.

12     Q    Okay.  And because you didn't write it down,

13 you're unable to tell me today exactly and specifically

14 everything that they told you back; true?

15     A    That's true.

16     Q    Okay.

17             Let's turn briefly to your supplemental

18 opinion regarding Origin's claim for amounts that it is

19 still owed under the loan.  If the court determines that

20 the loan was not completely paid off in August of

21 2001 [sic], have you determined what amount you believe

22 Origin would still be owed under the loan?

23     A    At this time, I have not been asked to provide

24 an opinion on that.  So no, I cannot tell you today.

25     Q    Where does your report offer an opinion that

1     Q    Okay.  And are you aware of any industry

2 regulation or rule that creates a deadline by which, if

3 the bank hasn't recovered its loan balance by a certain

4 amount of time, you know, after the loan matured, that

5 the bank is never allowed to collect that loan balance?

6     A    I am not.

7     Q    All right.  Going back real quick.  With

8 respect to your opinion that Origin Bank sending the

9 notice letters when it did was commercially unreasonable

10 because of the proximity to when Salt & Light was trying

11 to secure its new loan, can you cite me any written

12 authority or regulation or secondary source that would

13 call that action "commercially unreasonable"?

14    A    When I develop that opinion, I'm relying upon

15 my training, education, experience, as well as

16 discussions with my peers in the industry.

17    Q    Yes, sir.  Can I conclude from that, then,

18 that you can't cite me to a specific regulation that

19 would determine that action to have been commercially

20 unreasonable?

21    A    Outside, again, of my training, education,

22 experience, and my peers, I do not have any other

23 information and did not include it in this report.

24            MR. ROBINSON:  Mr. Koontz, I believe

25 those are all my questions, sir.  I want to thank you

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF TEXAS
 2                      DALLAS DIVISION

 3  SALT AND LIGHT ENERGY        §
    EQUIPMENT, LLC,              §
 4                              §
    Plaintiff/Counter-Defendant,§
 5                              §  CIVIL ACTION NO.
    v.                          §  3:22-cv-00654-N
 6                              §
    ORIGIN BANCORP, INC., DBA   §
 7  ORIGIN BANK,                §
                               §
 8  Defendant/Counter-Plaintiff,§
                               §
 9  v.                          §
                               §
10  DENISE MUDIGERE and SHAWN   §
    MUDIGERE,                   §
11                              §
    Third-Party Defendants.     §

12

13                 REPORTER'S CERTIFICATION

14  REMOTE ORAL AND VIDEOTAPED DEPOSITION BY VIDEOCONFERENCE

15                   OF JASON D. KOONTZ

16                     VOLUME I OF I

17                     August 1, 2023

18      I, Candyce E. Fisher, RPR, hereby certify to the

19  following:

20      That the witness, Jason D. Koontz, was duly sworn

21  by me and that the transcript of the proceedings is a

22  true record of the testimony given by the witness;

23      That review by the witness of the deposition

24  transcript was requested;

25      That the deposition transcript was submitted on
```

1  _____, to Bennett Hampilos, attorney for

2  the witness, for examination, corrections (if any),

3  signature, and return to U.S. Legal Support, Inc. within

4  30 days, by _____;

5      That the amount of time used by each party at the

6  deposition is as follows:

7          Mr. Robinson - 2 hrs, 23 mins

8          Mr. Hampilos - 0 hrs, 5 mins

9      I further certify that I am neither counsel for,

10 related to, nor employed by any of the parties or

11 attorneys in the action in which this proceeding was

12 taken, and further that I am not financially or

13 otherwise interested in the outcome of the action.

14     Certified to by me this 3rd of August 2023.

15

16

17 _____

18         CANDYCE E. FISHER, RPR
           Firm Registration No. 122
19         U.S. LEGAL SUPPORT, INC.
           16825 Northchase Drive, Suite 900
20         Houston, Texas 77060
           Phone: (713) 653-7100

21

22

23

24

25

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF TEXAS
 2                      DALLAS DIVISION

 3   SALT AND LIGHT ENERGY            )
     EQUIPMENT, LLC,                  )
 4        Plaintiff/                  )
          Counter-Defendant,          )
 5                                    )
     VS.                              )
 6                                    )
     ORIGIN BANCORP, INC., DBA        )   CIVIL ACTION NO.
 7   ORIGIN BANK,                     )   3:22-cv-00654-N
          Defendant/                  )
 8        Counter-Plaintiff,          )
                                      )
 9   VS.                              )
                                      )
10   DENISE MUDIGERE and              )
     SHAWN MUDIGERE,                  )
11        Third-Party Defendants.     )

12

13      ----------------------------------------------

14     CONTAINS CONFIDENTIAL ATTORNEYS' EYES ONLY PORTIONS

15

16           ORAL AND VIDEOTAPED DEPOSITION OF

17        LISA MCCAULEY, INDIVIDUALLY AND AS THE

18              CORPORATE REPRESENTATIVE OF

19         SALT AND LIGHT ENERGY EQUIPMENT, LLC

20                   August 1, 2023

21                      VOLUME 1

22      ----------------------------------------------

23

24                      EXHIBIT
                          3
25
```

Lisa McCauley Vol. 1, Attorneys Eyes Only
August 01, 2023                                                    40

1    Q.   (By Mr. Sbaiti)  In -- in August of 2021, Salt

2    and Light entered into a factoring agreement with

3    Amerisource Funding; is that fair?

4    A.   I believe it was a factoring-like agreement,

5    but yes.

6    Q.   Quasi-factoring?

7    A.   Yes.

8    Q.   Looked like a loan, but had some features of

9    factoring?

10   A.   Yes.

11   Q.   And one of the features of factoring that it

12   had was that Salt and Light's customers had to pay

13   Amerisource directly for their AR; is that right?

14   A.   Yes.

15   Q.   Do you know what the AR was in August of 2021

16   that was due to Salt and Light by ProPetro?

17   A.   I do not.

18   Q.   Do you know whether all of that AR was paid in

19   full by ProPetro?

20   A.   Yes, it was.

21            MR. SBAITI:  I did not write these topics.

22   There are way too many.

23            MR. DENNIS:  You should -- I've seen

24   worse.

25   Q.   (By Mr. Sbaiti)  After ProPetro phased out the

Lisa McCauley Vol. I, Attorneys Eyes Only
August 01, 2023
59

1    explain that.

2              Ah, I see, because of what we talked about

3    earlier.  There had been some amounts owed that hadn't

4    been invoiced; is that the clarification?

5        A.   Yes.

6        Q.   So whatever -- whatever ProPetro had been

7    billed by Salt and Light as of August was paid in full

8    by ProPetro to Amerisource, correct?

9        A.   Correct.

10       Q.   Okay.  Going back to the March 2021 time frame,

11   is it Salt and Light's position that Origin Bank should

12   have foreclosed on the loan in March or April of 2021?

13       A.   No.

14       Q.   Had -- had Origin Bank foreclosed in March or

15   April of 2021, I think you testified already, Salt and

16   Light would not have been able to pay off all of Origin

17   Bank's amount -- the amount that -- that was owed,

18   correct?

19              MR. DENNIS:  Objection, calls for

20   speculation.

21       A.   We did not have the cash on hand.

22       Q.   (By Mr. Sbaiti)  Right.

23              So had Origin foreclosed and demanded full

24   payment right then and there, you wouldn't have been

25   able to meet that demand, correct?

1    Q.   All right.  Had Origin Bank sent the same

2  letter that it sent on August 5th, had it sent in March

3  or April of 2021, do you know of any evidence that would

4  suggest that ProPetro would have taken any actions

5  differently than what it did in August of 2021?

6    A.   I do not.

7    Q.   Okay.  The allegation in this case is that

8  because Origin Bank sent that letter and whatever

9  alleged follow-up discussions happened in August,

10  ProPetro decided to phase out Salt and Light.  Are you

11  aware of that?

12    A.   I am.

13    Q.   Okay.  Do you know of any evidence that had

14  Origin Bank sent that same letter in March or April of

15  2021 and had the same discussion but just had it in

16  March or April instead of August, that Salt and Light

17  would have taken any action differently in terms of

18  phasing out ProPet- -- excuse me -- ProPetro would have

19  taken any actions differently in terms of phasing out

20  Salt and Light?

21    A.   I don't know --

22        MR. DENNIS:  Objection, calls for

23  speculation, compound.

24        Go ahead.

25    A.   Yeah.  I -- I don't know what ProPetro would

Lisa McCauley Vol. 1, Attorneys' Eyes Only
August 01, 2023                                              65

```
 1   have done.
 2      Q.   (By Mr. Sbaiti)  Right.
 3           So my question is:  Do you know of any
 4   evidence that ProPetro would have taken any action any
 5   differently?
 6      A.   I do not.
 7      Q.   Okay.  I'd like to switch -- shift over to your
 8   damages calculations, if we could.
 9      A.   We sure can.  If I can get a copy, that would
10   be wonderful.
11      Q.   I'm going to hand you your designation, if
12   that's what you mean by "a copy."
13      A.   That's correct.
14      Q.   Here you go.
15           (Exhibit 9 was marked.)
16           MR. SBAITI:  Somewhere my pen is here.
17           9?
18           THE REPORTER:  Yes.
19           MR. SBAITI:  And let's go ahead and label
20   this 10.
21           (Exhibit 10 was marked.)
22           MR. SBAITI:  Jason.
23           This is 11.
24           MR. DENNIS:  Is this the spreadsheet you
25   were talking about?
```

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF TEXAS
 2                      DALLAS DIVISION

 3   SALT AND LIGHT ENERGY        )
     EQUIPMENT, LLC,              )
 4        Plaintiff/             )
          Counter-Defendant,      )
 5                                )
     VS.                          )
 6                                )
     ORIGIN BANCORP, INC., DBA    )  CIVIL ACTION NO.
 7   ORIGIN BANK,                 )  3:22-cv-00654-N
          Defendant/              )
 8        Counter-Plaintiff,      )
                                  )
 9   VS.                          )
                                  )
10   DENISE MUDIGERE and SHAWN    )
     MUDIGERE,                    )
11        Third-Party Defendants. )

12

13            REPORTER'S CERTIFICATION OF THE

14           ORAL AND VIDEOTAPED DEPOSITION OF

15        LISA MCCAULEY, INDIVIDUALLY AND AS THE

16               CORPORATE REPRESENTATIVE OF

17          SALT AND LIGHT ENERGY EQUIPMENT, LLC

18                     August 1, 2023

19            I, Jamie K. Israelow, a Certified Shorthand

20   Reporter duly commissioned and qualified in and for the

21   State of Texas, Registered Merit Reporter and Certified

22   Realtime Reporter, do hereby certify to the following:

23            That the witness, LISA MCCAULEY, INDIVIDUALLY

24   AND AS THE CORPORTE REPRESENTATIVE OF SALT AND LIGHT

25   ENERGY EQUIPMENT, LLC, was duly sworn by the officer and
```

1   that the transcript of the oral deposition is a true

2   record of the testimony given by the witness:

3          That the original transcript was delivered to

4   Mr. Mazin A. Sbaiti.

5          That a copy of the certificate was served on

6   all parties and/or the witness shown herein on

7   _____.

8          I further certify that pursuant to FRCP Rule

9   30(f)(1) that the signature of the deponent:

10         _X_ was requested by the deponent or a party

11  before the completion of the deposition and that

12  signature is to be before any notary public and returned

13  within 30 days from date of receipt of the transcript.

14  If returned, the attached Changes and Signature Page

15  contains any changes and the reasons therefor;

16         ____ was not requested by the deponent or a

17  party before the completion of the deposition.

18         I further certify that I am neither attorney

19  or counsel for, nor related to or employed by any of the

20  parties to the action in which this deposition is taken,

21  and further that I am not a relative or employee of any

22  attorney or counsel employed by the parties hereto, or

23  financially interested in the action.

24

25

1        That the amount of time used by each party at the

2    deposition is as follows:

             Mr. Edward Jason Dennis - 0:07
3            Mr. Mazin A. Sbaiti - 1:56

4        That pursuant to information given to the

5    deposition officer at the time said testimony was taken,

6    the following includes counsel for all parties of

7    record:

8            Mr. Edward Jason Dennis, Attorney for
     Plaintiff/Counter-Defendant and Third-Party Defendants
9    Salt and Light Energy Equipment, LLC and Denise Mudigere
     and Shawn Mudigere.
10           Mr. Mazin A. Sbaiti, Attorney for
     Defendant/Counter-Plaintiff Origin Bancorp, Inc., dba
11   Origin Bank.

12           CERTIFIED TO BY ME on this 3rd day of August,
     2023.
13

14                    _Jamie K. Israelow_

15                    _____
                      Jamie K. Israelow, CSR, RMR, CRR
16                    Texas CSR 3801
                      Expiration Date: 4/30/2025
17                    US LEGAL SUPPORT, INC.
                      Firm Registration No. 122
18                    16825 Northchase Drive, Suite 800
                      Houston, Texas  77060
19                    713.653.7100

20

21

22

23

24

25

# REVOLVING CREDIT AND SECURITY AGREEMENT

By and Between

## ORIGIN BANK

and

## SALT AND LIGHT ENERGY EQUIPMENT LLC

December 11, 2018

1

**EXHIBIT**

**4**

exhibitsticker.com

**APP_068**



**EXHIBIT**

4

Mudigere
4-10-2023

PENGAD 800-631-6989

ORIGIN 000008

## TABLE OF CONTENTS

**ARTICLE I  Bank's Agreement to Make Advances**....................................................................4

1.1 Borrowing Base ...................................................................................................................4
1.2 Evidence of Advance Not Causing Excess of Borrowing Base ........................................5
1.3 Borrower's Loan Account ...................................................................................................5
1.4 Exceeding Borrowing Base .................................................................................................5
1.5 Discretionary Advances ......................................................................................................5

**ARTICLE II  Borrower's Representations and Warranties; Certain Covenants**..................6

2.1 Organization, Licenses, Qualifications, Etc.......................................................................6
2.2 Power and Authority; Enforceability ..................................................................................6
2.3 Liens.....................................................................................................................................6
2.4 Payment of Taxes, Charges, Etc. ........................................................................................6
2.5 Restrictions on Transfer of Collateral.................................................................................7
2.6 Additional Representations Regarding Accounts ...............................................................7
2.7 Additional Representations Regarding Instruments, Chattel Paper, Etc. ..........................7
2.8 Location of Records.............................................................................................................8
2.9 Additional Representations Regarding Financial Statements.............................................8
2.10 Borrower's Names and Offices .........................................................................................8
2.11 Additional Representations Regarding Absence of Defaults Under Other
        Agreements .......................................................................................................................8
2.12 Indemnification..................................................................................................................8
2.13 Taxes, Charges and Expenses Incurred with Respect to Revolving Line.........................8
2.14 Patents, Copyrights, Trademarks and Licenses ...............................................................9
2.15 Judgments/Actions............................................................................................................9
2.16 Margin Stock.....................................................................................................................9
2.17 No Untrue Statements or Omissions.................................................................................9
2.18 Bankruptcy ........................................................................................................................9
2.19 Business Purposes.............................................................................................................9
2.20 OFAC Compliance............................................................................................................9

**ARTICLE III  Inspection of Records; Further Assurance** .....................................................11

**ARTICLE IV  Security Interest of Bank in Collateral** ..........................................................11

4.1 Collateral............................................................................................................................11
4.2 Security Interest in Collateral Created/Acquired Hereafter.............................................12
4.3 Further Assurances.............................................................................................................12
4.4 Additional Further Assurances ..........................................................................................12
4.5 Restrictions on Pledging, Mortgaging Collateral.............................................................12

**ARTICLE V  Collection of Accounts Receivable**....................................................................13

5.1 Collection and Application of Proceeds; Notifying Account Debtors..........................13
5.2 Collection of Accounts .....................................................................................................13

i

ORIGIN 000009

**ARTICLE VI  Additional Affirmative Covenants** ................................................................ 13

    6.1 Reporting Requirements ........................................................................ 14
    6.2 Insurance ................................................................................................ 15
    6.3 Compliance with Laws .......................................................................... 16
    6.4 Debt Service Coverage Ratio ................................................................ 16
    6.5 Maximum Leverage Ratio. .................................................................... 16
    6.6 Origination and Other Fees .................................................................. 16
    6.7 Unused Line Fee .................................................................................... 17
    6.8 Notification of Defaults, Suits, Etc. ...................................................... 17
    6.9 Deposit Account ..................................................................................... 17

**ARTICLE VII  Additional Negative Covenants** ................................................................... 17

    7.1 Liens ....................................................................................................... 17
    7.2 Borrowings; Permitted Indebtedness .................................................... 17
    7.3 Dividends; Bonuses ............................................................................... 17
    7.4 Capital Expenditures ............................................................................. 18
    7.5 Acquiring Assets, Etc. of Other Entities ............................................... 18
    7.6 Dissolution. Mergers, Change in Nature. .............................................. 18
    7.7 Subordinated Debt ................................................................................. 18
    7.10 Loans to Related Parties and Affiliates ............................................... 18

**ARTICLE VIII  Events of Default; Acceleration** ................................................................ 18

    8.1 Events of Default .................................................................................... 18
    8.2 No Abrogation ........................................................................................ 20

**ARTICLE IX  Power to sell or Collect Collateral** ................................................................ 20

**ARTICLE X  Set Off** ................................................................................................................ 21

**ARTICLE XI  Waivers** ............................................................................................................. 22

**ARTICLE XII  Expenses; Proceeds of Collateral** ............................................................... 22

**ARTICLE XIII  Duration; Extension** ................................................................................... 23

**ARTICLE XIV  General** ........................................................................................................... 23

**ARTICLE XV  Miscellaneous** ................................................................................................ 25

**ARTICLE XVI  Compliance With Laws; Usury** ................................................................. 26

ii

ORIGIN 000010

APP_070

Addendum A – Definitions
Exhibit A – Borrowing Base Report
Exhibit B – Compliance Certificate

iii

ORIGIN 000011

## REVOLVING CREDIT AND SECURITY AGREEMENT

This Revolving Credit and Security Agreement (as may be amended, this "Agreement") is executed and delivered this 11th day of December, 2018, by and between **SALT AND LIGHT ENERGY EQUIPMENT LLC**, a Texas limited liability company ("Borrower"), with its chief executive office and its principal place of business at 1910 Pacific Avenue, Suite 15300, Dallas, Texas 75201, and **ORIGIN BANK** ("Bank"), with its principal place of business, for purposes hereunder, at 3838 Oak Lawn Avenue, P-100, Dallas, Texas 75219.

A.    Borrower has applied to Bank for a revolving line of credit not to exceed an aggregate principal amount at any one time outstanding the sum of **THREE MILLION AND NO/100 DOLLARS ($3,000,000.00)** (as may be amended, the "Revolving Line") to be evidenced by a Revolving Promissory Note (as may be amended, the "Note") in such amount and to be secured by a security interest in all of the Collateral (as defined herein) on the terms hereinafter set forth.

B.    Bank is willing to extend the Revolving Line to Borrower up to an aggregate principal amount not in excess of the amount set forth above upon the security of the Collateral on the terms and subject to the conditions hereinafter set forth to refinance some of Borrower's existing indebtedness and to provide Borrower with ordinary working capital.

NOW THEREFORE, in consideration of the premises, the credit to be extended hereunder, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Bank and Borrower agree as follows:

Capitalized terms not otherwise defined herein shall have the meaning attributed to the

same in Addendum A hereto incorporated herein by reference as if fully set forth.

## ARTICLE I
### Bank's Agreement to Make Advances.

1.1    Borrowing Base. From the date hereof until December 11, 2019, (the "Maturity Date"), or such future date to which the Maturity Date of the Revolving Line may be extended (any such extension to be at Bank's sole discretion and evidenced by a writing executed by Bank), subject to the terms and conditions of this Agreement and Borrower's and all guarantors' (as applicable) performance of and compliance with each of the Loan Documents, and so long as no event of default (including, without limitation, the breach of any warranty or representation) hereunder or under any of the other Loan Documents shall have occurred, be continuing or would result, Bank agrees to extend to Borrower an open-end credit line (also referred to as the Revolving Line) on the basis of the following advance formula (such advance formula being hereinafter referred to as the "Borrowing Base"): Up to eighty percent (80%) of the outstanding value of Borrower's Eligible Accounts Receivable at any one time outstanding plus up to fifty percent (50%) of the Borrower's Eligible Inventory; provided, however, that in no event shall the aggregate sum of all principal advances made by Bank to Borrower at any one time outstanding hereunder exceed the sum of Three Million and No/100 Dollars ($3,000,000.00). Within such

4

ORIGIN 000012

**APP_072**

limits and subject to the terms of this Agreement, Borrower may borrow, repay without penalty or premium, and reborrow hereunder, from the date of this Agreement until the Maturity Date. It is expressly understood and agreed that Bank shall have no obligation to make an advance under the Revolving Line if the amount of such advance together with the amount outstanding under the Revolving Line exceeds or would exceed the lesser of (i) $3,000,000.00 or (ii) the Borrowing Base. If at any time Borrower is not entitled to any advances by the terms of this Agreement, Bank may, in its sole discretion, make requested advances; however, it is expressly acknowledged and agreed that, in such event, Bank shall have the right, in its sole discretion, to decline to make any requested advance and to require any payment required under the terms of the Agreement without prior notice to Borrower and the making of any such advances shall not be construed as a waiver of such right by Bank.

1.2     Evidence of Advance Not Causing Excess of Borrowing Base. If requested by Bank, prior to any request for an advance hereunder, Borrower shall submit to Bank such information and documents as Bank shall reasonably request to establish to Bank's satisfaction that, if approved, the requested advance will not cause the amount of funds outstanding to Borrower hereunder to exceed the lesser of (i) the Borrowing Base or (ii) $3,000,000.00. Bank shall have no obligation to make any advance for which Borrower is unable to establish such to Bank's satisfaction.

1.3     Borrower's Loan Account. All borrowings/advances under the Revolving Line shall be evidenced by the Note and by entering such borrowings/advances as debits to Borrower's Loan Account. Bank shall also record in Borrower's Loan Account all other charges, expenses and items properly chargeable to Borrower hereunder (which shall also be evidenced by the Note), all payments made by Borrower on account of indebtedness under the Revolving Line and other appropriate debits and credits. The debit balance of Borrower's Loan Account shall also be evidenced by the Note and shall reflect the amount of Borrower's indebtedness to Bank from time to time hereunder.

1.4     Exceeding Borrowing Base. If at any time the outstanding balance of Borrower's Loan Account exceeds the lesser of (i) the Borrowing Base, or (ii) $3,000,000.00, then Borrower shall not be entitled to any additional advances under the Revolving Line while such excess exists and shall immediately remit to Bank immediately available funds sufficient to eliminate such excess and, if Bank requests, deliver to Bank additional collateral of a value and character satisfactory to Bank. If the Borrowing Base Report (as defined in Section 6.1(a)) indicates that Borrower's Loan Account or advances made to Borrower hereunder exceeds the lesser of (i) the Borrowing Base or (ii) $3,000,000.00, then Borrower shall not be entitled to any additional advances under the Revolving Line while such excess exists and shall immediately remit to Bank (with the relevant Borrowing Base Report) immediately available funds in the amount sufficient to eliminate such excess.

1.5     Discretionary Advances. In the event that the availability of the Revolving Line hereunder expires by the terms of this Agreement, or by the terms of any agreement extending the Maturity Date of the Revolving Line, Bank may, in its sole discretion, make requested advances; however, it is expressly acknowledged and agreed that, in such event, Bank shall have the right, in its sole discretion, to decline to make any requested advance and may require payment in full of Borrower's Loan Account at any time without prior notice to Borrower and

5

ORIGIN 000013

the making of any such advances shall not be construed as a waiver of such right by Bank. Bank's right to demand reimbursement with interest under this Section shall be in addition to and cumulative of and not in lieu of any and all other rights and remedies available to Bank under the Loan Documents. Any such reimbursement obligation shall be evidenced by the Note, or, at Bank's option, by the Borrower's executing and delivering additional promissory notes to Bank in form and substance acceptable to Bank.

## ARTICLE II
### Borrower's Representations and Warranties; Certain Covenants.

To induce Bank to enter into this Agreement, Borrower represents, warrants, and covenants as follows:

2.1     Organization, Licenses, Qualifications, Etc.  Borrower (a) is a duly organized limited liability company, validly existing, and in good standing under the laws of the State of Texas; (b) has all necessary licenses and corporate power and authority to own its assets and conduct its business as now conducted or presently proposed to be conducted; (c) has no subsidiaries; and (d) is duly qualified and in good standing (and will remain so qualified and in good standing) in every jurisdiction in which it is or shall be doing business or in which the failure to so qualify and remain in good standing would or could have an adverse effect on its business or properties, the Collateral or Bank.

2.2     Power and Authority; Enforceability.  The execution, delivery and performance hereof are within Borrower's corporate powers, have been duly and validly authorized and are not in contravention of the law or the terms of Borrower's certificate of formation, operating agreement, or other governance document, or of any indenture, agreement, or undertaking or any law, regulation, or order to which Borrower is a party or by which it or any of its properties is or may be bound. Upon execution and delivery hereof, this Agreement will be a valid and binding obligation of Borrower enforceable in accordance with its terms. This Agreement, the Note, and all other Loan Documents executed by Borrower have been validly executed and delivered by Borrower and constitute legal, valid, and binding obligations of Borrower enforceable against Borrower in accordance with their respective terms, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium, or similar laws at the time in effect affecting the rights of creditors generally.

2.3     Liens.  Except for the Permitted Liens and the security interests granted to Bank hereby or by any of the other Loan Documents in favor of Bank, Borrower is and, as to Accounts Receivable, Inventory, and other Collateral arising or to be acquired after the date hereof, shall be the sole and exclusive owner of the Accounts, Inventory, and each and every other item of Collateral free from any lien, claim, charge, security interest, mortgage, secondary financing or encumbrance, and Borrower shall defend the Accounts, Inventory, each and every other item of Collateral, including all Proceeds and products thereof, against all claims and demands of all persons at any time claiming the same or any interest therein adverse to the interests of Bank.

2.4     Payment of Taxes, Charges, Etc.  Borrower will promptly pay all taxes or charges levied on or with respect to, and will at all times keep the Accounts, Inventory, and each and every other item of Collateral, free and clear of all liens, claims, charges, security interests,

ORIGIN 000014

mortgages, secondary financing and encumbrances whatsoever, other than the Permitted Liens and the security interests granted to Bank hereby or by any of the other Loan Documents. Borrower agrees to take all actions that Bank may request to establish and maintain a valid title and security interest in the Accounts, Inventory, and each and every other item of Collateral, free and clear of all other liens, claims, charges, security interests, mortgages, secondary financing and encumbrances whatsoever (other than the Permitted Liens), including, without limitation, the payment of any amounts, taxes, assessments, fees and/or charges necessary to perfect and note Bank's interest in the same. If such amounts, taxes, assessments, fees and/or charges remain unpaid after the date fixed for the payment of same, or if any lien, claim, charge, security interest, mortgage, secondary financing or encumbrance shall arise, or be claimed or asserted with respect to the Accounts or any other item of Collateral, Bank may, without notice to Borrower, pay such taxes, assessments, charges or claims, or take any and all other actions (including the payment of money) deemed desirable by Bank to remove any such lien, claim, charge, security interest, mortgage, secondary financing or encumbrance, and Borrower agrees that the amounts thereof, along with any amounts necessary to perfect and note Bank's interest in any Collateral, shall be charged to Borrower's Loan Account described herein and shall bear interest at the rate of interest borne by Borrower's obligations under the Note.

2.5     Restrictions on Transfer of Collateral.  Borrower will not (and will not allow or suffer any other person or entity to) sell, transfer, lease, convey or otherwise dispose of the Collateral, any portion thereof, or any interest therein (or any of the Proceeds thereof, including, without limitation, money, checks, money orders, drafts, notes, instruments, documents, chattel paper, Accounts, returns or repossessions), without Bank's prior written consent.

2.6     Additional Representations Regarding Accounts.  At the time any Account becomes subject to a security interest in favor of Bank, said Account shall be a good and valid Account representing an undisputed, bona fide indebtedness incurred by the Account Debtor named therein, for merchandise held subject to delivery instructions or theretofore shipped or delivered pursuant to a contract of sale; or for services theretofore performed by Borrower with or for said Account Debtor; there shall be no set-offs, counterclaims, or disputes against any such Account except as indicated in some written list, statement or invoice furnished to Bank with reference thereto; and Borrower shall be the lawful owner of all such Accounts and shall have good right to subject the same to a security interest in favor of Bank. No such Account shall be sold, assigned, or transferred to any person other than Bank or in any way encumbered except to Bank, and Borrower shall defend the same against the lawful claims and demands of all persons other than Bank. If any Account shall be in violation of (a) any one or more of the warranties expressed in this section or (b) any of the requirements to be an Eligible Account Receivable, it shall not be deemed an Eligible Account Receivable for purposes of this Agreement.

2.7     Additional Representations Regarding Instruments, Chattel Paper, Etc.  At the time Borrower pledges, sells, assigns or transfers to Bank any instrument, document of title, security, chattel paper or other property, or any interest therein, Borrower shall be the lawful owner thereof and shall have good right to pledge, sell, assign or transfer the same; none of such property shall have been pledged, sold, assigned, or transferred to any person other than Bank or in any way encumbered (except for the Permitted Liens), and Borrower shall defend the same against the lawful claims and demands of all persons other than Bank.

7

ORIGIN 000015

2.8   Location of Records. All records of Borrower pertaining to Accounts Receivable, Inventory, general intangibles, and contract rights have always been, are and shall continue to be kept at Borrower's chief executive office as noted on the first page of this Agreement.

2.9   Additional Representations Regarding Financial Statements. Subject to any limitations stated therein or in connection therewith, all balance sheets, earnings statements and other financial data which have been or may hereafter be furnished to Bank to induce it to enter into this Agreement, to extend credit from time to time hereunder, or otherwise furnished in connection herewith, do or shall fairly represent the financial condition of Borrower (or other persons or entities, as applicable) as of the dates and results of operations for the periods for which the same are furnished in accordance with generally accepted accounting principles consistently applied, and all other information, reports and other papers and data furnished to Bank shall be accurate, as of the relevant date, and correct in all material respects and complete insofar as completeness may be necessary to give Bank a true and accurate knowledge of the subject matter.

2.10   Borrower's Names and Offices. Borrower's name, chief executive office, and principal place of business are and always have been as set forth on the first page of this Agreement, except as otherwise disclosed in writing to Bank. Borrower will promptly advise Bank in writing sixty (60) days prior to any change in Borrower's name, place of organization, organizational identification number, chief executive office, or principal place of business.

2.11   Additional Representations Regarding Absence of Defaults Under Other Agreements. Borrower is not now and will not be in default under any agreement evidencing an obligation for the payment of money, performance of a service or delivery of goods, demand for performance under which, or acceleration of the maturity of which would render Borrower insolvent or unable to meet its other debts as they become due or conduct its business as usual.

2.12   Indemnification. In the event (a) any of Borrower's warranties or representations shall prove to be false or misleading; (b) any Account Debtor in judicial proceeding shall assert against Bank or any of its officers, employees, directors, managers or agents a claim or defense arising out of any transaction between the Account Debtor and Borrower; or (c) Borrower or any other person or entity shall assert against Bank or any of its officers, employees, directors, managers, or agents a claim or defense arising out of or relating to any of the Collateral, the Liabilities, or any of the Loan Documents, Borrower agrees to indemnify and hold Bank harmless from and against any liability, judgment, cost, attorneys' fees or other expense whatsoever arising therefrom.

2.13   Taxes, Charges and Expenses Incurred with Respect to Revolving Line. Borrower will pay any and all taxes (with the exception of taxes measured by income), charges and expenses of every kind or description paid or incurred by Bank under or with respect to the Revolving Line, the Loan Documents, any advances hereunder or any Collateral therefor or the collection of or realization upon the same. Borrower hereby authorizes Bank to debit such and all other taxes, charges and expenses provided for in this Agreement (including, without limitation, those taxes, charges and expenses for which Borrower is liable under Article XII) to Borrower's Loan Account.

8

ORIGIN 000016

2.14   Patents, Copyrights, Trademarks, and Licenses.   None of the Collateral is patented, copyrighted, copyrightable, licensed, or trademarked by Borrower or incorporates or is subject, in whole or part, to any copyright, license, patent, or trademark in favor of Borrower or any of its affiliates.   Prior to the time any Collateral is copyrighted, licensed, patented, or trademarked or incorporates or is subjected, in whole or in part, to any copyright, license, patent, or trademark, Borrower shall notify Bank and shall take (or cause to be taken) all actions necessary to preserve the perfection and priority of Bank's security interest in such Collateral.

2.15   Judgments/Actions.   There are no judgments, actions, suits, claims, proceedings, or investigations existing, outstanding, pending, or to the best of Borrower's knowledge after due inquiry, threatened or in prospect, before any court, agency or tribunal, or governmental authority against or involving Borrower or any guarantor which do or could materially affect the business, properties, prospects, financial condition, earnings, results of operations or earnings capacity of Borrower or any guarantor or which question the validity of the Revolving Line or any of the Loan Documents, or any action or instrument contemplated by any of them.

2.16   Margin Stock.   Borrower is not engaged in the business of extending credit for the purpose of purchasing or carrying "margin" stock within the meaning of Regulation U of the Board of Governors of the Federal Reserve System (12 C.F.R. Part 221), as amended from time to time ("Regulation U").   No part of the proceeds of any advance under the Revolving Line shall be used directly or indirectly for the purpose of purchasing, acquiring, carrying, financing or refinancing the purchase of any "margin stock" as defined in and contemplated by Regulation U or for any other purpose which would constitute "purpose credit" under Regulation U. Borrower is not an "investment company" or a company "controlled" by an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

2.17   No Untrue Statements or Omissions.   Neither this Agreement, nor any document, certificate, or statement furnished (or to be furnished) to Bank by or on behalf of Borrower pursuant to or in connection with this Agreement contains (or will contain) any untrue statement of a material fact or omits (or will omit) to state a material fact necessary to make the statements contained herein and therein not misleading.   There is no fact known to Borrower that materially and adversely affects, or will materially and adversely affect, the assets, business, operations, or condition of Borrower that has not been specifically set forth in this Agreement or otherwise disclosed by Borrower to Bank in writing.

2.18   Bankruptcy.   Borrower is and at all times shall remain solvent as defined under applicable Texas state law and the federal bankruptcy code and is not now and has not been in the past three (3) years a debtor under any title of the United States Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.*

2.19   Business Purposes.   The Revolving Line is being obtained and the Collateral is being used, held or acquired for business purposes.

2.20   OFAC Compliance.

a.      Borrower represents and warrants to Bank that Borrower, each of its respective shareholders and any wholly-owned party which owns any legal or beneficial

9

interest in Borrower, directly or indirectly, is not (and to Borrower's knowledge, no other Person (as defined below) holding any legal or beneficial interest whatsoever in Borrower, directly or indirectly, is) included in, owned by, Controlled by (as defined below), acting for or on behalf of, providing assistance, support, sponsorship, or services of any kind to, or otherwise associated with any of the Persons referred to or described in any list of persons, entities, and governments issued by the Office of Foreign Assets Control of the United States Department of the Treasury ("OFAC") pursuant to Executive Order 13224 – Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism, as amended ("Executive Order 13224"), or any similar list issued by OFAC or any other department or agency of the United States of America (collectively, the "OFAC Lists"). A "Person" means any natural person, corporation, partnership, limited liability company, firm, association, governmental authority or agency or any other public or private entity, whether acting in an individual, fiduciary or other capacity. "Controlled by" means the power to direct the management and policies of a Person, whether through the ability to exercise voting power, by contract or otherwise, including the customary powers of a managing member of any limited liability company or any general partner of any limited partnership or any board of directors of any corporation or trust conferred by applicable law.

b.     Borrower covenants and agrees that neither Borrower nor any of its respective shareholders or any wholly-owned party which owns any legal or beneficial interest in Borrower, directly or indirectly (and to Borrower's knowledge, no other Person holding any legal or beneficial interest whatsoever in Borrower, directly or indirectly), will be included in, owned by, Controlled by, act for or on behalf of, provide assistance, support, sponsorship, or services of any kind to, or otherwise associate with any of the Persons referred to or described in any list of persons, entities, and governments issued by OFAC pursuant to Executive Order 13224 or any other OFAC Lists.

c.     Borrower covenants and agrees that it will comply at all times with the requirements of Executive Order 13224; the International Emergency Economic Powers Act, 50 U.S.C. Sections 1701-06; the United and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Pub. L. 107-56; the Iraqi Sanctions Act, Pub. L. 101-513, 104 Stat. 2047-55; the United Nations Participation Act, 22 U.S.C. Section 287c; the Antiterrorism and Effective Death Penalty Act, (enacting 8 U.S.C. Section 219, 18 U.S.C. Section 2332d, and 18 U.S.C. Section 2339b); the International Security and Development Cooperation Act, 22 U.S.C. Section 2349 aa-9; the Terrorism Sanctions Regulations, 31 C.F.R. Part 595; the Terrorism List Governments Sanctions Regulations, 31 C.F.R. Part 596; and the Foreign Terrorist Organizations Sanctions Regulations, 31 C.F.R. Part 597 and any similar laws are regulation currently in force or hereafter enacted (collectively, the "Anti-Terrorism Regulations").

d.     Borrower covenants and agrees that if it becomes aware of or receives any notice that Borrower, or any shareholder of Borrower, or the Collateral, or any Person holding any legal or beneficial interest whatsoever (whether directly or indirectly) in Borrower, or any shareholder of Borrower, or the Collateral, is named on any of the

10

ORIGIN 000018

OFAC Lists (such occurrence, an "OFAC Violation"), Borrower will immediately (i) give notice to Bank of such OFAC Violation, and (ii) comply with all laws applicable to such OFAC Violation (regardless of whether the party included on any of the OFAC Lists is located within the jurisdiction of the United States of America), including, without limitation, the Anti-Terrorism Regulations, and Borrower hereby authorizes and consents to Bank's taking any and all steps Bank deems necessary, in its sole discretion, to comply with all laws applicable to any such OFAC Violation, including, without limitation, the requirements of the Anti-Terrorism Regulations (including the "freezing" and/or "blocking" of assets).

e.    Upon Bank's request from time to time during the term of the loan evidenced by the Note, Borrower agrees to deliver a certification confirming that the representations and warranties set forth in this Section 2.20 remain true and correct as of the date of such certificate and confirming Borrower's compliance with this Section 2.20.

## ARTICLE III
### Inspection of Records; Further Assurance.

Borrower shall at reasonable times and from time to time allow Bank, by or through any of its officers, managers, agents, employees, attorneys, or accountants to (i) examine, inspect and make extracts from Borrower's books and records; (ii) analyze Borrower's financial statements; (iii) arrange for verification of Borrower's Accounts Receivable, Eligible Accounts Receivable, Inventory, and Eligible Inventory under reasonable procedures, directly with Account Debtors, on-site inspections, or by other methods; and (iv) inspect, review, and audit Borrower's Collateral at any time during normal business hours, without prior notice to Borrower, including to conduct a field examination or audit of all Inventory no less frequently than annually. Borrower shall allow, do, make, execute, and deliver all such additional and further acts, things, deeds, assurances, agreements, and instruments which Bank may require more completely to vest in and assure to Bank its rights hereunder and in any Collateral and to assure that Borrower's Loan Account balance does not exceed Borrower's availability hereunder.

## ARTICLE IV
### Security Interest of Bank in Collateral.

4.1    Collateral. As security for the payment and performance of all Liabilities, Bank shall have and Borrower hereby assigns to Bank and grants to Bank a continuing lien on, security interest in and right of set-off against all of Borrower's Accounts and Accounts Receivable, Inventory, contract rights, investment property, chattel paper, electronic chattel paper and software, commercial tort claims, deposit accounts, letter of credit rights, health-care-insurance receivables, documents, documents of title, warehouse receipts, bills of lading, notes, notes receivable, instruments, general intangibles, payment intangibles, licenses, furnishings, fixtures, and equipment, and all substitutions, accessions, additions, parts, accessories, attachments, replacements, proceeds and products of, for and to any and all of the foregoing, including, without limitation, any and all insurance and tort proceeds, and any and all such substitutions, accessions, additions, parts, accessories, attachments, replacements, proceeds and products in the form of any of the property described in this section, whether now or hereafter owned, existing, created, arising or acquired.

11

ORIGIN 000019

4.2     Security Interest in Collateral Created/Acquired Hereafter.  No submission by Borrower to Bank of any schedule or other particular identification of Collateral shall be necessary to vest in Bank a security interest in each and every item of Collateral now existing or hereafter created or acquired, but rather, such security interest shall vest in Bank immediately upon the creation or acquisition of any item of Collateral, without the necessity for any other or further action by Borrower or Bank; provided, however, that Borrower shall execute such other and additional documents, instruments and agreements as requested by Bank to evidence the security interests contemplated hereby.

4.3     Further Assurances.  To the extent allowable under applicable law, the Uniform Commercial Code of Texas shall govern the security interests provided for herein.  In connection therewith, Borrower (at Borrower's expense) shall take such steps and execute, deliver, and file (as applicable) (or cause the execution, delivery, and filing (as applicable) of) such financing statements, continuation statements, agreements (including, without limitation, security agreements, and landlord, creditor, and mortgagee subordination agreements), documents, and papers (all in form and substance acceptable to Bank) as Bank may from time to time request to perfect or preserve the perfection and priority of Bank's security interests granted hereby or by any of the other Loan Documents.  Borrower hereby appoints and empowers Bank, or any employee of Bank which Bank may designate for the purpose, as its attorney-in-fact, to execute and/or endorse (and file, as appropriate) on its behalf any documents, agreements, papers, checks, financing statements, and other documents which, in Bank's sole judgment, are necessary to be executed, endorsed, and/or filed in order to (i) perfect or preserve the perfection and priority of Bank's security interests granted hereby or by any of the other Loan Documents and (ii) collect or realize upon the Collateral or otherwise exercise its rights and remedies under any of the Loan Documents or applicable law.  Without limiting any of Bank's rights and remedies under law or any other provisions of this Agreement or any of the other Loan Documents, Borrower authorizes the filing by Bank of any and all financing statements in any and all jurisdictions Bank deems necessary or appropriate to perfect Bank's security interest in the Collateral and/or any other property.

4.4     Additional Further Assurances.  If, by reason of location of Borrower, the Collateral or otherwise, the creation, validity, or perfection of security interests provided for herein are governed by law other than the Uniform Commercial Code of Texas, Borrower shall take such steps and execute and deliver such documents, agreements, papers and financing statements as Bank may from time to time request to comply with the Uniform Commercial Code of Texas, the Uniform Trust Receipts Act, the Factors Lien Act, or other laws of Texas or other states or jurisdictions.  Borrower hereby appoints and empowers Bank, or any employee of Bank which Bank may designate for the purpose, as its attorney-in-fact, to execute and/or endorse (and file, as appropriate) on its behalf any documents, agreements, papers, checks, financing statements, and other documents which, in Bank's sole judgment, are necessary to be executed, endorsed, and/or filed in order to (i) perfect or preserve the perfection and priority of Bank's security interests granted hereby or by any of the other Loan Documents and (ii) collect or realize upon the Collateral or otherwise exercise its rights and remedies under any of the Loan Documents or applicable law.

4.5     Restrictions on Pledging, Mortgaging Collateral.  Except for the Permitted Liens, Borrower shall not pledge, mortgage, or create or suffer to exist a security interest in any of the

12

ORIGIN 000020

Collateral or any Proceeds or products thereof, or sell, assign, or create a security interest in any of the Collateral or any Proceeds or products thereof in favor of any person other than Bank unless such security interest is expressly subordinated to Bank's security interest therein and Bank has approved in writing the existence and status of such security interest.

## ARTICLE V
### Collection of Accounts Receivable.

5.1    Collection and Application of Proceeds; Notifying Account Debtors. Until Bank requests that Account Debtors on Accounts Receivable of Borrower be notified of Bank's security interest therein, Borrower shall continue to collect such Accounts Receivable. Upon Bank's request, Borrower shall notify Bank of any collections received and shall hold the same in trust for Bank without commingling the same with other funds of Borrower and shall turn the same over to Bank immediately upon receipt in the identical form received. All Account payments and other Proceeds transmitted to Bank via any lock-box, by Borrower or otherwise, shall be handled and administered in and through a remittance or special account; the maintenance of any such account shall be solely for the convenience of Bank, and Borrower shall not have any right, title, or interest in or to any such account or in the amounts at any time appearing to the credit thereof. Bank may apply and credit Account payments and other Proceeds transmitted to or otherwise received by Bank via any lock-box, by Borrower or otherwise, against the outstanding balance in Borrower's Loan Account or any other Liabilities; however, Bank shall not be required to credit Borrower's Loan Account or any other Liabilities with the amount of any check or other instrument constituting provisional payment until Bank has received final payment thereof at its office in cash or solvent credits accepted by Bank. In addition, Borrower shall, at the request of Bank, notify the Account Debtors of the security interest of Bank in any Account and shall instruct Account Debtors to remit payments directly to Bank, and Bank may itself at any time so notify and instruct Account Debtors.

5.2    Collection of Accounts. Borrower (i) shall (a) deliver any instrument or chattel paper evidencing or constituting an Account to Bank, and (b) use its best efforts to collect its Accounts in a commercially reasonable manner; and (ii) agrees that no court action or other legal proceeding or garnishment, attachment, repossession of property, detinue, sequestration or any other attempt to repossess any merchandise covered by an Account shall be attempted by Borrower except by or under the direction of competent legal counsel. Borrower hereby agrees to indemnify and hold Bank harmless for any loss or liability of any kind or character which may be asserted against Bank by virtue of any suit filed, process issued, or any repossession or attempted repossession done or attempted by Borrower or by virtue of any other actions or endeavors which Borrower may make to collect any Accounts or repossess any such merchandise.

## ARTICLE VI
### Additional Affirmative Covenants

Until all indebtedness of Borrower to Bank has been paid in full and all Liabilities have been satisfied:

13

ORIGIN 000021

**APP_081**

6.1    Reporting Requirements. Borrower will deliver to Bank, so long as any of the Liabilities shall remain outstanding, the following:

a.    on or before the twentieth (20th) day following the end of each calendar month or more often as Bank shall request:

i.    Borrower's internally prepared monthly financial statements, including a balance sheet as of the close of such period, an income statement, an aging report of Accounts Receivable and accounts payable, and such other statements containing financial information which Bank reasonably may require (in form, preparation and substance acceptable to Bank) and attested to by an authorized officer of Borrower;

ii.    detailed reports in form acceptable to Bank of all Borrower's Accounts Receivable (including the aggregate balance of all Accounts) and accounts payable as of the last day of the subject calendar month (or such shorter applicable period), and the period of time which has elapsed with respect to such Accounts Receivable and accounts payable since the invoice date with respect thereto (together with Borrower's certification as to any counterclaims, offsets or contra-accounts with respect to any of Borrower's Accounts);

iii.    an Inventory report attested to by an authorized officer of Borrower;

iv.    a completed and executed Borrowing Base Report substantially in accordance with Exhibit A hereto (herein referred to as a "Borrowing Base Report");

v.    a completed and executed Compliance Certificate (so called herein) substantially in accordance with Exhibit B hereto if an outstanding balance exists under the Revolving Line during the subject calendar month (or if requested by Bank); provided that, each Compliance Certificate for March, June, September, and December shall also represent and warrant that Borrower is in compliance with the covenants contained in Sections 6.4 and 6.5 hereof and shall publish the accounting calculations used to determine compliance or noncompliance with such covenant, or, if any such event of default or defaults exists, specify the nature thereof; and

vi.    if requested by Bank, a copy of Borrower's sales journal or invoice register for the subject calendar month (or such shorter applicable period) and the dates, amounts and Account Debtors with respect to such billings;

14

ORIGIN 000022

b. On or before one hundred twenty (120) days following the close of each of Borrower's fiscal years:

i. Borrower's audited annual financial statements (in form, preparation and substance acceptable to Bank), including a balance sheet as of the close of such period, an income statement, a reconciliation of stockholders' equity, a statement of cash flows and an inventory valuation, all analyzed in accordance with generally accepted accounting principles and certified as being fairly stated in all material respects by an independent, certified public accounting firm reasonably satisfactory to Bank;

ii. each guarantor's annual financial statements (in form, preparation and substance acceptable to Bank); and

iii. a field audit prepared by a firm acceptable to Bank of the Inventory of Borrower;

c. On or before thirty (30) days following the filing thereof with the Internal Revenue Service, but in any event no later than October 15th of any given year hereunder, copies of Borrower's and each guarantor's annual tax returns (and all related schedules, forms and attachments);

d. Promptly upon reduction or diminution in the face value of any Account Receivable that would cause the outstanding principal balance under the Revolving Line to exceed the Borrowing Base, Borrower shall advise Bank thereof; and

e. Such other financial and related information when and as requested by Bank regarding Borrower, the Collateral, and any endorser, guarantor, or surety of any of the Liabilities of Borrower to Bank.

6.2 Insurance. Borrower shall (i) maintain insurance (written by insurance companies acceptable to Bank) in form, amount and substance acceptable to Bank, including, without limitation, extended multi-peril hazard, worker's compensation, general liability insurance and insurance upon Borrower's property, all facets of its businesses and all the Collateral; (ii) furnish to Bank, upon request, a statement of the insurance coverage; (iii) use its best efforts to protect and preserve the Collateral and shall obtain other or additional insurance promptly, upon request of Bank, to the extent that such insurance may be available; and (iv) cause Bank to be named as an additional insured and a lender loss payee as to all insurance covering Collateral, pursuant to endorsements in form and substance acceptable to Bank. All insurance proceeds, payments and other amounts paid to or received by Bank under or in connection with any and all such policies may be retained by Bank in whole or part as additional Collateral for the Liabilities and/or, at Bank's option, be applied in whole or part to the payment of such of the Liabilities as shall then be due and/or, at Bank's option, be held (in a remittance or other special account in which neither Borrower nor any guarantor shall have an interest) for application to Liabilities not yet due and be applied to such Liabilities as and when the same shall come due, in such order as Bank may determine in its sole discretion. All insurance policies shall provide for a minimum of

15

ORIGIN 000023

ten (10) days' written cancellation notice to Bank and, at Bank's request, all such policies shall be delivered to and held by Bank. In the event of failure to provide and maintain insurance required by this Agreement, Bank may, at its option, provide such insurance and charge the costs and expenses incurred to Borrower's Loan Account. Bank is hereby made attorney-in-fact for Borrower to (i) obtain, adjust, and settle, in its sole discretion, such insurance, and (ii) endorse any drafts or checks issued in connection with such insurance.

6.3    Compliance with Laws. Borrower does and shall at all times while any Liabilities remain unsatisfied comply with all applicable laws, ordinances, rules, and regulations of any governmental authority or entity governing or affecting Borrower, any of its property, the Collateral, or any part thereof, and shall immediately notify Bank of any and all actual, alleged or asserted violations of any such laws, ordinances, rules or regulations. Without limitation to the generality of the foregoing, Borrower shall comply, and cause to be complied, with all laws, governmental standards and regulations applicable to Borrower or any Collateral in respect of occupational health and safety, toxic and hazardous waste and substances, and environmental matters. Borrower promptly shall notify Bank of receipt of any notice of any actual, alleged or asserted violation of any such law, standard or regulation. Borrower hereby agrees to indemnify, defend and hold Bank harmless from all loss, cost, damage, claim and expense incurred by Bank on account of Borrower's breach of any representation, warranty or requirement of this Article, Borrower's failure to perform the obligations of this Article, and/or Borrower's or any Collateral's violating any applicable laws, ordinances, rules or regulations, including, without limitation, any environmental or occupational health and safety laws or regulations. This indemnification shall survive the closing of the Revolving Line, payment of the Revolving Line and the exercise of any right or remedy under any of the Loan Documents. Borrower represents that there are no pending claims or threats of claims by private or governmental or administrative authorities relating to environmental impairment, conditions, or regulatory requirements involving Borrower or any Collateral.

6.4    Debt Service Coverage Ratio. Borrower shall maintain a minimum Debt Service Coverage Ratio of 1.25 to 1.0, such covenant to be tested quarterly on a rolling 12-month basis commencing on March 31, 2019 in accordance with Bank's standard procedures therefore and in Bank's sole and absolute discretion. Borrower's Debt Service Coverage Ratio shall be defined as the quotient of (1) (a) the sum of (i) net income after taxes, plus (ii) interest expenses, plus (iii) non-cash charges, minus (b) dividends or distributions; (2) divided by (i) Current Maturities of Long Term Debt, plus (ii) interest expenses.

6.5    Maximum Leverage Ratio. Borrower shall maintain a maximum Total Debt to Tangible Net Worth Ratio of 2.0 to 1.0, such covenant to be tested quarterly on a rolling 12-month basis commencing on March 31, 2019 in accordance with Bank's standard procedures therefore and in Bank's sole and absolute discretion. Borrower's Total Debt to Tangible Net Worth Ratio shall be defined as the quotient of (a) Total Debt, divided by (b) the difference of (i) Net Worth, minus (ii) intangible assets.

6.6    Origination and Other Fees. In consideration of Bank's commitment to make advances on the Revolving Line and Bank's incurring certain administrative expenses, Borrower agrees to and shall pay to Bank an origination fee in the amount of $7,500.00 and any and all

16

ORIGIN 000024

fees imposed by Bank pursuant to the Loan Documents, if any, including, but not limited to the fees set forth in Article XII herein.

6.7     Unused Line Fee. Borrower shall also pay Bank an unused line fee quarterly in arrears commencing March 31, 2019, and on the last day of each June, September, December, and March thereafter (in respect of the prior three months or any portion thereof). The unused line fee shall be equal to one quarter of one percent (0.25%) of the average daily amount by which the maximum amount of aggregate advances available under the Revolving Line exceeds the aggregate principal amount of advances outstanding from time to time during such period. The unused line fee shall be computed on the basis of a year of three hundred sixty (360) days and assessed for the actual number of days elapsed.

6.8     Notification of Defaults, Suits, Etc. Promptly after the same shall have become known to Borrower, Borrower shall notify Bank in writing of (i) any default or event of default under any of the Loan Documents, (ii) any material change in Borrower's financial condition and/or prospects and/or (iii) any action, suit or proceeding at law or in equity or by or before any governmental instrumentality or other agency which, if adversely determined, might impair the ability of Borrower to perform its obligations under the Loan Documents, impair the ability of Borrower to carry on its business substantially as now conducted, or which might materially affect the business, operations, properties, assets or condition, financial or otherwise, of Borrower.

6.9     Deposit Account. Within ninety (90) days of the date of this Agreement and so long thereafter as any Liabilities are outstanding, Borrower shall establish and maintain its primary deposit accounts with Bank.

## ARTICLE VII
## Additional Negative Covenants

Until all indebtedness of Borrower to Bank has been paid in full and all Liabilities have been satisfied:

7.1     Liens. Borrower shall not create or permit the creation of any lien upon any of the Collateral except for Permitted Liens and the security interests granted to Bank under the Loan Documents.

7.2     Borrowings; Permitted Indebtedness. Without Bank's prior written consent, and only to the extent such borrowings and loans shall be fully subordinated hereto, Borrower will not incur, create, assume, or permit to exist any debt in excess of $100,000.00 for purchase money liens except for (a) borrowings under the Revolving Line, (b) accounts payable in the ordinary course of business, and (c) debt incurred to finance the purchase of equipment in the ordinary course of business. Except in favor of Bank, Borrower shall not guarantee, endorse, or assume, either directly or indirectly, any indebtedness of any other corporation, person, or entity.

7.3     Dividends; Bonuses. Borrower shall not pay, make, or declare any dividends, distributions, bonuses, or other similar payments to Borrower's managers, officers, employees, owners, members, affiliates, subsidiaries, or other related persons or entities. Borrower shall not

17

ORIGIN 000025

redeem, purchase, or in any manner acquire any of its outstanding shares without Bank's prior written consent.

7.4    Capital Expenditures.    Borrower shall not make in any fiscal year capital expenditures or contracts for capital expenditures together aggregating in excess of $250,000.00.

7.5    Acquiring Assets, etc. of Other Entities.    Borrower shall not purchase or acquire, directly or indirectly, any shares of stock, any substantial part of the assets of, any interest in, evidences of indebtedness, loans, or other securities of any person, corporation, or other entity.

7.6    Dissolution, Mergers, Change in Nature.    Borrower shall not (i) liquidate, discontinue, or materially reduce its normal operations with intention to liquidate; (ii) cause, allow or suffer to occur (a) the merger or consolidation of or involving Borrower with or into any corporation, partnership, or other entity, or (b) the sale, lease, transfer or other disposal of all or any substantial part of its assets, except for Inventory in the ordinary course of business, or any of its Accounts Receivable; (iii) acquire any corporation, partnership, or other entity (or any interest therein), whether by stock or asset purchase or acquisition or otherwise, without the prior written consent of Bank; (iv) enter into any lease which could be characterized as a capitalized lease; or (v) cause, allow, or suffer to occur any change in the ownership, nature, control, or corporate structure of Borrower without the prior written consent of Bank.

7.7    Subordinated Debt.    Borrower shall not make any payment (principal or interest) upon any Subordinated Debt unless otherwise permitted in such Creditor's subordination agreement consented to by Bank and in form and substance acceptable to Bank.

7.8    Loans to Related Parties and Affiliates.    Borrower shall not make, extend, or allow to remain outstanding any loans or advances to or investments in Borrower's affiliates, parent, subsidiaries, owners, directors, employees, members, officers, managers or other related persons or entities without the prior written consent of Bank.

## ARTICLE VIII
### Events of Default; Acceleration

8.1    Events of Default.    Any or all of the obligations, indebtedness, and liabilities of Borrower to Bank, including, without limitation, the Liabilities, shall be, at the option of Bank and notwithstanding any time or credit allowed by any of the Loan Documents or any other document, agreement, or instrument evidencing any of the Liabilities, immediately due and payable without notice or demand, and the obligation of Bank to make advances hereunder shall immediately cease and terminate upon and after the occurrence of any of the following events of default:

a.    default in the payment or performance, when due or payable, of any of the Liabilities of Borrower or any liability or obligation (whether now or hereafter existing, arising or incurred, direct or indirect, conditional or unconditional) of any endorser, guarantor, or surety for any of the Liabilities of Borrower to Bank which is not paid within five (5) days after the same is due and payable;

18

ORIGIN 000026

b.  failure by Borrower, any guarantor, or any other person or entity, as applicable, to (i) pay or perform any act or obligation imposed hereby or by any of the other Loan Documents, or (ii) comply with any of the terms, conditions, warranties, covenants, or requirements contained or referenced herein or in one or more of the other Loan Documents which is not paid within five (5) days after the same is due and payable;

c.  failure of Borrower or any other person or entity, as applicable, to pay when due (i) any tax or (ii) any premium on any (a) insurance policy assigned to Bank, or (b) any insurance covering any Collateral;

d.  if any warranty or representation contained herein shall prove false or misleading or if Borrower or any endorser, guarantor, or surety for any of the Liabilities of Borrower to Bank made or makes any other misrepresentation to Bank for the purpose of obtaining credit or any extension of credit;

e.  failure of Borrower or any endorser, guarantor, or surety for any of the Liabilities of Borrower to Bank to furnish financial information or to permit the inspection of the books or records or Collateral of Borrower or of any endorser, guarantor, or surety for any of the Liabilities of Borrower to Bank and continuance thereof after written notice from Bank for a period of thirty (30) consecutive days;

f.  issuance of an injunction or attachment against property of, the general assignment by, judgment against or filing of a petition in bankruptcy by or against Borrower or any endorser, guarantor, or surety for any of the Liabilities of Borrower to Bank; the filing of an application in any court for a receiver for Borrower or any endorser, guarantor, or surety for any of the Liabilities of Borrower to Bank; or the death, dissolution, incapacity, or liquidation of Borrower or of any endorser, guarantor, or surety for any of the Liabilities of Borrower to Bank;

g.  calling of a meeting of creditors, appointment of a committee of creditors or liquidation agents, or offering of a composition or extension to creditors by, for, or of Borrower or by, for, or of any endorser, guarantor, or surety for any of the Liabilities of Borrower to Bank;

h.  bankruptcy or Insolvency of Borrower or of any of Borrower's owners, or of any endorser, guarantor, or surety for any of the Liabilities of Borrower to Bank;

i.  any change in the ownership, nature, control, or structure of Borrower without the prior written consent of Bank;

j.  failure of Borrower or any other person or entity, as applicable, to maintain any insurance required hereunder and/or assigned or pledged to Bank in connection herewith;

k.  occurrence or continuation of any default or event of default, after any applicable notice and cure period, by or attributable to Borrower under or in connection with any mortgage, deed of trust, lease, security agreement, note, bond, indenture, loan agreement, or similar instrument or agreement to which Borrower is now or may

19

ORIGIN 000027

hereafter be a party or by which Borrower or any of its property (including, without limitation, the Collateral) is now or may hereafter be bound or affected;

l.    fraud or misrepresentation by or on behalf of Borrower or any guarantor in its transactions with Bank;

m.    such a change in the condition or affairs (financial or otherwise) of Borrower or of any endorser, guarantor, or surety for any of the Liabilities of Borrower to Bank or of the Collateral or any other source of repayment of or security for any of the Liabilities which, in the opinion of Bank, impairs Bank's security or increases its risk and continuance thereof after written notice from Bank for a period of thirty (30) consecutive days;

n.    any breach or violation of or failure to abide by any warranty, covenant, term, or provision of this Agreement, the Note, or any of the other Loan Documents and continuance thereof after written notice from Bank for a period of thirty (30) consecutive days;

o.    Bank's not obtaining or maintaining a first perfected security interest in any of the Collateral; or the termination, cancellation, or revocation of any of the Loan Documents without Bank's consent or the determination by Bank that any of the Loan Documents is void, voidable, or unenforceable;

p.    a judgment against Borrower remaining unpaid, unstayed, or undismissed for a period of more than twenty (20) days;

q.    Borrower discontinuing doing business for more than twenty (20) consecutive calendar days during any year for any reason; or

r.    any default or event of default under the Note or any of the other Loan Documents after any applicable notice and cure period.

8.2    No Abrogation.    It is expressly understood and agreed that neither (a) the provisions above or any of the other terms of any of the Loan Documents nor (b) Borrower's or any other person's compliance or non-compliance with this Agreement or any of the other Loan Documents shall abrogate or restrict Bank's right to demand payment in full of the Revolving Line and all other Liabilities at any time in Bank's sole discretion.

### ARTICLE IX
### Power to Sell or Collect Collateral

Upon the occurrence of any of the above events of default and at any time thereafter, Bank shall have, in addition to all other rights and remedies, the remedies of a secured party under the Uniform Commercial Code of Texas (regardless of whether the Uniform Commercial Code has been enacted in the jurisdiction where rights or remedies are asserted), including, without limitation, the right to take possession and dispose of the Collateral, and for that purpose Bank may, so far as Borrower can give authority therefor, enter upon any premises on which the Collateral may be situated and remove the same therefrom or take possession of same and/or

20

ORIGIN 000028

store the same on such premises for a reasonable time pending disposition under the terms of this Agreement or applicable law. Bank may require Borrower to assemble the Collateral and make it available to Bank at a place designated by Bank which is reasonably convenient to both parties. Unless the Collateral is perishable or is of a type customarily sold on a recognized market, Bank shall give to Borrower at least ten (10) days' prior written notice of the time and place of any public sale of Collateral or of the time after which any private sale or any other intended disposition is to be made. Bank may, at any time, in its discretion, transfer any securities or other property constituting Collateral into its own name or that of its nominee and receive the income therefrom and hold the same as security for the Liabilities or apply it on principal, interest, charges or expenses due on Liabilities in any manner deemed appropriate by Bank. Bank may demand, collect, receipt for, settle, compromise, adjust, sue for, foreclose or realize upon Collateral as Bank may determine, whether or not Liabilities or Collateral are then due, and Bank may receive, open and dispose of mail addressed to Borrower and sign and endorse notes, checks, drafts, money orders, certificates and documents of title and related forms or other evidences of payment, shipment or storage or any form of Collateral on behalf of and in the name of Borrower as Borrower's attorney-in-fact for such purpose. Bank may apply Collateral and the Proceeds from any Collateral against the Liabilities secured hereby in any manner deemed appropriate by Bank. The enumeration of the foregoing rights is not intended to be exhaustive, and the exercise of any right shall not preclude the exercise of any other rights, all of which shall be cumulative. As against the obligations secured hereby, Borrower hereby expressly waives all claims and all rights to claim any exemptions, both as to personal and real property, allowed or allowable under the Constitution or laws of the United States, the State of Texas or any other jurisdiction. Any notice to Borrower of sale, disposition or other intended action by Bank, required by law to be given to Borrower, sent to Borrower at the address of Borrower shown on the first page of this Agreement or at such other address of Borrower as may from time to time be shown on Bank's records, at least ten (10) days prior to such action, shall constitute reasonable notice to Borrower. Bank may resort to any security given by this Agreement or to any other security now existing or hereafter given to secure the payment of Borrower's Liabilities, in whole or in part, and in such portions and in such order as may seem best to Bank in its sole discretion, and any such action shall not in any way be considered as a waiver of any of the rights, benefits, or security interests evidenced by this Agreement or any of the other Loan Documents. Bank may, at all times, proceed directly against Borrower to enforce payment of Borrower's Liabilities and shall not be required first to enforce its rights in the Collateral or any other security granted to it. Bank shall not be required to take any action of any kind to preserve, collect, or protect Bank's or Borrower's rights in the Collateral or any other security granted to Bank.

## ARTICLE X
### Set Off

Bank and any participant and any holder of all or any part of the Liabilities are given hereby as additional security for all Liabilities a continuing lien and security interest in and upon any and all moneys, securities, and other property of Borrower and the Proceeds thereof, now or hereafter held or received by or in transit to Bank (or such participant or holder) from or for Borrower, whether for safekeeping, custody, pledge, transmission, collection, or otherwise, and also upon any and all deposit balances (general or special) and credits of Borrower with, and any and all claims of Borrower against Bank (or such participant or holder) at any time existing, and

21

ORIGIN 000029

upon the occurrence of an event of default hereunder. Bank (or such participant or holder) may apply or set off the same against the Liabilities secured hereby or by any of the other Loan Documents in any manner deemed appropriate by Bank (or such participant or holder). Borrower agrees that any other person or entity purchasing a participation from Bank may exercise all its rights of payment (including the right of set-off) with respect to such participation as fully as if such person or entity were the direct creditor of Borrower in the amount of such participation.

## ARTICLE XI
### Waivers

Borrower waives demand, presentment, protest, notice of protest, notice of intent to accelerate, notice of acceleration, notice of acceptance of this Agreement, and notice of advances and loans made, credit extended, Collateral received or delivered, or other action taken in reliance hereon and all other demands and notices of any description. With respect both to the Liabilities and Collateral, Borrower assents to any extension or postponement of the time of payment or any other indulgence, to any substitution, exchange, or release of any or all of the Collateral, to the addition or release of any party or person primarily or secondarily liable, to the acceptance of partial payments thereon and the settlement, compromising, or adjusting of any thereof, all in such manner and at such time or times as Bank may deem advisable. Bank shall have no duty as to the collection or protection of any or all of the Collateral or any income therefrom, nor as to the preservation of any rights against prior parties, nor as to the preservation of any rights pertaining thereto beyond the safe custody of Collateral in its possession. Bank may exercise its rights with respect to Collateral without resorting or regard to other Collateral or sources of reimbursement for the Liabilities. Bank shall not be deemed to have waived any of its rights upon or under any of the Liabilities or Collateral unless such waiver be in writing and signed by Bank. No course of dealing and no delay or omission on the part of Bank in exercising any right shall operate as a waiver of such right or any other right. A waiver on any one occasion shall not be construed as a bar to or waiver of any right on any future occasion. All rights and remedies of Bank with respect to Liabilities or Collateral, whether evidenced hereby, by any of the other Loan Documents or by any other instrument or paper, shall be cumulative and may be exercised singularly or concurrently. Bank reserves the right to assess and collect a fee in connection with any agreement by Bank to waive the violation of any covenant contained in the Loan Documents or to waive or forego its rights and remedies upon the occurrence of an event of default. This article shall not in any respect obligate Bank to waive the violation of any covenant or to forego its rights and remedies upon the occurrence of an event of default, which Bank may or may not do in its sole discretion.

## ARTICLE XII
### Expenses; Proceeds of Collateral

Irrespective of whether the proceeds of the Revolving Line are disbursed, Borrower shall pay all fees and expenses, including, without limitation, legal fees and expenses, filing fees, insurance premiums and expenses, appraisal fees, recording costs, and taxes (except taxes measured by Bank's income) incurred by Bank or Borrower from time to time in connection with the preparation and closing, filing, administration, amendment, and modification of the Revolving Line, this Agreement, the Note, the other Loan Documents, and those documents and

22

ORIGIN 000030

instruments associated with the perfection and creation of the security interests and other rights granted pursuant hereto or pursuant to any of the other Loan Documents and Bank's selling, negotiating, documenting, and/or enforcing participations in the Revolving Line and the Loan Documents. Borrower shall pay to Bank on demand any and all such fees and expenses incurred or paid by Bank, together with any and all fees, expenses and costs (a) of collection or (b) otherwise incurred or paid by Bank in protecting, enforcing, or realizing its rights upon or with respect to any of the Liabilities, the Loan Documents, or the Collateral (including, without limitation, reasonable counsel fees, including, without limitation, those incurred in connection with any appeal or any bankruptcy proceedings). After deducting all of said fees and expenses, the residue of any proceeds of collection or sale of Liabilities or Collateral shall be applied to the Liabilities and interest, charges, and expenses constituting or related to the Liabilities in such order of preference as Bank may determine, proper allowance for Liabilities not then due being made, and, to the extent allowed by law, without limiting any of Borrower's or any guarantor's obligations or any of Bank's rights under the Loan Documents, Borrower and guarantors shall remain liable for any deficiency.

## ARTICLE XIII
### Duration; Extension

The Revolving Line shall terminate on the Maturity Date, at which time all principal, interest, charges, and expenses outstanding hereunder, under the Note or under any of the other Loan Documents shall be due and payable in full unless due sooner under the terms of the Note, this Agreement, or any of the other Loan Documents. It is understood that any extension hereof may require a revision of certain provisions of this Agreement. No modification or amendment of this Agreement or extension of the Maturity Date shall be effective unless placed in writing and duly executed by Bank and Borrower. It is expressly agreed that this Agreement shall survive the maturity or termination of the Revolving Line in all respects necessary for Bank to exercise its rights and remedies hereunder and with respect to the Collateral. The maturity or termination of the Revolving Line shall in no way affect any transactions entered into or rights created or obligations incurred prior to such maturity or termination; rather, such rights and obligations shall be fully operative until the same are fully disposed of, concluded, and/or liquidated. Without limitation to the generality of the foregoing, such maturity or termination shall not release nor diminish any of (i) Borrower's obligations and agreements, or (ii) Bank's rights and remedies arising hereunder or in connection herewith until full and final payment and performance of all of the Liabilities. This Agreement shall be a continuing agreement in every respect.

## ARTICLE XIV
### General

Any demand upon or notice to Borrower that Bank may elect to give shall be effective (i) upon delivery if such notice is given personally, (ii) upon the day following the date of dispatch if sent by a nationally recognized overnight carrier; (iii) upon the third (3rd) day following the date of dispatch if deposited in the mails, certified with return receipt requested, addressed to Borrower at the address noted on the first page of this Agreement or, if Borrower has notified Bank in writing of a change of address, to Borrower's last address so notified, or (iv) upon receipt if sent by electronic mail, so long as such demand or notice is also sent in compliance

23

ORIGIN 000031

with (i), (ii), or (iii) above. Demands or notices addressed to Borrower's address at which Bank customarily communicates with Borrower shall also be effective. If at any time or times by assignment or otherwise Bank transfers any of the Liabilities (either separately or together with the Collateral therefor), such transfer shall carry with it Bank's powers and rights under this Agreement and the other Loan Documents with respect to the Liabilities and/or Collateral transferred, and the transferee shall become vested with said powers and rights whether or not they are specifically referred to in the transfer. If and to the extent Bank retains any of the Liabilities or Collateral, Bank will continue to have the rights and powers herein set forth with respect thereto. All notices provided to Bank by Borrower under or related to any of the Loan Documents, the Liabilities, or the Collateral, including, without limitation, under any one or more Sections of the Texas Uniform Commercial Code, shall be sent to the address of Bank noted on the first page of this Agreement; no notice sent to Bank shall be effective until received by Bank. THE NOTE, THIS AGREEMENT, AND ALL OF THE OTHER LOAN DOCUMENTS, AND ALL RIGHTS AND OBLIGATIONS HEREUNDER AND THEREUNDER, INCLUDING MATTERS OF CONSTRUCTION, VALIDITY, AND PERFORMANCE, SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF TEXAS, EXCEPT THAT ANY CONFLICT OF LAWS RULE OF SUCH JURISDICTION THAT WOULD REQUIRE REFERENCE TO THE LAWS OF SOME OTHER JURISDICTION SHALL BE DISREGARDED. ANY SUITS, CLAIMS, OR CAUSES OF ACTION ARISING DIRECTLY OR INDIRECTLY FROM THIS AGREEMENT, THE NOTE, THE OTHER LOAN DOCUMENTS, OR ANY OTHER AGREEMENTS OR INSTRUMENTS BETWEEN BANK AND BORROWER RELATING TO SUCH DOCUMENTS MAY BE BROUGHT IN A COURT OF APPROPRIATE JURISDICTION IN DALLAS COUNTY, TEXAS AND OBJECTIONS TO VENUE AND PERSONAL JURISDICTION IN SUCH FORUM ARE HEREBY EXPRESSLY WAIVED. THIS AGREEMENT HAS BEEN NEGOTIATED AND IS BEING EXECUTED AND DELIVERED IN THE STATE OF TEXAS. IT IS INTENDED, AND BORROWER AND BANK SPECIFICALLY AGREE, THAT THE LAWS OF THE STATE OF TEXAS GOVERNING INTEREST SHALL APPLY TO THIS TRANSACTION. BORROWER HEREBY ACKNOWLEDGES THAT (I) THE NEGOTIATION, EXECUTION, AND DELIVERY OF THE LOAN DOCUMENTS CONSTITUTE THE TRANSACTION OF BUSINESS WITHIN THE STATE OF TEXAS, (II) ANY CAUSE OF ACTION ARISING UNDER ANY OF SAID LOAN DOCUMENTS WILL BE A CAUSE OF ACTION ARISING FROM SUCH TRANSACTION OF BUSINESS, AND (III) BORROWER UNDERSTANDS, ANTICIPATES, AND FORESEES THAT ANY ACTION FOR ENFORCEMENT OF PAYMENT OF THE REVOLVING LINE OR THE LOAN DOCUMENTS MAY BE BROUGHT AGAINST IT IN THE STATE OF TEXAS. TO THE EXTENT ALLOWED BY LAW, BORROWER HEREBY SUBMITS TO JURISDICTION IN THE STATE OF TEXAS FOR ANY ACTION OR CAUSE OF ACTION ARISING OUT OF OR IN CONNECTION WITH THE REVOLVING LINE OR THE LOAN DOCUMENTS AND WAIVES ANY AND ALL RIGHTS UNDER THE LAWS OF ANY STATE OR JURISDICTION TO OBJECT TO JURISDICTION OR VENUE WITHIN DALLAS COUNTY, TEXAS; NOTWITHSTANDING THE FOREGOING, NOTHING CONTAINED IN THIS ARTICLE SHALL PREVENT BANK FROM BRINGING ANY ACTION OR EXERCISING ANY RIGHTS AGAINST BORROWER, ANY

24

ORIGIN 000032

GUARANTOR, ANY SECURITY FOR THE REVOLVING LINE, OR ANY OF BORROWER'S OR ANY GUARANTOR'S PROPERTIES IN ANY OTHER COUNTY, STATE, OR JURISDICTION. INITIATING SUCH ACTION OR PROCEEDING OR TAKING ANY SUCH ACTION IN ANY OTHER STATE OR JURISDICTION SHALL IN NO EVENT CONSTITUTE A WAIVER BY BANK OF ANY OF THE FOREGOING. Nothing contained herein, or in any of the documents contemplated hereby, shall be deemed to render Bank on the one hand, and Borrower on the other hand, partners or venturers for any purpose.

## ARTICLE XV
### Miscellaneous

In the event of actual conflict in the terms and provisions of this Agreement and any of the other Loan Documents or any other document, instrument or agreement executed in connection with this Agreement or described or referred to in this Agreement, the terms and provisions most favorable to Bank shall control. No modification, consent, amendment or waiver of any provision of this Agreement or any of the other Loan Documents, nor consent to any departure by Borrower therefrom, shall be effective unless the same shall be in writing and signed by Bank, and then shall be effective only in the specific instance and for the purpose for which given. This Agreement and each of the other Loan Documents are binding upon Borrower, its successors and assigns, and inure to the benefit of Bank, its successors and assigns. Borrower may not assign or delegate any of its rights or obligations under the Revolving Line, this Agreement, or any of the other Loan Documents. All representations and warranties of Borrower herein, and all covenants and agreements of Borrower herein, in the other Loan Documents, or in any other document delivered hereunder or in connection herewith, shall survive the execution of this Agreement and shall be deemed continuing representations, warranties, covenants, and agreements. This Agreement and each of the other Loan Documents shall be deemed to be drafted by all parties hereto and shall not be construed against any party hereto. In the event any one or more of the terms or provisions contained in this Agreement, in any of the other Loan Documents or in any other instrument or agreement referred to herein or executed in connection with or as security for the Liabilities, or any application thereof to any person or circumstances, shall be declared prohibited, illegal, invalid, or unenforceable to any extent in any jurisdiction, as determined by a court of competent jurisdiction, such term or provision, in that jurisdiction, shall be ineffective only to the extent of such prohibition, illegality, invalidity, or unenforceability, or as applied to such persons or circumstances, without invalidating or rendering unenforceable the remaining terms or provisions hereof or thereof or affecting the validity or enforceability of such term or provision in any other jurisdiction or as to other persons or circumstances in such jurisdiction, unless such would effect a substantial deviation from the general intent and purpose of the parties, make a significant change in the economic effect of the transactions contemplated herein on Bank, or impair the validity or perfection of Bank's security interest in any Collateral or the validity of any guaranty or other security for the Liabilities, in which event a substitute provision shall be supplied by the court in order to provide Bank with the benefits intended by such invalid term or provision. Borrower hereby expressly acknowledges and agrees that Bank may share with and disclose to any participant and any of Borrower's other creditors information regarding Borrower, the Liabilities, and the Collateral as and when Bank determines is necessary or convenient to establish and confirm to Bank's and any participant's and any other creditor's satisfaction

25

ORIGIN 000033

Bank's rights against Borrower and rights and priority in the Collateral. The table of contents hereto and the headings of the sections, paragraphs and subdivisions of this Agreement are for convenience of reference only, are not to be considered a part hereof, and shall not limit or otherwise affect any of the terms hereof.

## ARTICLE XVI
## Compliance With Laws; Usury

It is the intention of Bank and Borrower to conform strictly to any applicable usury laws. Accordingly, if the transactions contemplated hereby would be usurious under any applicable law, then, in that event, notwithstanding anything to the contrary in this Agreement, the other Loan Documents, or any other agreement entered into in connection with or as security for or guaranteeing the Revolving Line, it is agreed as follows: (i) the aggregate of all consideration which constitutes interest under applicable law that is contracted for, taken, reserved, charged, or received by Bank under or in connection with the Revolving Line shall under no circumstances exceed the Highest Lawful Rate (as defined below), and any excess shall be canceled automatically and, if theretofore paid, shall, at the option of Bank, be credited by Bank on the principal amount of any indebtedness owed to Bank by Borrower or refunded by Bank to Borrower, and (ii) in the event that the payment of the Revolving Line is accelerated or in the event of any required or permitted prepayment, then such consideration that constitutes interest under law applicable to Bank may never include more than the Highest Lawful Rate and excess interest, if any, to Bank provided for in this Agreement or the other Loan Documents or otherwise with respect to the Revolving Line shall be canceled automatically as of the date of such acceleration or prepayment and, if theretofore paid, shall, at the option of Bank, be credited by Bank on the principal amount of any indebtedness owed to Bank by Borrower or refunded by Bank to Borrower. "Highest Lawful Rate" means the maximum non-usurious interest rate that at any time or from time to time may be contracted for, taken, reserved, charged, or received on amounts due to Bank, under laws applicable to Bank with regard to the Revolving Line that are presently in effect or, to the extent allowed by law, under such applicable laws that allow a higher maximum non-usurious rate than applicable laws now allow.

[Signature page follows.]

26

ORIGIN 000034

IN WITNESS WHEREOF, the parties hereto have hereunder set their hands and seals on this 11th day of December, 2018.

**BORROWER:**

**SALT AND LIGHT ENERGY
EQUIPMENT LLC,**
a Texas limited liability company

Prashanth M. Mudigere, Manager

**BANK:**

**ORIGIN BANK**

Austin Lewis, Vice President

27

ORIGIN 000035

## ADDENDUM A

### DEFINITIONS

"Account" and "Account Receivable" shall mean and include all accounts, accounts receivable, notes, notes receivable, contracts, contract rights, retail installment sales contracts, drafts, documents, documents of title, warehouse receipts, bills of lading, title retention and lien instruments, security agreements, acceptances, instruments, conditional sales contracts, chattel mortgages, chattel paper, general intangibles, and other forms of obligation and rights to payment and receivables whether or not yet earned by performance, including, without limitation, state and federal tax refunds.

"Account Debtor" shall mean the party who is obligated on or under any Account Receivable.

"Borrower's Loan Account" shall mean the account on the books of Bank in which Bank will record loans and other advances made by Bank to or on behalf of Borrower pursuant to the Agreement, payments received on such loans and advances and other appropriate debits and credits as provided by the Agreement or any of the other Loan Documents.

"Collateral" shall mean any and all property in which Bank acquired, now has, by this Agreement or any of the other Loan Documents (as defined herein) acquires, or hereafter acquires a security interest or other rights or interests as security for the Liabilities (as defined herein) and without limiting the foregoing expressly includes the property described in Article IV of the Agreement.

"Eligible Account Receivable" shall mean an Account Receivable of Borrower in which Bank holds a first perfected security interest which meets each of the following requirements and is otherwise acceptable to Bank:

   a.   it arises from the sale or lease of goods or from services rendered, such goods have been shipped or delivered to the Account Debtor under such Account Receivable and such services have been fully performed and have been accepted by the Account Debtor, and Borrower's full right to payment for all sums due from such Account Debtor with respect to such Account Receivable shall have been earned and then be due and payable;

   b.   it is a valid and legally enforceable obligation of the Account Debtor thereunder according to its express terms, and is not subject to any offset, counterclaim, crossclaim, or other defense on the part of such Account Debtor denying liability thereunder in whole or in part;

   c.   it is not subject to any mortgage, lien, security interest, right of a surety under a performance bond or otherwise or similar adverse rights or interests whatsoever other than the security interests granted to Bank hereunder;

   d.   it is evidenced by an invoice, dated the date of shipment (in the case of goods sold or leased) or the date of performance (in the case of services rendered) and

28

ORIGIN 000036

having payment terms acceptable to Bank, rendered to such Account Debtor, and is not evidenced by an instrument, note, draft, title retention and lien instrument, security agreement, acceptance, conditional sales contract, chattel mortgage, or chattel paper and further, if requested by Bank, a copy of such invoice shall have been delivered to and received by Bank;

     e.    it is not owing by an Account Debtor whose obligations with respect to which Bank, acting in its discretion, shall have notified Borrower in writing are not deemed to constitute an Eligible Account Receivable;

     f.    it is not due from an affiliated or related corporation or entity, subsidiary corporation or entity, parent corporation or entity, or any owner, officer, manager, or employee of Borrower or of any such affiliated, related, subsidiary, or parent corporation or entity, or any individual who is a relative of any one or more of the foregoing by blood or marriage;

     g.    it does not constitute, require, or provide for progress billings, offsets, or deferred payments under a contract not fully performed, and it does not constitute a bonded receivable;

     h.    it does not constitute, in whole or in part, interest or finance charges on outstanding balances, any amount received as a down payment or prepayment or other principal reduction or similar payment, any chargebacks, or contra amounts or accounts;

     i.    it is an Account Receivable with respect to which no return, repossession, rejection, cancellation, or repudiation shall have occurred or have been threatened;

     j.    it is an Account Receivable with respect to which Borrower continues to be in full conformity with the representations, warranties, and covenants of Borrower made with respect thereto;

     k.    it is not subject to any sales terms, trial terms, sales-or-return terms, consignment terms, guaranteed sales or performance terms, minimum sales terms, C.O.D. terms, cash terms, or similar terms or conditions;

     l.    it is not owed by an Account Debtor that is not an individual residing in the United States (or Canada, upon approval from Bank) or a corporation or partnership organized and validly existing under the laws of a state within the United States (or Canada, upon approval from Bank) unless the payment of such Account is supported by a letter of credit or receivable insurance in form and substance and issued by an issuer acceptable to Bank;

     m.    it is not an Account Receivable subject, in whole or in part, to any "bill and hold" or similar arrangement pursuant to which the invoice is delivered prior to the actual delivery of the sold or leased goods or the performance of the services;

29

ORIGIN 000037

n.      it is not an Account Receivable with respect to which ninety (90) days or more shall have passed since the earlier of (i) the relevant invoice date, or (ii) the date that the obligation of the Account Debtor thereunder arose and became due and payable;

o.      it is not owed by any Account Debtor with respect to which ten percent (10%) or more of its total Accounts owing to Borrower remain unpaid after ninety (90) days from invoice or earlier due date;

p.      it is not an Account owed by an Account Debtor whose aggregate Account balance with Borrower exceeds twenty-five percent (25%) of the total value of Borrower's total Accounts, provided, however, that such Accounts shall be excluded from the definition of Eligible Account Receivable only to the extent to which Accounts exceed twenty-five percent (25%) of the Accounts of Borrower (less retainage);

q.      it is not an Account subject to any holdback or retainage requirements, provided, however, that such Accounts shall be excluded from the definition of Eligible Account Receivable only to the extent of the percentage of holdback or retainage required under the terms of the Account; further provided, however, in the event a final application for payment is submitted by Borrower to Account Debtor to collect the retentions owed and such Account Debtor approves the application for payment in writing, the percentage of retentions owed shall no longer be excluded herein; and

r.      it is not an Account owed by the United States Government or any other governmental body, agency, entity or authority.

"Eligible Inventory" shall mean ninety percent (90%) of Inventory, valued at the lower of cost or market value, which meets each of the following requirements on the date that such Inventory is included in the applicable Borrowing Base Report or Compliance Certificate:

a.      it (i) is subject to a first perfected security interest in favor of Bank and (ii) is not subject to any mortgage, lien, security interest, right of a surety under a performance bond or otherwise or similar adverse rights or interests whatsoever other than the security interests granted to Bank hereunder;

b.      it is in saleable condition;

c.      it is stored and held in locations owned by Borrower or, if such locations are not so owned, Bank is in possession of a subordination agreement or other similar waiver or acknowledgment agreements, pursuant to which the applicable lessor, warehouseman, processor or bailee provides satisfactory lien waivers and access rights to the Inventory;

d.      it is not Inventory produced in violation of the Fair Labor Standards Act and subject to the "hot goods" provisions contained in Title 29 U.S.C. §215;

e.      it is located in Texas;

30

ORIGIN 000038

f.      (i) it is not "in transit" to any Borrower except between Borrower's facilities and (ii) it is not held by Borrower on consignment;

g.      it is not subject to any agreement which would restrict Bank's ability to sell or otherwise dispose of such Inventory;

h.      it is not work-in-progress Inventory or custom or private labeled finished goods;

i.      Bank shall not have determined in its reasonable discretion that it is unacceptable due to age, type, category, quality, quantity, and/or any other reason whatsoever; and

j.      meets all of the foregoing requirements, regardless of whether such Inventory previously met all of the foregoing requirements.

"Insolvency" of Borrower or any other person or entity shall mean that there shall have occurred with respect to Borrower or such other person or entity one or more of the following events:   dissolution, termination of existence, liquidation, insolvency, business failure, appointment of a receiver of any part of the property of, assignment for the benefit of creditors by or against Borrower or such other person or entity, or institution of any action or proceeding with respect to Borrower or such other person or entity under or pursuant to any insolvency laws relating to the relief of debtors by or against Borrower or such other person or entity, institution of proceedings in bankruptcy or with respect to the readjustment of indebtedness, reorganization, composition or extension by or against Borrower or such other person or entity (including, without limitation, under or pursuant to the United States Bankruptcy Code, as amended, or under any similar law at any time enacted), or if any action shall be taken for the purpose of effecting any of the foregoing.

"Inventory" shall mean any inventory as defined under the Uniform Commercial Code of Texas.

"Liabilities" shall mean any and all obligations, indebtedness and liabilities of Borrower to Bank or any affiliate of Bank of every kind and description, whether direct or indirect, absolute or contingent, joint or several, due or to become due, liquidated or unliquidated, now existing or hereafter arising, and all extensions, modifications, renewals, and refinancings thereof, regardless of how such Liabilities arise or by what agreement or instrument (if any) they may be evidenced and include obligations to perform acts and refrain from taking actions as well as obligations to pay money.   Without limiting the foregoing, Liabilities shall specifically include all liabilities and obligations of Borrower hereunder and the obligation to repay the indebtedness evidenced by the Note. Without limiting the foregoing, Liabilities shall specifically include all liabilities and obligations of Borrower evidenced by or arising under or in connection with (a) this Agreement; and (b) the Note.

"Loan Documents" shall mean and include the Note, this Agreement, and any subordination agreements, and other agreements, documents and instruments now or hereafter evidencing, securing, guaranteeing or relating to the Revolving Line or any of the other Liabilities, obligations or indebtedness of Borrower to Bank, as the same may be amended.

31

ORIGIN 000039

"Net Worth" and "Current Maturities of Long Term Debt" shall be defined and calculated in accordance with generally accepted accounting principles consistently applied as of the date hereof.

"Permitted Liens" shall mean any of the following (but only to the extent the same do not or could not, in Bank's reasonable opinion, jeopardize Bank's rights or priority in or to any Collateral):

      (a)   liens of carriers, warehousemen, landlords, mechanics, laborers and materialmen arising by law for sums which are (i) not yet due or (ii) being diligently contested in good faith and with respect to which Borrower has set aside sufficient reserves with Bank;

      (b)   liens for taxes which are (i) not yet due or (ii) being diligently contested in good faith by appropriate proceedings and with respect to which Borrower has set aside sufficient reserves with Bank;.

      (c)   security interests in Borrower's equipment provided that they are limited to those securing a portion of the purchase price of said equipment; and

      (d)   pledges or deposits in connection with or to secure worker's compensation or unemployment insurance.

"Proceeds" shall mean all cash proceeds, non-cash proceeds and all forms of payment and other property received or due from the sale, lease, rental, transfer, disposition, licensing, collection, use or exchange of property constituting Collateral hereunder and any and all claims against any third party for loss of or damage to any Collateral, including insurance, contract and tort claims, and further, without limiting the generality of the foregoing, Proceeds shall include all Accounts, checks, cash, money orders, drafts, chattel paper, general intangibles, instruments, notes and other documents evidencing payment and payment obligations to Borrower for the sale, lease, rental, transfer, disposition, licensing, collection, use or exchange of Collateral.

"Subordinated Debt" shall mean all such debts, obligations, or indebtedness owing from Borrower to others which have been and remain subordinated to all Liabilities owing from Borrower to Bank pursuant to a creditor's subordination agreement(s) in form and substance acceptable to Bank, and including (i) the debt owed by Borrower to Wells Fargo Bank, N.A. which is secured by the security interest described in that certain UCC Financing Statement, Filing No. 18-0039775282, filed with the Texas Secretary of State on November 9, 2018 and (ii) the debt owed by Borrower to Mark Amador described in that certain Compromise and Settlement dated December 13, 2017 in compromise of Cause No. DC-C201800055 in the District Court of Johnson County, Texas, 249th Judicial District.

"Tangible Net Worth" shall mean Borrower's Net Worth less (i) any and all loans and other advances to and investments in Borrower's affiliates, subsidiaries, owners, parent, employees, officers, managers, directors or other related entities; (ii) notes, notes receivable, accounts, accounts receivable, intercompany receivables, and other amounts owing from Borrower's affiliates, subsidiaries, owners, parent, employees, officers, directors, managers or

32

ORIGIN 000040

other related entities; and (iii) any and all goodwill and other intangibles; plus Subordinated Debt.

"Total Debt" shall mean all of Borrower's indebtedness and liabilities owing to Bank or any other person or entity, whether now or hereafter existing, created or arising, direct or indirect, joint or several, including, without limitation, the Liabilities.

Any terms used to describe Bank's security interest under the Agreement not specifically defined in the Agreement shall have the meanings and definitions given those terms under the Uniform Commercial Code of Texas as may be amended.

33

ORIGIN 000041

**EXHIBIT A**

BORROWING BASE REPORT

[To Be Attached]

ORIGIN 000042

**APP_102**

## EXHIBIT B

### COMPLIANCE CERTIFICATE

Reference is made to that certain Revolving Credit and Security Agreement (the "Agreement") executed by **SALT AND LIGHT ENERGY EQUIPMENT LLC**, a Texas limited liability company ("Borrower") in favor of **ORIGIN BANK** ("Bank"), on December 11, 2018 (as amended, modified, renewed or extended from time to time). Capitalized terms used but not defined herein shall have the meaning attributed to the same in the Agreement. Borrower hereby represents, warrants, and covenants to and in favor of Bank as follows:

(1)    no default or event of default (or any event that would constitute an event of default but for the requirement that notice be given or time elapse or both) has occurred or is continuing under the Agreement or any of the other Loan Documents or under any other loans, notes, debentures, bonds, leases, or other obligations of Borrower now outstanding;

(2)    all representations, warranties, and covenants contained in the Agreement and the other Loan Documents are expressly reaffirmed and restated as of the date hereof;

(3)    neither Borrower nor, to the best of Borrower's knowledge, any other party has any matured or unmatured claim, offset, or cause of action against Bank or its officers, agents, or affiliates arising under or in connection with the Loan Documents or the Liabilities;

(4)    all financial statements, reports, and other documents delivered to Bank on or before the date hereof under or in connection with the Loan Documents are, as of the relevant date, complete and accurate and may be relied upon by Bank[.] [; and]

### [FOR MARCH, JUNE, SEPTEMBER, AND DECEMBER]

(5)    as of _____, 201__, the amounts and calculations attached hereto as Schedule 1 to this Compliance Certificate were true and correct; and

(6)    Pursuant to the calculations in Schedule 1, Borrower is [not] in compliance with the financial covenants contained in Sections 6.4 and 6.5 of the Agreement.

<div style="margin-left:50%">

**SALT AND LIGHT ENERGY EQUIPMENT LLC**,
a Texas limited liability company

</div>

Dated:_____          _____

35

ORIGIN 000043

Prashanth M. Mudigere, Manager

36

ORIGIN 000044

**APP_104**

## SCHEDULE 1

[see attached]

37

ORIGIN 000045

# REVOLVING PROMISSORY NOTE

$3,000,000.00                                                December 11, 2018

FOR VALUE RECEIVED, the undersigned, **SALT AND LIGHT ENERGY EQUIPMENT LLC**, a Texas limited liability company ("**Maker**"), promises to pay to the order of **ORIGIN BANK** ("**Payee**"), the principal sum of THREE MILLION AND NO/100 Dollars ($3,000,000.00), or so much thereof as shall be advanced, on demand, or if no demand is sooner made, at the maturity of this Revolving Promissory Note (this "**Note**"), with interest on the unpaid balance thereof from the date of this Note until maturity at the rate or rates specified below, both principal and interest payable as provided below in lawful money of the United States of America at the address of Payee set forth below or at such other place as from time to time may be designated by the holder of this Note.

<div align="center">

I.   <u>*Interest Rates and Payments*</u>

</div>

The unpaid principal of this Note from time to time outstanding shall bear interest prior to maturity at the rate of interest per annum equal to the highest prime rate (or base rate) reported in the Money Rates column or section of The Wall Street Journal (or another similar publication selected by the Bank, in the event the Wall Street Journal is no longer published) announced from time to time and automatically fluctuating upward and downward with each announcement without notice to Maker or any other person (the "**Prime Rate**"), **plus** one-quarter of one percent (0.25%) (the sum being, the "**Floating Rate**"), provided that in no event shall such interest rate be less than zero nor exceed the Maximum Rate (as hereinafter defined). If hereafter the Floating Rate shall increase, the rate of interest on the unpaid balance of principal of this Note prior to maturity shall be increased or decreased, as the case may be, from time to time as of the effective date of each change in the Prime Rate. All interest accruing under this Note shall be calculated on the basis of a 360-day year applied to the actual number of days elapsed.

Payee may disburse the principal of this Note to Maker in one or more Advances (herein so called) from time to time, pursuant to the terms of this Note and the Security Agreement (defined below). Maker shall be entitled to receive disbursements of Advances hereunder when Payee is delivered requests for advances by Maker in accordance with Payee's policies (as same may be established and may exist from time to time); provided, however, that at no time shall the total amount outstanding hereunder exceed the face value of this Note.

Maker shall be entitled, and in certain instances may be required, to prepay the principal of the Note from time to time. Maker may borrow, repay, and re-borrow up to the principal face amount of this Note. It is contemplated that by reason of prepayments hereon there may be times when no indebtedness is owing hereunder; but notwithstanding such occurrences, this Note shall remain valid and shall be in full force and effect subsequent to each such occurrence until the Maturity Date (as hereinafter defined).

Interest on the unpaid principal balance of this Note shall be due and payable on January 11, 2019, and continuing regularly and monthly thereafter on the same day of each month, until December 11, 2019, when all accrued and unpaid interest and all unpaid principal shall be due and payable in full (the "**Maturity Date**"). All payments received hereon shall be applied first to the payment of accrued interest on the unpaid principal, with the remainder, if any, applied to reduction of principal. Any payment received later than ten (10) days from the due date thereof must be accompanied by a late fee payment in the amount of five percent (5%) of the amount of such monthly payment.

The term "**Maximum Rate**", as used herein, shall mean, with respect to each holder hereof, the maximum nonusurious interest rate, if any, that at any time, or from time to time, may under applicable law be contracted for, taken, reserved, charged or received on the indebtedness evidenced by this Note

**REVOLVING PROMISSORY NOTE – Page 1**





ORIGIN 000002

APP_106

under the laws which are presently in effect of the United States and the State of Texas applicable to such holder and such indebtedness or, to the extent allowed by law under such applicable laws of the United States of America and State of Texas which may hereafter be in effect, which allow a higher maximum non-usurious interest rate than applicable laws now allow; provided, that in determining the Maximum Rate, due regard shall be given, to the extent required by applicable law, to any and all relevant payments, fees, charges, deposits, balances, agreements and calculations which may constitute or be deemed to constitute interest, or be deducted from principal to calculate the interest rate or otherwise affect interest rate determinations, so that in no event shall the Payee contract for, charge, receive, take, collect, reserve or apply, on the Note, any amount in excess of the maximum non-usurious rate of interest permitted by applicable law. To the extent that Texas law determines the Maximum Rate, the Maximum Rate shall be determined by utilizing the "indicated rate ceiling" from time to time in effect pursuant to the Texas Finance Code (V.T.C.A. Finance Code Section 303.001 *et seq.*) (the "**Texas Finance Code**") or such successor statute, as then in effect, governing usury. The Maximum Rate shall not be limited to the applicable rate ceiling in the Texas Finance Code or such successor statute if Federal laws or other state laws now or hereafter in effect and applicable to this Note (and the interest contracted for, charged and collected hereunder) shall permit a higher rate of interest.

All principal and interest which is past due under this Note shall bear interest at the Maximum Rate for which the undersigned may legally contract under applicable law, or, if no such rate is designated under applicable law, at the rate of eighteen percent (18%) per annum.

Maker shall have the right to prepay, without penalty, at any time and from time to time prior to maturity, all or any part of the unpaid principal balance of this Note and all or any part of the unpaid interest accrued to the date of such prepayment, provided that such prepayment is made on a regularly scheduled payment date, and any such principal thus paid is accompanied by accrued interest on such principal. Any partial prepayments of principal shall be applied to installments thereof in the inverse order of maturity.

## II.    *Security*

This Note is secured by a Revolving Credit and Security Agreement (the "**Security Agreement**"), entered into by Maker, Payee and the guarantors of the Note, of even date herewith, to which Security Agreement reference is made for a description of the property covered thereby and the nature and extent of the rights and powers of the holder of this Note in respect of such property.

## III.    *Right to Accelerate Upon Default*

The holder of this Note shall have the option of declaring the principal balance hereof and the interest accrued hereon to be immediately due and payable upon the failure of Maker to pay any installment of the principal of or interest on this Note as above promised or upon the occurrence of a default specified in this Note, the Security Agreement, or in any other document securing or evidencing the obligations established by this Note (collectively, the "Loan Documents"). Maker hereby agrees that the occurrence of an event of default under any Loan Document shall constitute an "Event of Default" under this Note, and (ii) the occurrence of an Event of Default under this Note shall constitute an event of default under the Security Agreement, and Payee shall thereafter have all rights and remedies following the occurrence of an event of default under the Security Agreement.

## IV.    *Waiver of Conditions and Defenses to Liability*

Maker and any other party who is or becomes liable to pay all or any part of this Note, or who grants any lien or security interest to secure all or any part of this Note (each called an "**other liable**

**REVOLVING PROMISSORY NOTE – Page 2**

ORIGIN 000003

party" below), including but not limited to any drawer, acceptor, endorser, guarantor, surety, or accommodation party, severally waive presentment for payment, demand, notice of demand and of dishonor and nonpayment of this Note, notice of intention to accelerate the maturity of this Note, protest and notice of protest, diligence in collecting, and the bringing of suit against any other party.

Further, Maker and any other liable party severally waive any notice of or defense based upon any agreement or consent of the holder of this Note made or given from time to time, before or after maturity, to any of the following: the acceleration, renewal, or extension of this Note; a change in the time or manner of payments required by this Note; a change in the rates of interest specified in this Note; acceptance or surrender of security; a substitution of security or subordination, amendment, or release of security; an addition or release of any other liable party; changes of any sort whatsoever in the terms of payment of this Note or in the manner of doing business with Maker; and any settlement or compromise with Maker or any other liable party on such terms as the holder of this Note may deem appropriate in its sole and absolute discretion.

The holder of this Note may apply all moneys received from Maker or others, or from any security (whether held under a security instrument or not), in such manner upon the indebtedness evidenced or secured by any Loan Documents (whether then due or not) as such holder may determine to be in its best interest, without in any way being required to marshal assets or to apply all or any part of such moneys upon any particular part of such indebtedness. The holder of this Note is not required to retain, hold, protect, exercise due care with respect to, perfect security interests in or otherwise assure or safeguard any security for this Note, and no failure by the holder of this Note to do any of the foregoing and no exercise or failure to exercise by such holder of any other right or remedy shall in any way affect any of Maker's or any other liable party's obligations hereunder or under other Loan Documents or affect any security or give Maker or any other liable party any recourse against the holder of this Note.

## V.    _Usury Savings Provision_

It is the intent of Maker and Payee in the execution of this Note and all other Loan Documents to contract in strict compliance with applicable usury law. In furtherance thereof, Maker and Payee stipulate and agree that none of the terms and provisions contained in this Note, or in any other instrument executed in connection herewith, shall ever be construed to create a contract to pay for the use, forbearance or detention of money, interest at a rate in excess of the Maximum Rate. Neither Maker nor any guarantors, endorsers or other parties now or hereafter becoming liable for payment of this Note shall ever be obligated or required to pay interest on this Note at a rate in excess of the Maximum Rate, and the provisions of this paragraph shall control over all other provisions of this Note and any other Loan Documents now or hereafter executed which may be in apparent conflict herewith. Payee expressly disavows any intention to charge or collect excessive unearned interest or finance charges in the event the maturity of this Note is accelerated. If the maturity of this Note shall be accelerated for any reason or if the principal of this Note is paid prior to the end of the term of this Note, and as a result thereof the interest received for the actual period of existence of the loan evidenced by this Note exceeds the applicable maximum lawful rate, the holder of this Note shall credit the amount of such excess against the principal balance of this Note then outstanding and thereby shall render inapplicable any and all penalties of any kind provided by applicable law as a result of such excess interest; provided, however, that if the principal hereof has been paid in full, such excess shall be refunded to Maker. If the holder of this Note shall receive money (or anything else) which is determined to constitute interest and which would increase the effective interest rate on this Note or the other indebtedness secured by the Loan Documents to a rate in excess of that permitted by applicable law, the amount determined to constitute interest in excess of the lawful rate shall be credited against the principal balance of this Note then outstanding or, if the principal balance has been paid in full, refunded to Maker, in which event any and all penalties of any kind under applicable law as a result of such excess interest shall be inapplicable. If the holder of this

**REVOLVING PROMISSORY NOTE – Page 3**

ORIGIN 000004

Note shall not actually receive, but shall contract for, request or demand, a payment of money (or anything else) which is determined to constitute interest and which would increase the effective interest rate contracted for or charged on this Note or the other indebtedness evidenced or secured by the Loan Documents to a rate in excess of that permitted by applicable law, the holder of this Note shall be entitled, following such determination, to waive or rescind the contractual claim, request or demand for the amount determined to constitute interest in excess of the lawful rate, in which event any and all penalties of any kind under applicable law as a result of such excess interest shall be inapplicable. By execution of this Note Maker acknowledges that Maker believes the loan evidenced by this Note to be non-usurious and agrees that if, at any time, Maker should have reason to believe that such loan is in fact usurious, Maker will give the holder of this Note notice of such condition and Maker agrees that the holder shall have sixty (60) days in which to make appropriate refund or other adjustment in order to correct such condition if in fact such exists. Additionally, if, from any circumstance whatsoever, fulfillment of any provision hereof or of the Security Agreement or any other Loan Documents shall, at the time fulfillment of such provision be due, involve transcending the Maximum Rate then, *ipso facto*, the obligation to be fulfilled shall be reduced to the Maximum Rate. The term "**applicable law**" as used in this Note shall mean the laws of the State of Texas or the laws of the United States, whichever laws allow the greater rate of interest, as such laws now exist or may be changed or amended or come into effect in the future.

VI.    *Miscellaneous*

Should the indebtedness represented by this Note or any part thereof be collected at law or in equity or through any bankruptcy, receivership, probate, or other court proceedings or if this Note is placed in the hands of attorneys for collection after default, Maker and all endorsers, guarantors, and sureties of this Note jointly and severally agree to pay to the holder of this Note in addition to the principal and interest due and payable hereon all the costs and expenses of the holder in enforcing this Note including, without limitation, reasonable attorneys' fees and legal expenses.

This Note and the rights, duties, and liabilities of the parties hereunder or arising from or relating in any way to the indebtedness evidenced by this Note or the transaction of which such indebtedness is a part shall be governed by and construed in accordance with the law of the State of Texas and the law of the United States applicable to transactions within such State.

No amendment of this Note shall be binding unless expressed in a writing executed by Maker and the holder of this Note.

**MAKER IRREVOCABLY SUBMITS TO THE NON-EXCLUSIVE JURISDICTION OF ANY TEXAS OR FEDERAL COURT SITTING IN DALLAS COUNTY, TEXAS OVER ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO ANY OF THE LOAN DOCUMENTS, AND MAKER HEREBY AGREES AND CONSENTS THAT, IN ADDITION TO ANY METHODS OF SERVICE OF PROCESS PROVIDED FOR UNDER APPLICABLE LAW, ALL SERVICE OF PROCESS IN ANY SUCH SUIT, ACTION OR PROCEEDING IN ANY TEXAS OR FEDERAL COURT SITTING IN DALLAS COUNTY, TEXAS MAY BE MADE BY CERTIFIED OR REGISTERED MAIL, RETURN RECEIPT REQUESTED, DIRECTED TO MAKER AT THE ADDRESS INDICATED BELOW, AND SERVICE SO MADE SHALL BE COMPLETE FIVE DAYS AFTER THE SAME SHALL HAVE BEEN SO MAILED.**

**THIS WRITTEN LOAN AGREEMENT (AS DEFINED BY SECTION 26.02 OF THE TEXAS BUSINESS AND COMMERCE CODE) REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY**

**REVOLVING PROMISSORY NOTE – Page 4**

ORIGIN 000005

EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

[Signature page follows.]

REVOLVING PROMISSORY NOTE – Page 5

ORIGIN 000006

**APP_110**

**Maker's Address:**

1910 Pacific Avenue, Ste. 15300
Dallas, Texas 75201

**MAKER:**

**SALT AND LIGHT ENERGY
EQUIPMENT LLC,**
a Texas limited liability company

_____
Prashanth M. Mudigere, Manager

**Payee's Address:**

**ORIGIN BANK**
3838 Oak Lawn Avenue, P-100
Dallas, Texas 75019
Attn: Austin Lewis

**REVOLVING PROMISSORY NOTE – Page 6**

ORIGIN 000007